No. 2014-1496

# In the United States Court of Appeals
### for the
# Federal Circuit

## EON CORP. IP HOLDINGS LLC,
*Plaintiff-Appellant,*

*v.*

## CISCO SYSTEMS, INC., HTC AMERICA INC, UNITED STATES CELLULAR CORPORATION, SPRINT SPECTRUM, L.P., MOTOROLA SOLUTIONS, INC., MOTOROLA MOBILITY LLC,
*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of California
in No. 3:12-cv-01011-JST, Judge Jon S. Tigar.

## BRIEF FOR APPELLANT, EON CORP. IP HOLDINGS LLC

JOHN L. HENDRICKS
DANIEL R. SCARDINO
MATTHEW MURRELL
REED & SCARDINO LLP
301 Congress Ave, Suite 1250
Austin, Texas 78701
512-474-2449

TERESA M. SUMMERS
SUMMERS LAW GROUP LLC
300 New Jersey Ave., NW
Suite 900
Washington, DC 20001
202-664-0926

*Counsel for Respondent,*
*EON Corp. IP Holdings LLC*

August 21, 2014

# CERTIFICATE OF INTEREST

Counsel for <u>Appellant EON Corp. IP Holdings LLC</u> certifies the following:

1. The full name of every party or amicus represented by me is:

   <u>EON Corp. IP Holdings LLC</u>

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   <u>EON Corp. IP Holdings LLC</u>

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   <u>EON Corp. IP Holdings LLC is a wholly owned subsidiary of EON Corporation.</u>

4. The names of all the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   <u>Reed & Scardino LLP: Daniel Scardino, Jeffrey Johnson, Cabrach Connor, Craig Jepson, Chad Ennis, Mark Halderman, Nicholas Wyss, Jason Deats, Cary Ferchill, Steven Tepera, Ray Mort, John Hendricks, Matthew Murrell; Hopkins & Carley: John Picone III, Jennifer Coleman, Christopher Hohn; Summers Law Group: Teresa Summers</u>

<i>/s/ John L. Hendricks</i>

JOHN L. HENDRICKS
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-615-5792

August 21, 2014

<i>Counsel for Appellant,
EON Corp. IP Holdings LLC</i>

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..........................................................................i

TABLE OF CONTENTS........................................................................... ii

TABLE OF AUTHORITIES ........................................................................v

STATEMENT OF RELATED CASES ............................................... viii

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUES................................................................2

STATEMENT OF THE CASE....................................................................3

STATEMENT OF THE FACTS ................................................................5

I.     Technology of the '491 Patent ..................................................5

II.    The Accused Instrumentalities And Methods................................10

III.   The Claim Construction .........................................................12

       A.    The Conditional "If" Terms.............................................12

       B.    "Network Hub Switching Center"....................................17

IV.    The Motion For Reconsideration ...............................................20

V.     Summary Judgment................................................................24

SUMMARY OF ARGUMENT ...............................................................29

STANDARD OF REVIEW ......................................................................29

ARGUMENT ....................................................................................31

I.  THE DISTRICT COURT'S JUDGMENT OF NONINFRINGEMENT
    WAS BASED ON AN ERRONEOUS CONSTRUCTION OF THE
    CONDITIONAL "IF" TERMS........................................................31

    A.  The District Court's Limitation Requiring a Fully Automated
        Transition Between Path A and Path B in Every Claim in the '491
        Patent Is Unsupported by the Claim Language and the Intrinsic
        Record.................................................................................32

        1.  The '491 Patent's silence on a user's role in facilitating
            transfer between Paths A and B is not a legitimate basis for
            the district court's imposition of a claim limitation requiring
            automatic transfer. ......................................................33

        2.  The district court misapplied the single case it relied upon for
            the proposition that the claims in the '491 Patent require an
            automatic system...........................................................37

        3.  The district court's analysis of the "switching means" term
            does not support an automatic transferring limitation.....................40

    B.  The District Court Ignored Relevant Differences in Claim
        Language Between the System Claims and Method Claims of the
        '491 Patent..........................................................................43

    C.  The "Present-Tense Condition" Is Not Supported by the
        Specification........................................................................45

II. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN
    ITS CONSTRUCTION OF "NETWORK HUB SWITCHING
    CENTER" BECAUSE ITS CONSTRUCTION IS NOT BASED ON
    THE CLAIM LANGUAGE BUT RATHER APPELLEES'
    NONINFRINGEMENT READ. ....................................................46

    A.  The Court's Construction of Network Hub Switching Center
        Favors a Dictionary Definition over Express Patent Language and
        Is  Not Supported by the Intrinsic Record.................................46

    B.  The District Court Impermissibly Based Its Construction on a
        Noninfringement Read. ..........................................................52

C.   The District Court Impermissibly Limited Network Hub Switching
     Center To Exclude a Preferred Embodiment of the Invention.................54

III. THE DISTRICT COURT ERRED IN FINDING NO
     INFRINGEMENT. ...........................................................................57

     A.   Genuine Issues of Material Fact Regarding Literal Infringement of
          the System Claims Remain.......................................................58

     B.   Genuine Issues of Material Fact Regarding Literal Infringement of
          the Method Claims Remain. ....................................................60

     C.   The District Court Erred in Finding No Material Issues of Fact
          Existed Regarding Noninfringement Under the Doctrine of
          Equivalents. ............................................................................61

CONCLUSION ...........................................................................................63

ADDENDUM

## <u>Note Pursuant to Federal Circuit Rules 28(d) & 30(h)</u>

Several record documents that Appellant cites in this Brief were sealed below. However, the references to those documents in this Brief do not disclose confidential information that warrants redaction under Federal Circuit Rule 28(d)(1)(A) because those references call upon nonconfidential information that appeared in both the sealed and the public, redacted versions of the documents below. Thus, Appellant is not required to file two versions of this brief. Pursuant to Federal Circuit Rule 30(h), however, Appellant will file two sets of appendices.

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Altiris, Inc. v. Symantec Corp.*,
    318 F.3d 1363 (Fed. Cir. 2003) ...........................................................................41

*American Calcar, Inc. v. American Honda Motor Co.*,
    651 F.3d 1318 (Fed. Cir. 2011) .............................................................33, 37–40

*Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*,
    723 F.3d 1376 (Fed. Cir. 2013) ...........................................................................30

*Comark Comm'ns Inc. v. Harris Corp.*,
    156 F.3d 1182 (Fed. Cir. 1998) ...........................................................................60

*Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*,
    559 F.3d 1308 (Fed. Cir. 2009) ....................................................................29, 30

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ....................................................................36, 60

*Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) (en banc) ..........................................................29

*Del. Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC*,
    597 F.3d 1374 (Fed. Cir. 2010) ...........................................................................30

*DSW, Inc. v. Shoe Pavilion, Inc.*,
    537 F.3d 1342 (Fed. Cir. 2008) ....................................................................43, 44

*Ecolab, Inc. v. Envirochem, Inc.*,
    264 F.3d 1358 (Fed. Cir. 2001) ...........................................................................33

*Frank's Casing Crew & Rental Tools, Inc. v. PMR Technologies, Ltd.*,
    292 F.3d 1363 (Fed. Cir. 2002) .............................................................35, 39, 45

*Fraser v. Goodale*,
    342 F.3d 1032 (9th Cir. 2003) .............................................................................57

*Hughes v. United States*,
    953 F.2d 531 (9th Cir. 1992) ...............................................................................58

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ..................................................47, 48

*Leever v. Carson City*,
  360 F.3d 1014 (9th Cir. 2009) .........................................................30

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (en banc) ...........................................29

*Martin v. Barber*,
  755 F.2d 1564 (Fed. Cir. 1985) .......................................................63

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
  287 F.3d 1062 (Fed. Cir. 2002) .......................................................52

*Omega Eng'g, Inc., v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) .......................................................57

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................47, 57

*Seachange Int'l, Inc. v. C-COR, Inc.*,
  413 F.3d 1361 (Fed. Cir. 2005) .......................................................33

*Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*,
  753 F.3d 1291 (Fed. Cir. 2014) .......................................................48

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
  358 F.3d 870 (Fed. Cir. 2004) ....................................................41, 45

*USHIP Intellectual Props., LLC v. United States*,
  714 F.3d 1311 (Fed. Cir. 2013) ............................................33, 39, 40

*Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc.*,
  212 F.3d 1377 (Fed. Cir. 2000) .......................................................30

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) .........................................................54

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
  721 F.2d 1540 (Fed. Cir. 1983) ...................................................43, 45

*Wilson Sporting Goods, Co v. Hillerich & Bradsby Co.*,
  442 F.3d 1322 (Fed. Cir. 2006) ...................................................52, 53

*Wong v. Regents of Univ. of Cal.*,
  410 F.3d 1052 (9th Cir. 2005) ............................................................31

*Z4 Technologies, Inc. v. Microsoft Corp.*,
  507 F.3d 1340 (Fed. Cir. 2007) ...................................................34, 45

**FEDERAL STATUTES**

28 U.S.C. § 1295 .......................................................................................1

28 U.S.C. § 1338 .......................................................................................1

35 U.S.C. § 112 .......................................................................................20

**RULES**

Fed. R. Civ. P. 56(f) ............................................................................1, 4

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant provides as follows:

(a)     There have been no other appeals in this case.

(b)     Appellant knows of no other cases that are related to this matter.

**STATEMENT OF JURISDICTION**

The case below was brought as a patent infringement action in the Eastern District of Texas and transferred to the Northern District of California; both had jurisdiction under 28 U.S.C. § 1338(a).  The California court granted Defendants–Appellees' (collectively "Appellees") Motion for Summary Judgment on April 1, 2014.  A11.  Appellee Motorola Solutions, Inc. ("MSI") did not join the Motion; pursuant to Fed. R. Civ. P. 56(f), the court subsequently granted summary judgment as to MSI and entered final judgment on April 24, 2014.  A32, A34. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in its construction of the conditional "if" terms in the patent-at-issue when it limited the disclosed systems and methods of communication to a singular idea that the invention was an apparatus that automatically transferred between communication paths without user intervention.

2.  Whether the district court erred in its construction of the term "network hub switching center" in the patent-at-issue by limiting the term to only equipment found within an accused cellular network's core network, without any support in the intrinsic record.

3.  Whether the district court erred by holding that no disputed issue of material fact existed regarding the patentee's infringement theories where appellant submitted extensive evidence demonstrating both literal infringement and infringement under the doctrine of equivalents.

## STATEMENT OF THE CASE

Plaintiff–Appellant EON Corp. IP Holdings LLC ("EON") filed its Original Complaint on October 22, 2010, in the Eastern District of Texas, alleging that Cisco Systems, Inc. ("Cisco") and others infringed U.S. Patent No. 5,592,491 (the "'491 Patent"). A67, A78, A81. On January 11, 2011, EON filed its First Amended Complaint, alleging infringement of the '491 Patent against HTC America Inc. ("HTC"); United States Cellular Corporation ("U.S. Cellular"); Sprint Spectrum, L.P. ("Sprint"); Motorola Solutions, Inc. ("MSI"); and Motorola Mobility LLC ("Motorola Mobility"). A1135, A1156, A1160, A1163–66, A1169. On January 9, 2012, the Eastern District of Texas transferred venue to the Northern District of California (the "district court"). A136, A144.

After the case was transferred, EON filed its Second Amended Complaint. A87–88, A97–102, A108–10, A119–21, A127–34. On July 8, 2013, the district court issued a *Markman* Order, construing several terms and invalidating system Claims 1 and 13 of the '491 Patent. A411; *see also* A36–37. EON requested leave to file a Motion for Reconsideration, arguing, in part, that the court erred in its construction of several terms, including finding Claims 1 and 13 invalid. A445– 47. After the court granted EON leave, A750–51, the parties submitted briefing and participated in oral argument. On February 25, 2014, the court granted EON's Motion, rescinding its finding of invalidity of Claims 1 and 13 and clarifying its

construction of an additional term.  A835–40.  The court subsequently issued a revised *Markman* Order.[1]  *See* A36.

On February 2, 2014—while the court was considering the Motion for Reconsideration—Appellees (except MSI) filed a Motion for Summary Judgment of Non-Infringement, alleging that the court's construction of several terms precluded infringement.  *See* A841–46.  After a hearing, the court granted Appellees' Motion.  A11, A31.  The court subsequently granted summary judgment for MSI, who had not joined the Motion, pursuant to Fed. R. Civ. P. 56(f).  A32–33.  The court entered Judgment as to all Appellees on April 24, 2014. A32–33.  EON appeals from the district court's judgment, its order granting summary judgment, and its claim construction underpinning that order.

---

[1]  Because the revised *Markman* Order was operative at summary judgment, EON will cite to it unless specifically discussing issues related to the Motion for Reconsideration below.

## STATEMENT OF THE FACTS

**I.  Technology of the '491 Patent**

The '491 Patent claims systems and methods for a two-way, interactive digital communication network with alternate paths for a subscriber unit to communicate with the network.  A1.  In one embodiment, the subscriber unit communicates with a base station repeater cell through an rf signal ("Path A"), which then allows the subscriber to access a network hub switching center.  A6 at 3:40–48.  However, if the rf signal becomes impaired—for example, the subscriber enters an interior room in a house that gets poor reception from the base station repeater cell—then communication can occur over an alternate path ("Path B") facilitated by a modem connected to a public switched network.  A6 at 3:49–55.

This embodiment can be seen in Figure 2 of the patent:



FIG. 2

A3.    Path A allows subscriber unit 12 to communicate directly with local base

station repeater cell 10:

> [I]f subscriber unit 12 is able to detect rf signals from
> local base station repeater cell 10 switching means 13
> assumes a default position "Path A".  When switching
> means 13 of subscriber unit 12 selects Path A, subscriber
> unit 12 receives rf signals directly from local base station
> repeater cell 10 over rf link 14 . . .

A6 at 3:40–45. If Path A becomes impaired, however, the system facilitates communication over an alternate path:

> When subscriber unit 12 is unable to receive rf signals directly from local base station repeater cell 10, switching means 13 selects "Path B". Thus, if subscriber unit 12 is unable to receive rf signals from local base station repeater cell 10, communication between subscriber unit 12 and local base station repeater cell 10 occurs along Path B using modem 22.

A6 at 3:49–55.

In another embodiment, the subscriber unit uses a modem to communicate through a public switched network to the network hub switching center, effectively bypassing any base station in the network. Figure 3 depicts this embodiment:



FIG. 3

A4.

The '491 Patent is a continuation-in-part of U.S. Patent No. 5,388,101 (the "'101 Patent"), which shares the same inventor and claims an interactive

communication network (configured of base stations and other components) that facilitates communication with subscriber units through various gateways into the network, including a base station and remote receivers. A1085; A1095 at 1:8–20. The '101 Patent, while establishing a nationwide, two-way, wireless digital communication network for improving communication with subscriber units, did not resolve certain problems encountered or anticipated when the wireless network was in use. For example, if the subscriber unit could not communicate with a base station or a remote receiver into the network, either because communication was impaired or because the area was not yet covered by the base station, then the subscriber could not communicate into the network. A5 at 2: 3–11. Thus, the network was only as good as the collective coverage of the base stations and remote receivers. If the base station's signal was impaired in a specific location (for example, indoor coverage is a perennial problem for wireless service providers), or a base station was not close enough (for example, in a rural area without network coverage), then the subscriber unit could not communicate with the network because its only path—which became Path A in the '491 Patent—was unavailable. A5 at 1:43–54.

By introducing an alternative way of communication—using a modem connected, for instance, through a "public switched network," *see* A3 (Fig. 2); A4 (Fig. 3)—the '491 Patent solved such coverage issues for network providers by

creating a less expensive alternative than building out a geographic area with additional base stations. This modem-based communication system allowed a subscriber to communicate over an alternative path (Path B) despite impairment in or unavailability of the base station path (Path A). A5 at 2:15–41.

Three system claims and two method claims in the '491 Patent are relevant. System Claims 1, 12, and 13 are independent claims that recite variations of the two-way communication system whereby the subscriber unit may access the network through various network components (a base station (Claim 1), a digital receiver (Claim 12), or the network hub switching center itself (Claim 13)) by using alternate paths of communication—Path A or Path B. A7, at 6:17–64 (Claim 1); A8 at 8:10–35 (Claim 12); A8 at 8:36–54 (Claim 13). Method Claims 5 and 17 are independent claims that recite variations of methods utilizing alternate paths of communication to allow a subscriber unit to communicate with the network. The steps include, *inter alia*, determining whether Path A is impaired and responding to an impairment by communicating over Path B. A8 at 7:7–43 (Claim 5); A8 at 8:65 to A9 at 9:29 (Claim 17).

With respect to the network hub switching center, the '491 Patent and its parent, the '101 Patent, contain extensive disclosure regarding both what the network hub switching center is and what it does. The network hub switching center includes functionality responsible for routing communications and data

messages to the subscriber units, storing information about the subscriber status and location of subscriber units in the network, and sorting data packets containing data messages. *See* A7 at 5:8–29; A8 at 8:42–43; A1097 at 5:34–39; A1098 at 7:1–3; A1098 at 8:3–7; A1098 at 9:7–13; A1098 at 9:20–31.

## II. The Accused Instrumentalities And Methods

EON asserted that cellular networks infringe the '491 Patent's system claims by incorporating alternative path access through a modem device (for example, a wi-fi access point or a femtocell). Subscriber units (cellular smartphones and other cellular devices) access the cellular network through various gateways by alternating between Path A (a base station path) and Path B (a wi-fi or a femtocell path). Further, EON alleged that Path B is provided either by a standard wi-fi modem or a "femtocell," a modem device provided by cellular companies to customers who may experience poor or no cellular network coverage (*i.e.,* low or no bars on their phone) in their homes (or elsewhere) over Path A. A132–33; *see, e.g.*, A99–102. Thus, EON alleged that Sprint and U.S. Cellular, as cellular network providers, HTC, Motorola Mobility, and MSI, as cellular handset manufacturers, and Cisco, as a femtocell provider, infringed the '491 Patent. The infringement theories regarding the method claims were similar; the manner in which cellular networks and handsets within those networks utilize alternate paths of communication infringe the method claims of the '491 Patent. An example of

infringement would occur when a cell phone user walked into her home, lost her cellular signal due to poor indoor coverage, and in order to communicate using her device, started to communicate over a wi-fi or femtocell modem.

EON's infringement theories focused on two Path A–Path B configurations. In the first, a cellular smartphone can communicate over alternate paths of communication that consist of the cellular network path (Path A) and a wi-fi path (Path B). A868–70; A873–80. In the second, the alternate paths of communication are the cellular network path (Path A) and a femtocell path (Path B). A868–70; A880–83; A885–89. EON submitted substantial evidence in support of infringement, including the results of empirical studies by certain Appellees showing that wi-fi connections were initiated by smartphone users in response to communication problems over the cellular network. A876–77; *see also* A1215 (Ex. 2); A1670–78 (Ex. 7). Appellees' own documents demonstrated that the accused instrumentalities and methods worked in this manner. For the wi-fi configuration, for example, Sprint's case studies and other documents demonstrated that users could (and frequently did) utilize both in-home and publicly available wi-fi as a backup in case Sprint's network was inaccessible or the phone was not receiving a good signal. A876–79; *see also* A1216 (Ex. 2); A1311–13 (Ex. 6); A1670–78 (Ex. 7); A1688 (Ex. 8). For the femtocell configuration, the evidence was even more stark—Sprint and Cisco, for example,

deployed femtocells *for the express purpose* of remedying inadequate (including a complete lack of) cellular coverage (Path A). A880–82; *see also* A1213 (Ex. 1); A1216 (Ex. 2); A1714 (Ex. 15). EON provided evidence that Sprint and Cisco deployed femtocells, Sprint and U.S. Cellular supported the cellular–wi-fi configuration, and HTC and Motorola Mobility sold handsets that used the cellular–wi-fi configuration. A876–83; *see, e.g.*, A1219–28, 1252–53 (Ex. 3) (Sprint); A1267–73 (Ex. 4) (U.S. Cellular); A1298–1306 (Ex. 5) (Cisco); 1259–63 (Ex. 3), A1692–94 (Ex. 10) (HTC); A1262–63 (Ex. 3), A1280, A1285–89 (Ex. 4), A1690 (Ex. 9) (Motorola Mobility).

## III.   The Claim Construction

In its *Markman* Order, the district court construed two terms in the '491 Patent relevant to this appeal: the conditional "if" terms and "network hub switching center."

### A. The Conditional "If" Terms

The conditional "if" terms are found in both the system and method claims of the '491 Patent, including all five independent claims asserted in this case. *See* A7 at 6:57–64 (Claim 1); A8 at 7:13–19, 27–36 (Claim 5); A8 at 8:31–35 (Claim 12); A8 at 8:44–54 (Claim 13); A9 at 9:5–9, 13–23 (Claim 17). The conditional "if" terms fall into two categories. The first are the "transferring . . . if" terms employed in system Claims 1, 12, and 13. These terms describe the conditions

under which the claimed systems utilize an alternative path (Path B) if the local

subscriber units "are unable to directly communicate" through Path A, thus

maintaining the overall system's ability to communicate despite impairment in

Path A. *See, e.g.*, A7 at 6:57–64 (Claim 1). Claim 1's language is illustrative:

> a modem communicatively coupled to said local
> subscriber units . . . for transferring . . . digital data
> messages . . . if said local subscriber units are unable to
> directly communicate with said local base station
> repeater cell;

A7 at 6:57–64

A separate group of conditional "if" terms are recited in method Claims 5

and 17; those terms likewise describe steps whereby a data message is

communicated over Path B if there is an impairment of communication through

Path A. *See, e.g.*, A8 at 7:13–19, 27–36 (Claim 5). Two portions of Claim 5 are

illustrative:

> if said subscriber unit is receiving a signal from said local
> base station repeater cell, performing the steps of:
>
> > transmitting outgoing data . . . , and
> >
> > transmitting incoming data . . . .

A8 at 7:13–26;

> if said subscriber unit is not receiving a signal from said
> local base station repeater cell, performing the steps of:
>
> > transmitting said outgoing data . . . , and
> >
> > transmitting said incoming data . . . .

A8 at 7:27–43.

With respect to the foregoing conditional "if" terms of the patent, EON argued that no construction was necessary because a person skilled in the art would understand the intrinsic record and claim language to refer to a system or a method that employed the use of Path B as a response to an impairment of communication in Path A.    A173–74.    EON also noted that another federal district court corroborated this position on two separate occasions, agreeing that the terms needed no construction.  A172–73.[2]  Appellees, on the other hand, argued that a construction was necessary and proposed a multi-sentence commentary to the claim language.

For the system claims, Appellees proposed the following construction:

> The system is binary, meaning the subscriber unit either communicates over Path A or Path B, but not over both at once. The "transferring function" of the modem is conditioned on whether the subscriber unit is unable to directly communicate with the local base station repeater cell. A user rendering the subscriber unit unable to communicate with the local base station repeater cell does not fall within the scope of the claim.

A172.  This proposed "construction" introduces three limitations to the meaning of the claim language: (1) the system was binary; (2) the transfer had to occur in

---

[2]    The '491 Patent was construed several times previously by the Eastern District of Texas, and the bulk of EON's claim construction positions were corroborated by those constructions.  A151 n.2.

response to impairment in Path A; and (3) a user could not be the cause of impairment in Path A.

For their construction of the method claims, Appellees proposed similar language but omitted any limitation on a user's interaction:

> The method steps listed after "if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of" are not performed if the subscriber unit is determined to be receiving a signal from said local base station repeater cell. Using the modem to communicate without there first being a determination that there is no signal reception and using the modem to communicate regardless of whether there is signal reception does not fall within the scope of the claim.

A174.

EON opposed Appellees' constructions on several grounds, including the fundamental problem that such commentary was not a construction of claim terms but merely a description of factual circumstances that stake out a noninfringement position based on accused instrumentalities. *See* A172–75.

The district court largely adopted Appellees' positions on the conditional terms. The court engaged in an analysis of the "user intervention" limitation, ultimately concluding that the system claims did not capture a user intentionally causing the impairment in Path A.[3] A59–60. The court expressed skepticism at

---

[3] Notably, EON did not advance the position that the court rejected—that the scope of the claim included a user intentionally causing impairment in Path A.

Appellees' proposed construction, noting that it "bears an uncomfortable resemblance to a specific noninfringement determination," *but nonetheless* adopted a slightly modified version of that limitation, injecting an entire phrase regarding user intent into the claim: "Claim 1 could be construed as 'transferring . . . if said local subscriber units are unable, *for some reason other than the user intentionally disabling said unit*, to directly communicate with said local base station repeater cell.'" A60.

In addition to this explicit limitation preventing intentional user intervention causing impairment in Path A, the court recognized that users could still play a role in selecting Path B in the patented systems: "A user wandering into a basement is not intentionally disabling the unit. And a *user could still respond to an inability to communicate* without falling outside of the scope of the claim. But the user's own action cannot itself cause the condition, if that condition does not otherwise obtain." A60 (emphasis added).

Regarding the conditional "if" terms in the method claims, the district court likewise adopted Appellees' proposed limitations. A61. In reaching its construction, the district court openly admitted that Appellees' argument was "a noninfringement determination" that addressed what "products" fell outside of the

_See_ A172–75. At the *Markman* hearing, EON expressly disavowed that position. A297. Despite the lack of a dispute with respect to user intervention, the court nevertheless adopted the "user intervention" limitation.

claim, *but nonetheless* adopted a modified version of that limitation on the grounds that "it properly describe[d] the scope of the claim." A62. Thus, the court inserted a noninfringement, exclusionary phrase into the claim:

> The method steps listed after "if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of" are not performed if the subscriber unit is receiving a signal from said local base station repeater cell. Using the modem to communicate regardless of whether there is signal reception *does not fall within the scope of the claim.*

A63 (emphasis added) (Claim 5); *see also* A65 (inserting the same limitations and language into method Claim 17). Notably, by contrast to the system claims, the district court's claim construction of method Claims 5 and 17 contained *no* user intervention limitations. *See* A61–66.

Finally, the court went even further in introducing limitations based upon inferences from the Appellees' proposed constructions. For example, the court introduced a "present-tense condition" limitation under which the use of Path B could only be infringement during the continued existence of impairment in Path A. A59. The court thus made impairment in Path A a condition not only for transfer to Path B but for *continued use* of that path.

### B. "Network Hub Switching Center"

"Network hub switching center" appears in three of the five independent claims of in the '491 Patent. *See* A7 at 6:18 (system Claim 1); A8 at 8:42 (system

Claim 13); A8 at 8:63 (method Claim 17).  The district court construed "network hub switching center" to mean "a switching center that performs the switching functions needed for operation of the subscriber units in a group of cells that the switching center services."  A52.

At claim construction, EON argued that no construction was necessary based on evidence that a person skilled in the art would understand the term because of its extensive use (and explanation) in the intrinsic record and the art.  A152.  EON emphasized that another district court had twice adopted a no-construction-necessary position, reasoning that network hub switching centers are "well-known networking components that a person having ordinary skill in the art would have recognized were capable of performing the routing functions."  A152.

Appellees again urged a construction that began with their noninfringement position, openly admitting at the *Markman* hearing that "[t]he reason this is an issue at all is *because of the infringement issues* in the case," and later emphasizing that "the reason we proposed this for construction in the first place is *this infringement allegation*."  A280 (emphasis added).  Their construction was based on a technical-dictionary definition for a related term, "mobile switching center" ("MSC").  A200.  That proposed construction was "a centralized switching center that performs all of the switching functions needed for operation of the subscriber units in the group of cells that the switching center services."  A152.

-18-

EON argued at claim construction that Appellees' construction impermissibly adopted a dictionary definition that was inconsistent with the intrinsic record; impermissibly imposed a geographic limitation through the word "centralized"; impermissibly forced nearly the entire functionality of the '491 Patent's claimed system into one component of that system by requiring the network hub switching center to perform "all of the switching functions"; and impermissibly linked the network hub switching center with particular cells by including "in the group of cells that it services," which found no intrinsic support. A153–55.

The court found some of EON's arguments persuasive—it agreed that "centralized" was an unsubstantiated limitation and, at oral argument, pressed Appellees to concede that "all of the switching functions" should not be in the construction. *See* A50–51. The district court disagreed with EON's position regarding "in the group of cells that it services" *despite* acknowledging that particular embodiments of the invention depict local subscriber units communicating directly with the network hub switching center, bypassing the local base station. A51; *see also* A8 at 8:36–54 (Claim 13) (claiming a system where the subscriber unit communicates directly with the switching center if the unit is unable to communicate with the base station). After deleting those words it found problematic, the court settled on the following construction:

-19-

> a ~~centralized~~ switching center that performs ~~all of~~ the switching functions needed for operation of the subscriber units in the group of cells that the switching center services.

*See* A50, A52 (emphasis added).

## IV.  The Motion For Reconsideration

In addition to the terms that directly underpin the district court's grant of summary judgment, the court's claim construction raised several similar concerns: those constructions imported noninfringement limitations unmoored to the claim language, intrinsic record, or understanding of a person skilled in the art. Among those was the "switching means" term found in system Claims 1 and 13, as it shaped the court's eventual construction of the conditional "if" terms at summary judgment.  *See* A7 at 6:18–22 (Claim 1) ("switching means for selecting a communication path within said network/communication system"); A8 at 8:36–41 (Claim 13) (same).  In the context of these two systems claims—the only two asserted claims that contain the term—the switching means plays a role in the transfer from base station Path A to modem Path B.  According to the patent specification, on the condition of an impairment in Path A, the communication takes place through Path B after the switching means selects that path for communication.  A7 at 5:6–8 ("Thus, switching means 13 selects Path B, such that communication to and from subscriber unit 12 occurs through modem 22.").

-20-

During claim construction, the parties agreed that the switching means term was governed by 35 U.S.C. § 112 ¶ 6, and at least superficially agreed that the function was "selecting a communication path within said network/communication system." A167. The parties disagreed, however, on the structure. Whereas EON pointed to the understanding of a person skilled in the art reading the '491 Patent's repeated disclosure in the specification of "electronic switch 13" as adequate corresponding structure, Appellees contended that the term was indefinite because electronic switch 13 did not contain structure sufficient to perform the function of "selecting" a path where "selecting" included both *determining* signal strength in Path A, and—based on that determination—*deciding* to transfer to Path B. A167–68. EON argued that Appellees' position unjustifiably incorporated additional functions into the term "selecting," and that another district court had rejected that very argument. A167–68.

Nonetheless, in its original *Markman* Order, the district court agreed with Appellees. Moreover, the district court concluded that the function of "selecting" implied and included the additional functions of "gathering," "determining," and intelligent selecting of communication paths. A416. The district court imported that additional functionality into the switching means, going beyond the claim language and the intrinsic record, reasoning that "[n]o other feature of the invention performs [the] function" of "gather[ing] information about how much rf

signal the unit is receiving, determin[ing] whether the subscriber unit is 'able' or 'unable' to receive rf signals, [and] on this basis select[ing] the appropriate path, and then perform[ing] the switch."  A416.  The court sought to justify its construction of the switching means as an intelligent switch by observing that, in the court's view, such automatic functioning was at the heart of invention disclosed in the '491 Patent: "*The innovation claimed in the '491 Patent* is the capability to determine which communications path to use, not merely the physical capacity to be able to switch from one path to another."  A416 (emphasis added).

EON moved for reconsideration, arguing that the district court should reconsider its positions regarding the switching means term, the network hub switching center term, and a number of other terms.[4]  A445–47.  The district court granted EON's motion for leave as to the switching means term and a second term, "communicatively coupled."[5]  A750–51.  On reconsideration, the court reversed its position on the switching means:

> The Court agrees that the term "selecting," as understood by a layperson outside of the context of the patent, connotes an intelligent determination rather than merely "assuming a position."  But the Court must

---

[4]  For reasons that become apparent in the summary judgment discussion below, *see infra* Part V, EON chose not to argue the conditional "if" terms on reconsideration because its infringement theory was largely intact *if* user intervention was barred only at causing impairment in Path A.

[5]  The district court did not grant EON's request to reconsider its construction of "network hub switching center."  *See* A750–51.

> construe the term based primarily on the intrinsic record, as it would be understood by a person of ordinary skill in the art. And here, other elements of the patented invention perform the functions that the Court had previously concluded must be performed by "electronic switch 13."

A838.

It is critical to note here, as it becomes relevant at summary judgment, that the district court did not jettison its preconception that the innovation of the invention resided in the ability to "gather" information about rf signals and "determine" which path to use for communication automatically. Although the court ultimately, and only after reconsideration, agreed that this was not part of the "switching means" element, it did so only because it *found that functionality elsewhere* in the intrinsic record. Thus, the court was still operating from the standpoint that an automatic switching mechanism capable of gathering, determining, and selecting needed to be found *somewhere* in the claim terms, instead of beginning from the position that the claim terms define the invention. *See* A838 ("*other elements* of the patented invention perform the functions" (emphasis added)). In its revised *Markman* Order, the court continued to emphasize its understanding of the invention as a whole: "The claims recite a simple 'if, then' automatic switching. They do not suggest an apparatus generally designed to switch at the user's whim. It may be possible to practice the invention that way, *but that is not what is claimed as novel*." A59 (emphasis added).

-23-

## V.    Summary Judgment

During the pendency of the district court's ruling on the Motion for Reconsideration, Appellees filed a motion for summary judgment of noninfringement on three grounds.  Appellees first argued that all of EON's claims for infringement should be dismissed on grounds that the conditional "if" terms—as construed by the court—were, as a matter of undisputed fact, not practiced by any of the accused products and services.  A856–58.  According to Appellees, the conditional "if" terms were not met by their products and services because there were no instances in which Path B was utilized as a result of impairment in Path A, as all of the accused handsets were configured to "prefer" Path B over Path A. A856–58.

In response, EON observed that Appellees' "Path B preferred" argument wrongly presupposed that a connection with Path B was already enabled, when in fact the subscriber unit cannot utilize Path B *without a user first turning it on and initializing a connection*, a fact Appellees could not dispute.  A877–78.  EON further argued and presented evidence that one reason for use of Path B in the accused instrumentalities was the cellular network user's inability to get uninterrupted communication through Path A.  A875, A879–80; *see also* A1216 (Ex. 2); A1253, A1255–56 (Ex. 3); A1281 (Ex. 4); A1688 (Ex. 8); A1697 (Ex. 11); A1700 (Ex. 12).

The district court rejected EON's argument, summarizing its reasons for granting Appellees' Motion by emphasizing Appellees' "wi-fi preferred" argument: "In the accused networks, cellular phones transfer to a modem-based Wi-Fi connection *whenever* there is a Wi-Fi connection, *regardless* of whether there is or is not an available cellular connection." A11. In its Order, the court reasoned that the invention disclosed in the patent did not encompass systems and methods where the response to cellular impairment is mediated by a human decision to communicate through Path B; rather, the inventions were limited to "subscriber units" that *automatically* detected failure in Path A and *automatically* responded to failure by selecting Path B. The court noted that "nothing in the claims, or in the specification, contemplates a role for the user in affirmatively selecting one path over another." A27 (brackets removed).

Here, the district court expanded the "user intervention" limitation beyond merely causing impairment in Path A. Despite the court's *Markman* Order barring user intervention *only* at causing impairment in Path A, the court reasoned that its construction had barred *any* user intervention in the use of the alternate communication paths, including the *response* to impairment in Path A: "[T]he Court . . . adopted Defendants' view of claim scope: a user deciding to switch to Path B is not part of the system that the Patent claims for transferring." A19–20. The court brushed off EON's arguments that the court's explicit construction

limited user intervention only to causing impairment in Path A, and that the court itself had previously stated that a user's *response* to impairment was within the scope of the claims:

> EON relies on a sentence of dicta in the Court's claim construction order: "a user could still respond to an inability to communicate without falling outside of the scope of the claim." In retrospect, this sentence could have been clearer, but it should have been plain enough from the surrounding context and the Court's actual construction that *intentional user intervention is not part of the claimed system*, even if the user is responding to poor communications over Path A.

A20 (emphasis added) (citation omitted).

Second, the district court contended that EON's arguments during the Motion for Reconsideration precluded any user intervention in the conditional "if" terms. The court reasoned that if the ability to make a determination of signal strength could be found in the subscriber unit as illustrated in the '101 Patent, EON was bound to that automatic capability as a feature of *all* transfers from Path A to Path B described in the claims of the '491 Patent. *See* A20–21. Thus, in the court's eyes, it was hoisting EON by its own petard by forcing the functional limitations that EON had shown could not be found in the switching means element into *other* claim elements. *See id.* Moreover, the court ignored those portions of the '101 Patent specification that describe embodiments where the capability to detect inadequate signal strength is attributed to components *other*

-26-

*than* the subscriber units, including the base station.  For example, the '101 Patent states:

> As above described, *the base station repeater cell* 3 may initiate the hand-off of a subscriber 4 from a local 5 remote receiver 20 in one zone to another in a different zone within the subdivided cell. Thus a signal strength (RSSI) measurement may serve as a criterion for handoff, *with the cell directing the subscriber* into a set-up routine when signals below a threshold, - 80dBm for 10 example, are encountered.

A1099 at 9:4–11 (emphasis added).

Third, the district court did not address EON's argument that a user *at some point* must authorize or initiate Path B communication (by authorizing her cellular smartphone to connect to a wi-fi access point or by installing and initializing a connection with a femtocell).  Instead, the court implicitly rejected the argument in its finding that users were not part of the '491 Patent's claimed system and that once Path B was authorized, the phone always chose Path B, regardless of the communication impairment over Path A.

In rejecting EON's femtocell-based infringement contentions, the court noted that femtocells could not function as Path B because femtocells emitted a cellular signal that used the same antenna as Path A, thus making it impossible for a user to select Path B—the femtocell path—after determining that the cellular signal from a base station was impaired.  A22.  Here, the court essentially premised its noninfringement finding with respect to femtocells—that users do not

intervene—on the very thing it found as a matter of claim construction was not within the scope of the claims—user intervention.

Turning to method Claims 5 and 17, the court found noninfringement again because it concluded that those claims were limited to a fully automated invention. A24. Despite the fact that the court's own claim construction included *no* express limitations on user intervention, the court extended its analysis of the system claims as follows:

> Again, as the Court already held, "[n]othing in the claims, or in the specification, contemplates a role for the user in affirmatively selecting one path over another." That phrase appeared it in portion of the Court's order discussing the systems claims, *but it is equally true of the method claims.* While a method claim is normally agnostic as to the user who performs the steps, here it is more than implausible that the user actions accused in this case form part of the method the '491 Patentee invented.

A27 (emphasis added).

Turning to the network hub switching center, the district court concluded that Appellees did not infringe system Claims 1 and 13 and method Claim 17 because the network hub switching center had to serve a "a group of cells," which the court reasoned, in terms of infringement, meant that every part of the system or claimed method had to be within the cellular core network, excluding any third-party servers or other elements outside of the cellular core network. A28–29.

## SUMMARY OF ARGUMENT

The district court's order granting summary judgment should be vacated and remanded because it is based on an erroneous underlying claim construction and overlooks genuine issues of material fact in dispute. The court incorrectly construed the conditional "if" terms, based on a misunderstanding of the essence of the invention that it applied to all of the claims in the patent. The court incorrectly construed "network hub switching center," based on a dictionary definition and proposed construction that Appellees openly admitted was a noninfringement read. Based upon these errors in its claim construction, and despite EON's evidence showing disputed material facts, the court erroneously granted summary judgment of noninfringement. In addition, the court disregarded evidence sufficient to raise a genuine issue of fact as to Appellees' infringement.

## STANDARD OF REVIEW

Patent infringement analysis involves two steps: claim construction, and application of the construed claim to the accused process or product. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). This Court reviews the first step, claim construction, without deference. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). The second step, application of the claim to

the accused product to determine infringement, is a question of fact. *See Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009).

This Court reviews the grant of summary judgment under the law of the regional circuit. *Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*, 723 F.3d 1376, 1378 (Fed. Cir. 2013). The Ninth Circuit reviews the grant or denial of summary judgment *de novo*. *Leever v. Carson City*, 360 F.3d 1014, 1017 (9th Cir. 2009). On appeal from a grant of summary judgment of noninfringement, this Court "must determine whether, after resolving reasonable factual inferences in favor of the patentee, the district court correctly concluded that no reasonable jury could find infringement." *Crown Packaging*, 559 F.3d at 1312 (quoting *IMS Tech., Inv. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000)). "Infringement under the doctrine of equivalents requires an intensely factual inquiry." *Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1382 (Fed. Cir. 2000). Thus, this Court "may sustain summary judgment of non-infringement under the doctrine of equivalents . . . only if it discerns no genuine issues of material fact and that no reasonable jury could find equivalence." *Id.* (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997)).

This Court reviews a district court's decision to exclude evidence under the law of the regional circuit. *Del. Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC*,

597 F.3d 1374, 1379 (Fed. Cir. 2010). The Ninth Circuit reviews a district court's

decision to exclude evidence on summary judgment for abuse of discretion. *Wong*

*v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1060 (9th Cir. 2005).

## ARGUMENT

## I. THE DISTRICT COURT'S JUDGMENT OF NONINFRINGEMENT WAS BASED ON AN ERRONEOUS CONSTRUCTION OF THE CONDITIONAL "IF" TERMS.

The district court's determination at summary judgment that Appellees did

not infringe the asserted claims of the '491 Patent was predicated, *inter alia*, on its

construction of the conditional "if" terms in the patent. Though not explicit in

either the original or the revised *Markman* Order, the district court's final position

on these terms at summary judgment reduced the conditional relationship between

impairment in Path A and transfer to Path B to an electronic event that occurred

entirely within the physical confines of the subscriber unit, manifested as a cellular

smartphone in the accused instrumentalities. The court's preoccupation with the

belief that the subscriber unit was fully automated even extended to initializing

Path B, precluding a user from turning on a wi-fi connection in the handset or

initializing communications over a femtocell. *See* A22.

This automatic-transferring limitation was not explicit in the *Markman*

Order construction of the conditional "if" terms, the express language of which

included only a limitation to system Claims 1, 12, and 13 that barred a user from

being the sole cause of impairment in Path A.  However, by the time the court reached summary judgment, that limitation became much broader, as the court not only expanded it—for the first time—to method Claims 5 and 17, but also interpreted it to preclude *any* role for human agency in the transfer to Path B, including the initialization of Path B.  The court ultimately concluded that "intentional user intervention *is not part of the claimed system*, even if the user is *responding* to poor communications over Path A."  A20 (emphasis added). Pursuant to this sweeping limitation, the court found noninfringement on all claims because the accused handsets utilized Path B only when a user initiated a connection to that path and thereafter remained on or "preferred" Path B.

The court's expansion of the limitation on user intervention and its belief that *all* transitions between Path A and Path B across *all* claims must occur automatically is legally erroneous for two broad reasons.  First, it is unsupported by the claim language and the intrinsic record.  Second, it ignores key differences between the different claims in the '491 Patent, and especially as between the system and method claims.

## A. The District Court's Limitation Requiring a Fully Automated Transition Between Path A and Path B in Every Claim in the '491 Patent Is Unsupported by the Claim Language and the Intrinsic Record.

The '491 Patent provides no support for the district court's interpretation that "intentional user intervention is not part of the claimed system." A20.  In

reaching its conclusion, the district court used three lines of argument. First, the court reasoned that the patent's silence on any role for the user in facilitating a transfer between Path A and Path B meant that the patent *precluded* such a role. Second, the district court misinterpreted and misapplied this Court's holding in a single case—*American Calcar, Inc. v. American Honda Motor Co.*, 651 F.3d 1318 (Fed. Cir. 2011). A59. Third, the court relied on the "switching means" term—despite that term's appearance in only system Claims 1 and 13—to support its notion that the transfer to Path B across all claims was limited to a circuit-driven, switch-like transfer. A59. None of the court's justifications find support in the record or the law.

> ### 1. The '491 Patent's silence on a user's role in facilitating transfer between Paths A and B is not a legitimate basis for the district court's imposition of a claim limitation requiring automatic transfer.

This Court has repeatedly noted that "it is improper to import a limitation into a claim where the limitation has no basis in the intrinsic record." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1376 (Fed. Cir. 2005); *see also Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1366 (Fed. Cir. 2001). Specifically, this Court has noted that the rule also applies to human intervention in inventions that utilize machines. Imposing a limitation on human intervention—even where portions of the invention utilize an "automated" machine—is impermissible if such a limitation is not supported by the record. *See USHIP Intellectual Props., LLC v.*

*United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013) ("[W]e do not find persuasive Appellees' argument that the appearance of the phrase 'using an automated shipping machine' in the preamble raises a presumption that every step of the claimed method must be performed by a machine. Our precedents provide no basis for this presumption.").

In *Z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340 (Fed. Cir. 2007), this Court was presented with claims that required "a manual registration mode and an *automatic* or *electronic* registration mode." *Id.* at 1344 (emphasis added). At issue was whether the "automatic" or "electronic" limitations altogether precluded user intervention. The appellee in that case argued that, "once users choose the electronic or automatic registration mode (as contrasted with the manual mode), the initiation of the registration communication must commence *without any user interaction*." *Id.* at 1351 (emphasis added). This Court rejected that argument, concluding that the record did not support such a limitation. The Court reasoned that, "[a]lthough the specification discloses that automatic registration is performed 'without user intervention,' . . . nothing in the claims or specification precludes user interaction in the selection or initialization of the automatic registration." *Id.* at 1351 (citation and emphasis removed). Thus, this Court found that a limitation barring user intervention was unwarranted *despite* the fact that parts of the invention were "automatic."

Similarly, in *Frank's Casing Crew & Rental Tools, Inc. v. PMR Technologies, Ltd.*, 292 F.3d 1363 (Fed. Cir. 2002), this Court considered whether patent claim language that required "monitoring" excluded user involvement. *Id.* at 1374–75. This Court rejected such a limitation, stating:

> while the apparatus described in the [patent-at-issue] may be necessary for performing the steps of "(a) sensing the torque imposed on the connection during makeup" and "(d) displaying the torque sensed during make-up," *neither the plain language of the claim nor the specification excludes a human operator from performing the step* of "(b) monitoring the torque conditions during said step of sensing the torque to detect if a satisfactory threaded connection is obtained."

*Id.* at 1375 (emphasis added) (quoting the patent-at-issue).

In rejecting an automation requirement, this Court observed that "[t]he clear language itself is also not limited to a machine—or computer—implemented method of monitoring, and does not explicitly exclude human intervention." *Id.* at 1374. The Court further noted that nothing in the specification precluded human intervention even though an autonomous invention had also been disclosed. *Id.* at 1375 ("[Portions of the specification] may be understood to mean that the monitoring is generally done automatically by the apparatus. However, the specification also suggests an interpretation of 'monitoring' under which a human operator detects the torque conditions.").

In light of these cases, the district court's limitation on user intervention in this case was not warranted. Specifically, the conditional "if" terms in system Claims 1, 12, and 13 contain no explicit disavowal of human intervention. For example, the conditional term of system Claim 1 recites:

> a modem communicatively coupled to said local subscriber units . . . for transferring . . . digital data messages . . . if said local subscriber units are unable to directly communicate with said local base station repeater cell;

A7, at 6:57–64 (Claim 1). The patent language neither identifies nor expressly disavows a particular agency or sequence of specific events for accomplishing the transfer to Path B.[6] The same is true for the conditional "if" terms employed in method Claims 5 and 17, which contain a "determining" step to determine whether a subscriber unit "is receiving a signal" from the base station repeater cell, and then performing one of two sets of steps based on whether the unit is receiving a signal. *See* A8 at 7:8–43 (Claim 5); A9 at 9:1–29 (Claim 17); *see supra* Statement of Facts, Part III.A.

---

[6] To the contrary, the "modem communicatively coupled" language in the system claims could suggest a role for a user in performing at least the first connection between a "subscriber unit" and a "modem" because the modem cannot install and couple itself. In addition, the method claims "comprise" separate steps including a "determining" step. As this Court has recognized, there is nothing "wrong with claiming mental method steps as part of a process containing non-mental steps." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011).

These terms contain no language that precludes a user from facilitating the transfer or playing some role in the *response* to impairment in Path A. In fact, nothing in the '491 Patent claim language or the specification supports such a reading. The conditional "if" terms in system Claims 1, 12, and 13 appear in the "modem" element portion of the claim, not the "subscriber unit" element, and the conditional "if" terms in method Claims 5 and 17 contain no indication as to who or what mediates the transfer. *See* A7 at 6:57–64 (Claim 1); A8 at 7:8–12 (Claim 5); A8 at 8:31–35 (Claim 12); A8 at 8:44–54 (Claim 13); A9 at 9:1–4 (Claim 17). Further, as EON notes above, the '101 Patent—the '491 Patent's parent—discloses that the base station itself can make determinations regarding signal strength, demonstrating that mediation of the communication path can occur outside of the subscriber unit. *See* A1099 at 9:4–11. Moreover, even in those embodiments that utilize a "switching means," there is no requirement that the mechanism be the sole agency of detection, response, and transfer. Accordingly, the district court's conclusion that user intervention is precluded finds no basis in the patent language itself.

**2. The district court misapplied the single case it relied upon for the proposition that the claims in the '491 Patent require an automatic system.**

The district court cited *American Calcar*, 651 F.3d 1318, to support its broad limitation on user intervention. A59–60. However, *Calcar* does not support an

automatic transferring limitation in the '491 Patent, and is disanalogous, for two reasons. First, the invention and claim language at issue in *Calcar* differ substantially from those at issue here. Second, the user involvement at issue in *Calcar* was expressly disavowed during the prosecution history of the patent.

The relevant patent-at-issue in *Calcar* claimed an invention built into an automobile that determined whether the vehicle needed service, identified a service provider for that service, and provided the vehicle's driver information about that service provider. 651 F.3d at 1324. Specifically, the patent-at-issue's claim language required that a "processing element" determine the vehicle's condition and respond to it:

> 1. A system for use in a vehicle comprising:
>
> . . .
>
> *a processing element* for determining based on the at least one measure a vehicle condition for which a selected service of the vehicle is needed, *the processing element* identifying one of the plurality of providers *in response to* the vehicle condition . . . .

*Id.* (emphasis added).

The *Calcar* Court considered whether user involvement was contemplated by the latter half of the claim language that required "the processing element [to] identify[] one of the plurality of providers in response to the vehicle condition." *See Calcar*, 651 F.3d at 1339–40. Based on that language, this Court perceived a direct, unmediated relationship between the processing element's detection of

-38-

vehicle malfunction and its identification of service providers: "The language of the claim itself suggests that when a vehicle condition is detected, the processing element identifies a provider automatically as opposed to requiring further user interaction." *Id.* at 1340. Consistent with the approach this Court has taken in *USHIP*, *Z4*, and *Frank's Casing*, the patent claim language at issue in *Calcar* made explicit that a single internal electrical component—"a processing element"—performed the entire sequence of determination and response to vehicle malfunction, thus explicitly precluding user involvement.

In contrast to *Calcar*, and as EON details above, none of the claims of the '491 Patent disclose a single agent—machine or otherwise—for performing the sequence of detection and response to impairment. *See supra* Part I.A.1. The "determining" step from method Claims 5 and 17 discussed above is illustrative:

> determining whether a subscriber unit located with a base station geographic area associated a said local base station repeater cell is receiving a signal from said local base station repeater cell;

*See* A8 at 7:8–12 (Claim 5); A9 at 9:1–4 (Claim 17).

This language sets forth a step without any constraints on what or who may perform it; no specific element, agent, or subject is designated to perform a determination of signal strength. Thus, unlike the clear and explicit recitation of the "processing element" as the agent of performance in *Calcar*, the '491 Patent's silence on such an agent precludes an analogy to that case.

-39-

The *Calcar* case is distinguishable for the additional reason that it involved a finding of prosecution history estoppel. Specifically, the *Calcar* Court found that user involvement was expressly disavowed during the prosecution of the patent: "*The inventors' disclaimer was thus broad*, distinguishing the claimed invention as one where the identification of service providers is solely in response to a vehicle condition *determined by a processor*." 651 F.3d at 1340 (emphasis added). Accordingly, in addition to finding an express disavowal of human intervention in the claim language itself, the Court affirmed a finding of prosecution history estoppel. *Id.* at 1340–41; *see also USHIP*, 714 F.3d at 1314–16 (finding that a clear disavowal of manual performance during the patent's prosecution supported a claim construction barring user performance of method steps). Here, by contrast, there is no evidence that EON ever disclaimed to the PTO the involvement of a user in the '491 Patent, or argued that the claimed inventions were limited to automated systems and methods. Thus, the district court's reliance on *Calcar* is further misplaced.

### 3. The district court's analysis of the "switching means" term does not support an automatic transferring limitation.

In addition to its reliance on *Calcar* at claim construction, the district court—at summary judgment—relied upon a portion of the intrinsic record to support its understanding of the invention as a fully automated mechanism that precluded human intervention to facilitate the transfer of communication between

Path A and Path B. Specifically, the district court modeled all of the transitions between Path A and Path B described in the conditional language of the patent on its original understanding of the "switching means"—a term used in system Claims 1 and 13 to describe a subcomponent of the invention disclosed in those two claims.

In its Summary Judgment Order, the court continued to demonstrate its misconception that the inventions of the '491 Patent were all defined by an automatic relationship between impairment in Path A and the use of Path B. Specifically, the court maintained that EON's arguments for reconsideration of the "switching means" were "in significant tension" with the view that the inventions included the user's initiation of Path B.[7] A20. The court seems to reason that EON's reference to the parent—the '101 Patent—to illustrate how subscriber units *could* electronically determine impairment in Path A is evidence that such automatic determinations *must* be the basis for all transfers between Path A and Path B claimed in the '491 Patent.

But this understanding is misguided. First, it is reversible error to read limitations from a preferred embodiment into claim language. *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir. 2003); *see also SuperGuide Corp.*

---

[7] The court later went further and claimed that EON's arguments for reconsideration of the "switching means" construction "vitiated" the argument for user-initiated transfer. A1132–33.

*v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (noting that "it is important not to import into a claim limitations that are not a part of the claim"). Second, the fact that the specification of the parent '101 Patent describes a means of automated detection of the signal strength in the subscriber unit does not, as the court reasoned, justify reading a *requirement* of automated detection into the claims of the '491 Patent. Finally, the '101 Patent addresses network configuration of base stations and other components and is in no way directed to an alternate, modem-based path of communication, which the '491 Patent was designed to address. *See supra* Statement of Facts Part I.

The district court fundamentally misunderstood EON's reference to the '101 Patent during the Motion for Reconsideration below. EON sought to demonstrate that the "switching means" term *need not* contain certain functionality and that such functions, such as determining signal strength, could be found elsewhere (thus precluding such a limitation on the "switching means" term). As EON explained, the '101 Patent specification describes *several* other ways in which such a determination of signal strength might be performed by the based station equipment or the subscriber. A1099 at 9:4–19. The court's error was not just its initial assumption that the "switching means" had to contain circuitry sufficient for detecting failure in Path A and calculating to a selection of Path B. It was a second error to assume that the patent's "if" language—describing the conditions for

transfer from Path A to Path B—should be constrained to the court's original understanding of the invention as an automatic switch, affording no other factors in the relationship between impediments in Path A and transition to Path B.

### B. The District Court Ignored Relevant Differences in Claim Language Between the System Claims and Method Claims of the '491 Patent.

Each *claim* in a patent recites a distinct invention. *See W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1548 (Fed. Cir. 1983). Thus, a district court commits error if it ascribes to an entire *patent* a single, generalized point of novelty, divorced from the specific language of each claim. *See id.* at 1547–48. Further, this Court has specifically noted the impropriety of importing the limitations of apparatus or system claims onto method claims when such limitations are unsupported by the claim language. *See DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed. Cir. 2008) ("Because [the claims-at-issue] are unambiguous, contain limitations other than the disputed claim term, and are directed to a method for using an apparatus, not to its structure or assembly, *it was improper for the trial court to import limitations from the apparatus and system claims into the method claims*." (emphasis added)).

Nonetheless, the district court painted all of the asserted claims with the same broad brush. The district court failed to recognize key differences among the '491 Patent's five asserted claims and that those claims are of differing *types—i.e.,* system claims and method claims—which must be considered separately.

-43-

None of the system claims in the '491 Patent expressly require any determination of signal strength or communicative ability, let alone a specific means of making such a determination. Nonetheless, the district court injected into the system claims the "logic and circuitry" that it associated with "determining"—a function it originally found must be performed by the switching means but then abandoned after EON sought reconsideration, and a step that is present only in the method claims. *E.g.,* A8 at 7:7–43 (Claim 5); A8 at 8:65 to A9 at 9:29 (Claim 17). For example, in discussing the conditional "if" terms in the *system claims*, the court focused on the function of determining:

> [I]f the "determining" processes are performed entirely by the subscriber unit, and the "electronic switch" merely toggles between the two paths on the basis of those determinations, there is no room left for a human user to be part of the claimed system.

A21. It was impermissible to inject into the system claims the "determining" limitation the district court agreed was not present in the switching means and is only found in the method claims, let alone a further limitation that the "determining" be accomplished by any particular component of the system, like the subscriber unit. *See DSW*, 537 F.3d at 1348.

The imposition of an automation requirement is particularly unwarranted in the method claims because a patent's lack of an express description of how a user would perform a step cannot justify the imposition of a limitation barring user

interaction. *See, e.g., Z4*, 507 F.3d at 1351 ("[N]othing in the claims or specification precludes user interaction in the selection or initialization of the automatic registration."); *Frank's Casing*, 292 F.3d at 1375 ("[N]either the plain language of the claim nor the specification excludes a human operator from performing the step of . . . monitoring.").

Finally, the district court's analysis of the method claims is flawed because it attempts to reduce the multi-component and multi-step inventions into a single, overriding concept of automated determinations regarding communication paths— a concept which is not present *anywhere* in *any* of the claims. This attempt to impose a misconception of the invention's novelty onto individual claims is error. *Cf. W.L. Gore*, 721 F.2d at 1548 ("A court's restriction of a claimed multi-step process to one step constitutes error, whether done at the behest of a patentee . . . or at the behest of an accused infringer . . . .").

### C.    The "Present-Tense Condition" Is Not Supported by the Specification.

The district court's erroneous construction also led to a separate limitation— the "present-tense condition"—that is not supported by the specification. The district court required that impairment in Path A be a continuing condition for use of Path B. A59. But the claim language and the specification contain no support for such a limitation, and it is erroneous. *See SuperGuide*, 358 F.3d at 875. The district court again reasoned by starting with Appellees' construction and working

backwards, noting that EON's position failed because the claims themselves used present-tense verbs.  A59.  The district court also rejected, out of hand and with no explanation, EON's argument that the present-tense limitation was a noninfringement argument in the guise of claim construction.  A59; A279–80.

## II.  THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN ITS CONSTRUCTION OF "NETWORK HUB SWITCHING CENTER" BECAUSE ITS CONSTRUCTION IS NOT BASED ON THE CLAIM LANGUAGE BUT RATHER APPELLEES' NONINFRINGEMENT READ.

The district court's construction of "network hub switching center,"[8] and subsequent grant of summary judgment pursuant to that construction, is erroneous because it is based on a dictionary definition, and the '491 Patent's claim language and specification contradict such a construction.  Moreover, the construction is based largely, if not entirely, on a consideration of the accused products and what was required for their noninfringement.

### A. The Court's Construction of Network Hub Switching Center Favors a Dictionary Definition over Express Patent Language and Is Not Supported by the Intrinsic Record.

The court began its claim construction with Appellees' proposed construction that was based on a technical-dictionary definition of a different network component known in the art as a "mobile switching center" ("MSC").  A200.  The definition of MSC from that dictionary noted that an MSC "performs

---

[8]  "Network hub switching center" appears in independent Claims 1, 13, and 17 of the '491 Patent.

all the switching functions needed for the operation of the [subscriber equipment] in the group of cells its services." A200 (brackets in original). Appellees' proposed construction, based largely on that definition, was "a centralized switching center that *performs all of the switching functions needed for operation of the subscriber units in the group of cells that the switching center services*." A49 (emphasis added). As this Court noted in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), such dictionary definitions may play a role in helping the court understand the underlying art or when construing terms "so long as the dictionary definition *does not contradict any definition* found in or ascertained by a reading of the patent documents." *Id.* at 1322–23 (emphasis added) (internal quotation marks omitted) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996)). The court largely adopted Appellees' dictionary-based definition. Thus, to the extent that the limitations in the dictionary definition contradict the claim language itself and the intrinsic record, the district court committed error in relying on such a definition.

In this case, the district court's inclusion of language that narrows the meaning of network hub switching center is not supported by the claim language or the specification. As this Court has repeatedly noted, "[i]t is a bedrock principle of patent law that *the claims* of a patent define the invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)

(emphasis added). Accordingly, "a claim construction analysis must begin and remain centered on the claim language itself." *Id.* at 1116. A construction that adds language to a claim without intrinsic support, but rather in response to an infringement (or noninfringement) read, is impermissible. *See Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014).

Adopting much of Appellees' proposed construction, the district court construed the term "network hub switching center to mean "a switching center that performs the switching functions needed for operation of the subscriber units in a group of cells that the switching center services." A52. Critical to the analysis here (and at summary judgment below) was the court's inclusion of the limitation that the network hub switching center had to "service[]" "a group of cells."

To begin, the claim language and specification of the '491 Patent do not support a limitation that the network hub switching center and the base station repeater cells have a special relationship, much less one in which the network hub switching center "serves" the cells. Claim 13 vitiates the court's construction because the claimed system there bypasses "a group of cells" altogether. The invention in Claim 13 is a "two-way communication system" comprised of three components: (1) a "subscriber unit" containing "switching means for selecting a communication path" and located within a "base station geographic area"; (2) a "network hub switching center for routing communications from and to . . . [the]

-48-

subscriber unit"; and (3) a "modem communicatively coupled" to the subscriber unit and the network hub switching center, for allowing communication between the two if the "subscriber unit is unable to communicate directly with a local base station repeater cell." A8 at 8:36–54. Nothing in the language of Claim 13 indicates that the network hub switching center and the base station have any relationship, much less one where the network hub switching center "serves" a base station. *See* A8 at 8:36–54.

The description in the '491 Patent's specification further supports the reading that a network hub switching center and a base station repeater cell do not have a mandatory relationship: "another embodiment of the present invention is shown in which subscriber unit 12 communicates directly with a network hub switching center 30 via modem 22." A6 at 4:64–68. Indeed, the system claimed in Claim 13 based on this preferred embodiment does not even need a base station repeater cell to function: "As shown in the embodiment of FIG. 3, *in instances where no local base station repeater cell is located proximate to subscriber unit 12*, two-way interactive communication is still possible. *Because there is no local base station repeater cell*, subscriber unit 12 is unable to receive rf signals from a local base station repeater cell." A6 at 4:68 to A7 at 5:8 (emphasis added). Figure 3 from the '491 Patent corroborates this point; a base station repeater cell is not even present in the figure:

FIG. 3



A4.

System Claim 1 and method Claim 17 provide further support that there is no mandatory "serving" relationship between the network hub switching center and base station repeater cells. System Claim 1 discusses the relationship between the base stations and subscriber units, and provides a number of details regarding the base stations, but is void of any language that would suggest that the switching center must "serve" the base station. *See* A7 at 6:17–64. Further, the specification's discussion of Claim 1 does not even reference the network hub switching center. *See* A6 at 3:33–4:63; *see also* A3 (Fig. 2). Method Claim 17 likewise contains no support for the district court's reading; the only relationship that it suggests between the base station and the network hub switching center is that the two are able to communicate with one another. *See* A9 at 9:5–29.

The district court ignored this evidence, instead relying on a phrase from Claim 1 of the '101 Patent that the court contends defines "network hub switching center." A51. That portion of the '101 Patent reads:

> A base station configuration in a two-way communication interactive video network having a network hub switching center for routing communications from and to a plurality of subscriber units at various geographic locations *served by a base station* that processes digital data . . . .

A1100 at 11:20–25 (emphasis added). The district court contends that the phrase "served by a base station" in this claim indicates that the network hub switching center serves base stations. But there are several problems with such a reading. First, it is grammatically incorrect—the phrase "served by a base station" modifies the "subscriber units at various geographic locations" in the claim, not the "network hub switching center." This is corroborated throughout the '101 Patent, which notes in several other claims that the base stations serve subscriber units. *See, e.g.*, A1101 at 13:9–10 (Claim 16) (claiming a system where, *inter alia*, "at least some of said base stations serve a set of subscriber units"); A1101 at 13:34–35 (Claim 17) (same).

The court's reading is grammatically incorrect for a second reason. If the phrase "served by a base station" does modify "network hub switching center," then the correct construction would be that the base station *serves* the network hub switching center ("a network hub switching center . . . *served by* a base station"),

rather than the court's misreading that the network hub switching center *serves* a base station or group of cells.

In sum, the '491 Patent contains no support for—and controverts—the district court's construction of "network hub switching center," and the only evidence that the district court cites to support its construction is a misreading of Claim 1 in the parent patent.

### B. The District Court Impermissibly Based Its Construction on a Noninfringement Read.

As EON notes above, it is well settled that "claims *may not* be construed by reference to the accused device." *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002) (emphasis added). As this Court has explained:

> [T]hat rule posits that a court may not use the accused product or process as a form of extrinsic evidence to supply limitations for patent claim language. Thus, the rule forbids a court from tailoring a claim construction to fit the dimensions of the accused product or process . . . .

*Wilson Sporting Goods, Co v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006). In no uncertain terms, the rule "forbids biasing the claim construction process to exclude or include specific features of the accused product or process." *Id.*

Although the *Wilson Sporting Goods* Court noted that the rule does not forbid the district court from noting the context of the accused instrumentalities, it

emphasized that district courts could not construe claims to include or exclude those instrumentalities: "While a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction." *Id.* at 1326–27.

Yet the court's construction of network hub switching center does precisely that: it creates an exclusion based on the accused instrumentality. EON argued that infringement occurred if, *inter alia*, a cellular handset communicated with the cellular network using the patented system where a web server like Google's was used as the communication hub (for instance, meaning that communications were sent between the subscriber units and the Google, or other, email server). A890. Appellees openly sought to exclude that infringement theory from the case through claim construction, admitting twice at the claim construction hearing that the only reason they proposed network hub switching center for construction was because of the third-party-web-server infringement theories. A280–81. For this reason, the court's infringement-minded construction of the network hub switching center term was in error.

## C. The District Court Impermissibly Limited Network Hub Switching Center To Exclude a Preferred Embodiment of the Invention.

The district court's limitations on network hub switching center, rooted in a dictionary definition unmoored to the claim language and based on a noninfringement read, also lead the court to read preferred embodiments out of the claims. As this Court has frequently noted, a claim construction that reads a preferred embodiment out of a claim "is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics*, 90 F.3d at 1583. No such support for the court's reading exists here.

The '491 Patent contains two embodiments in which the modem (Path B) is connected to the "public switched network." Figures 2 and 3 in the patent demonstrate the connection between the modem and the public switched network:

Case: 14-1496 Case: 14-1496 PARTICIPANTS ONLY Document: 53 Page: 64 Filed: 08/21/2014 Page: 64 Filed: 08/21/2014

# FIG. 2



# FIG. 3



A3; A4; *see also* A6 at 3:55–58; A7 at 5:8–11. As EON noted in both its claim construction briefing and its opposition to the summary judgment, the "public switched network" is *not* part of a cellular network but refers instead to any network that provides communication capabilities among public users, one example being the Internet. A170 & n.80; A890.

In its Summary Judgment Order, the court rejected such an interpretation, noting that "network" in "network hub switching center" meant "a cellular core network" (an accused instrumentality), and that the network could not be "something as expansive as the Internet." A29. The court reasoned that the public switched network must be part of the cellular core network because Figure 2 shows the public switched network between the modem and the base station repeater cell. A29. But that argument ignores that Figure 3 does not contain such a configuration because, in that figure, the public switched network sits between the modem and the network hub switching center. *See* A4. Furthermore, the court's assumption that the public switched network was part of a cellular core network finds no support in the '491 Patent or the '101 Patent, which refer to various links between network components as being of any available kind. *See* A7 at 5:9–15 (noting that the modem and network hub switching center may be connected via "hard wire link and public switched network," "telephone line," "cable," or "other means"); A1097 at 5:56–59 (noting that remote receivers may be connected by

-56-

"cable, microwave, or leased telephone line"). Thus, by limiting "network" in "network hub switching center" to an accused instrumentality—a cellular core network—the district court impermissibly read preferred embodiments out of the claim element.

## III. THE DISTRICT COURT ERRED IN FINDING NO INFRINGEMENT.

In light of the claim construction errors identified above, the district court's grant of summary judgment of noninfringement based upon an underlying erroneous claim construction should be vacated. *See, e.g.*, *Phillips*, 415 F.3d at 1328; *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1335 (Fed. Cir. 2003). In addition, with respect to both the system and method claims, the court did not properly consider the relevant evidence that EON set forth, establishing that genuine issues of material fact should defeat summary judgment. The district court abused its discretion by finding that EON's evidence was unsworn and inadmissible. A17. Despite objecting to the lack of an affidavit in their Reply Brief, Appellees cited to this evidence and did not file a motion to strike, conceding admissibility. *See* A904–05. Moreover, EON provided sworn affidavits from counsel and its expert declaring that the evidence was accurate and authentic. A1814–15, A1818–20; *see Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (holding that evidence need not be in an admissible form to be considered at summary judgment as long as its contents *could be* admissible at trial); *Hughes v.*

*United States*, 953 F.2d 531, 543 (9th Cir. 1992) (holding that an affidavit may be considered on summary judgment even though it might not be in a form that would be admissible at trial). Finally, although the district court claims to have considered EON's evidence (despite calling it inadmissible), it failed to accord it proper weight and consideration, as explained below.

### A. Genuine Issues of Material Fact Regarding Literal Infringement of the System Claims Remain.

At summary judgment, EON presented evidence raising genuine issues of material fact that one or more of the accused systems literally infringe the system claims. Specifically, EON presented evidence that users configure the accused handsets to transfer to wi-fi when the cellular service is impaired. A875, A879–80; *see also* A1216 (Ex. 2); A1253, A1255–56 (Ex. 3); A1281 (Ex. 4); A1688 (Ex. 8); A1697 (Ex. 11); A1700 (Ex. 12). The district court did not consider this evidence and incorrectly stated that it was undisputed that the accused handsets transfer communication from cellular to wi-fi regardless of the availability of cellular service. A18. EON's evidence showed that there is at least one infringing use (for example, when users first configure wi-fi) and raised genuine issues as to whether, under the district court's construction, the accused products literally infringe the system claims.

The district court also disregarded EON's expert evidence that raised genuine issues of material fact regarding whether the accused femtocells infringe

the system claims.  A22.  EON's expert explained that when users have poor cellular coverage, they can turn on femtocells and communicate over this alternate path.  A1258–61.  The district court dismissed this evidence on the ground that because a femtocell and cell tower transmit the same cellular (or Path A) signals, so there is no separate path to seek out a femtocell connection.  A22.

Nothing in the intrinsic record would support a requirement that the base station and modem links must use different frequencies.  In fact, the specification suggests that Path A and Path B would use the same rf frequency or alternatively different frequencies.  A6 at 3:13–15; 3:62–4:2 (disclosing rf links of 218–219 MHz and 902 MHz or 45 MHz).  Moreover, certain dependent claims require the system to use specific rf frequencies.  *See* A8 at 7:1–3 (Claim 3) (limiting rf frequency to 218–219 MHz); A8 at 7:55–60 (Claim 8) (same); A8 at 7:66–8:4 (Claim 10) (same); A8 at 8:58–61 (Claim 15) (same); A9 at 10:8–14 (Claim 20) (same); A9 at 10:20–25 (Claim 22) (same).   Under the doctrine of claim differentiation, it was erroneous for the district court to limit the independent claims to requiring that the rf frequency used for communications between the subscriber unit and modem must be different than the rf frequency used for communications between the subscriber unit and the base station.  Two claims of a patent are presumptively of different scope.  *See Comark Comm'ns Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).  It was therefore erroneous for the

district court to dismiss EON's evidence raising genuine issues of material fact with respect to the femtocell infringement read.

### B. Genuine Issues of Material Fact Regarding Literal Infringement of the Method Claims Remain.

As concerns method claims 5 and 17 and their dependents, the district court erred for the same reasons identified above with respect to the system claims. In addition, the district court overlooked several distinctions between the system and method claims.

First, the method claims do not recite a "switching means" and therefore cannot require an ongoing automatic determination of pathway access and switching between paths. EON presented expert evidence that the method claims are literally infringed when a user makes a determination just once, at the outset of failure in the cellular path, to activate or install an alternative path via a wi-fi or femtocell connection. A1252–53; A1278–79 A1293; A1300–01; A1306–08.

Second, under this Court's precedent, method claims allow for user involvement, *see, e.g.*, *CyberSource Corp.*, 654 F.3d at 1373, and the district court acknowledged that method claims are agnostic as to who performs the steps. A27.

Third, contrary to the district court's finding that EON did not submit infringement contentions and claim charts detailing the non-infringement theories advanced in opposition to summary judgment, A26 (noting that EON made "no mention of the user whatsoever"), EON in fact made such submissions. *See, e.g.*,

A1793, A1796 (noting a user's interaction with the device by turning it off or configuring it).  The district court erred in failing to consider this evidence.

### C. The District Court Erred in Finding No Material Issues of Fact Existed Regarding Noninfringement Under the Doctrine of Equivalents.

The district court's failure to consider and give adequate weight to EON's evidence is likewise relevant to the court's refusal to consider EON's theories regarding the doctrine of equivalents.   As the district court acknowledged, "determining equivalency is normally a question of fact for the jury."  A30–31.  Here, equivalence should not have been decided by summary judgment given EON's evidence. The district court did not analyze whether the accused instrumentalities, viewed as a whole, operate in substantially the same way, and have substantially the same function and result, as the claimed invention.  Nor did the district court evaluate whether any changed element operates in substantially the same way as the claimed elements.  The range of equivalents to which the '491 Patent is entitled presents material fact issues relating to the nature and closeness of the prior art.   None of these fact issues were evaluated by the district court, making its determination of no infringement under the doctrine of equivalents unwarranted.

EON's expert opined that, if the conditional limitation is not met literally, then the accused systems meet this limitation under the DOE.  *See* A872–73; *see,*

*e.g.*, A1257, A1307–08.  When the signal in a particular location is poor, the user will install a wi-fi access point or a femtocell and configure the handset to always connect to that alternate path when access to it is near.  *Id.*  EON's expert explained that any difference between (a) conditioning the first initial use of the wi-fi or femtocell as a result of impairment in cellular function and thereafter using the wi-fi or femtocell when traffic is near, compared to (b) instantaneously and automatically determining and putting a wi-fi access point or femtocell in use would be insubstantial because the customer not only determines that cellular function is impaired but at the same time determines that the condition will not be rectified in the near future.  *See id.*  Similarly, a user affirmatively enabling the handset to switch from a cellular path to a wi-fi or femtocell path is insubstantially different from an intelligent switch that determines to switch paths when the subscriber unit is unable to communicate with the base station in the present tense sense.  *Id.*

EON's expert also opined that the method claims are infringed under equivalents.  *See* A872–73; *see, e.g.*, A1257, A1307–08.  The district court did not consider this evidence.  Nor did it perform a separate equivalents analysis, pointing instead to the same analysis it rendered with respect to literal infringement.  "Although framed in equivalence language, the court's analysis is no more than a substituted test for literal infringement."  *Martin v. Barber*, 755 F.2d 1564, 1567–

68 (Fed. Cir. 1985) (reversing summary judgment of non-infringement under equivalents).

In conclusion, the district court erred when it held that it was undisputed that no uses of the accused systems and methods meet the limitations of the asserted claims. Numerous disputed facts remain for the jury to resolve as to whether the accused handsets and femtocells infringe literally and under the doctrine of equivalents.

## CONCLUSION

For the foregoing reasons, EON respectfully requests that the Court vacate the district court's claim construction of the conditional "if" terms and "network hub switching center," vacate the district court's granting of summary judgment based on those constructions, and remand this case for further proceedings below.

Respectfully submitted,

_/s/ John L. Hendricks_

JOHN L. HENDRICKS
DANIEL SCARDINO
MATTHEW MURRELL
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-615-5792

TERESA M. SUMMERS
SUMMERS LAW GROUP LLC

300 New Jersey Ave., NW
Suite 900
Washington, DC 20001
202-664-0926

*Counsel for Plaintiff–Appellant*

August 21, 2014

CASE PARTICIPANTS ONLY    Case: 14-1496    Document: 51    Page: 74    Filed: 08/21/2014

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

## PATENT-IN-SUIT

U.S. Patent No. 5,592,491.............................................................................A1–A10

## JUDGMENTS AND ORDERS APPEALED FROM

Order Granting Defendants' Motion For Summary Judgment,
*EON Corp. IP Holdings, LLC v. Cisco Systems, Inc., et.
al.*, No. 12-cv-01011-JST, ECF No. 1029, (N.D. Cal.
Apr. 1, 2014) ...................................................................................A11–A31

Order Granting Summary Judgment To Defendant Motorola
Systems, Inc., *EON Corp. IP Holdings, LLC v. Cisco
Systems, Inc., et. al.*, No. 12-cv-01011-JST, ECF No. 1039,
(N.D. Cal. Apr. 24, 2014) ...............................................................A32–A33

Judgment, *EON Corp. IP Holdings, LLC v. Cisco Systems, Inc.,
et. al.*, No. 12-cv-01011-JST, ECF No. 1037, (N.D. Cal.
Apr. 24, 2014) .................................................................................A34–A35

Revised *Markman* Order, *EON Corp. IP Holdings, LLC v. Cisco
Systems, Inc., et. al.*, No. 12-cv-01011-JST, ECF No. 979,
(N.D. Cal. March 5, 2014) ..............................................................A36–A66

US005592491A

# United States Patent [19]

**Dinkins**

[11] **Patent Number:** **5,592,491**

[45] **Date of Patent:** **Jan. 7, 1997**

[54] **WIRELESS MODEM**

[75] Inventor: **Gilbert M. Dinkins**, Herndon, Va.

[73] Assignee: **EON Corporation**, Reston, Va.

[21] Appl. No.: **348,618**

[22] Filed: **Dec. 2, 1994**

**Related U.S. Application Data**

[63] Continuation-in-part of Ser. No. 966,414, Oct. 26, 1992, Pat. No. 5,388,101.

[51] **Int. Cl.$^6$** ...................................... **H04J 3/16**
[52] **U.S. Cl.** ............................ **370/277**; 455/11.1; 379/59
[58] **Field of Search** ................................. 370/95.1, 95.2, 370/95.3, 60, 60.1, 94.1, 94.2, 75, 32, 97; 455/34.1, 34.2, 57.1, 58.2, 56.1, 50.1, 51.1, 54.1, 33.1, 33.2, 33.3, 11.1, 13.1, 13.2, 13.3, 13.4, 15, 16; 375/211, 222; 379/4

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 5,282,204 | 1/1994 | Shpancer et al. | 370/95.1 |
| 5,494,698 | 8/1995 | Kito | 370/95.1 |

*Primary Examiner*—Douglas W. Olms
*Assistant Examiner*—Dang Ton
*Attorney, Agent, or Firm*—Cushman Darby & Cushman IP Grop of Pillsbury Madison & Sutro, LLP

[57] **ABSTRACT**

A system and method for communicating between local subscriber units and a local base station repeater cell in a two-way communication interactive video network. In one embodiment, a modem is used to enable communications between a subscriber unit and a local base station repeater cell when the subscriber units are unable to receive rf transmissions from the local base station repeater cell. The local base station repeater cell is connected via a telephone line to the modem. Data communications are sent from the local base station repeater cell to the modem. The modem is also connected via an rf link to the subscriber unit. The modem then transmits the data communications received from the local base station repeater cell to the subscriber unit. Responses from the subscriber unit are then transmitted over the rf link from the subscriber unit to the modem. The modem then transmits the responses over the telephone line to the local base station repeater cell.

**23 Claims, 3 Drawing Sheets**



# FIG. 1 (Prior Art)



Case: 14-1496 Case: 14-1496 CASE PARTICIPANTS ONLY Document: 53 Page: 78 Filed: 08/28/2014 Filed: 08/21/2014

# FIG. 2





FIG. 3

5,592,491

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## WIRELESS MODEM

This is a continuation-in-part of an application Ser. No. 07/966,414, filed Oct. 26, 1992, by G. Dinkins, entitled "Interactive Nationwide Data Service Communication System For Stationary And Mobile Battery Operated Subscriber Units", which issued as U.S. Pat. No. 5,388,101.

## TECHNICAL FIELD

This invention relates to an interactive two-way data service network, and more particularly, to communication within an interactive two-way broadcast data service network.

## BACKGROUND ART

Communication within an interactive two-way broadcast data service network is described in detail in application Ser. No. 07/966,414, filed Oct. 26, 1992 now U.S. Pat. No. 5,388,101 G. Dinkins, entitled "Interactive Nationwide Data Service Communication System For Stationary And Mobile Battery Operated Subscriber Units" which is incorporated herein by reference. In such a system, a local base station repeater cell comprises a central transmitter and data processing site for transmitting digital data to individual low-cost, portable, battery-operated, milliwatt transmitter, subscriber units within a local base station designated area. A plurality of receive only stations, remote receivers, are distributed throughout the local base station designated area and are connected by wire, cable, microwave link, or radio to the local base station repeater cell. The remote receivers process and relay transmitted digital data received from the individual subscriber units. Thus, the local base station repeater cell transmits data directly to the individual subscriber units. The milliwatt transmitter individual subscriber units, however, do not transmit data directly back to the local base station repeater cell. Instead, the individual subscriber units transmit to a remote receiver which then relays the data to the local base station repeater cell. The use or remote receivers allows the individual subscriber units to transmit data using power in the milliwatt range.

Unfortunately, under certain conditions, individual subscriber units are unable to receive transmissions from the local base station repeater cell. For example, a user may purchase a subscriber unit and place the subscriber unit in an area which is not yet equipped with or is not covered by a local base station repeater cell. Additionally, a subscriber unit may be located within range of a local base station repeater cell, but may be positioned, for example, in a basement or other physical location which prevents the subscriber unit from receiving transmissions from the local base station repeater cell.

In an attempt to alleviate reception problems, local base station repeater cells have been situated with overlapping coverage to produce strong signals throughout a given area. However, such placement of local base station repeater cells is extremely costly due to the number of local base station repeater cells required, and such "crowded" placement of the local base station repeater cells is not always practical. In a further attempt to deal with ineffective communication between the local base station repeater cell and the subscriber unit, the location of the user is determined at the time of sale of the subscriber unit to the user. However, even if the user's location is within an area covered by the local base station repeater cell, the subscriber unit might still be placed in a physical location which prevents the subscriber unit from receiving signals from the local base station repeater cell.

Thus, the need has arisen for a system to enable communications between a subscriber unit and a local base station repeater cell in areas where such communication has previously been impaired, which does not require the addition of numerous costly local station repeater cells, which is not dependent on the physical location of the subscriber unit, and which does not significantly increase the cost of communication within the interactive two-way broadcast data service network.

## DISCLOSURE OF THE INVENTION

It is therefore an object of the present invention to provide a system to enable communications between a subscriber unit and a local base station repeater cell in areas where such communication has previously been impaired, which does not require the addition of numerous costly local station repeater cells, which is not dependent on the physical location of the subscriber unit, and which does not significantly increase the cost of communication within the interactive two-way broadcast data service network. The above object has been achieved using a modem which is used to enable communications between a subscriber unit and a local base station repeater cell when the subscriber units are unable to receive rf transmissions from the local base station repeater cell. The local base station repeater cell is connected via a telephone line to the modem. Data communications are sent from the local base station repeater cell to the modem. The modem is also connected via an rf link to the subscriber unit. The modem then transmits the data communications received from the local base station repeater cell to the subscriber unit. Responses from the subscriber unit are then transmitted over the rf link from the subscriber unit to the modem. The modem then transmits the responses over the telephone line to the local base station repeater cell. In so doing, two-way communications in an interactive broadcast network are achieved even in conditions which have previously prevented such communications.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and form a part of this specification, illustrate embodiments of the invention and, together with the description, serve to explain the principles of the invention:

FIG. 1 shows a Prior Art interactive broadcast system wherein a local base station repeater cell transmits data directly to a subscriber unit.

FIG. 2 shows a communication system in an interactive broadcast system wherein a modem enables communication between a local base station repeater cell and a subscriber unit over one of two separate paths in accordance with the present invention.

FIG. 3 shows another embodiment of a communication system in an interactive broadcast system wherein a modem enables communication between a subscriber unit and a network hub switching center in accordance with the present invention.

## BEST MODE FOR CARRYING OUT THE INVENTION

Reference will now be made in detail to the preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings. While the invention

5,592,491

will be described in conjunction with the preferred embodiments, it will be understood that they are not intended to limit the invention to these embodiments. On the contrary, the invention is intended to cover alternatives, modifications and equivalents, which may be included within the spirit and scope of the invention as defined by the appended claims.

With reference now to Prior Art FIG. 1, an interactive broadcast network as set forth in application Ser. No. 07/966,414, filed Oct. 26, 1992, now U.S. Pat. No. 5,388, 101 by G. Dinkins, entitled "Interactive Nationwide Data Service Communication System For Stationary And Mobile Battery Operated Subscriber Units" is schematically shown. As shown in Prior Art FIG. 1, a local base station repeater cell 10 communicates with a subscriber unit 12 over an rf link 14 of, for example 218–219 MHz. Subscriber unit 12 transmits data back to local base station repeater cell 10 via a remote receiver 16. That is, subscriber unit 12 transmits messages directly to remote receiver 16 over an rf link 18. Remote receiver 16 then transfers the messages received from subscriber unit 12 to local base station repeater cell 10 over, for example, hard wire link 20.

With reference still to Prior Art FIG. 1, under certain conditions, subscriber unit 12 is unable to receive transmissions via rf link 14 from local base station repeater cell 10. For example, subscriber unit 12 may be placed in an area which is not yet equipped with or is not covered by a local base station repeater cell. Additionally, subscriber unit 12 may be located within range of local base station repeater cell 10, but may be positioned, for example, in a basement or other physical location which prevents subscriber unit 12 from receiving transmissions from local base station repeater cell 10 over rf link 14.

With reference next to FIG. 2, a communication system including a modem 22 for enabling communication between a local base station repeater cell 10 and a subscriber unit 12 is shown. As shown in FIG. 2, subscriber unit 12 includes switching means such as, for example, an electronic switch 13 for selecting the path of communication between subscriber unit 12 and local base station repeater cell 10. Specifically, in the present embodiment, if subscriber unit 12 is able to detect rf signals from local base station repeater cell 10 switching means 13 assumes a default position "Path A". When switching means 13 of subscriber unit 12 selects Path A, subscriber unit 12 receives rf signals directly from local base station repeater cell 10 over rf link 14, and transmits data over an rf link 18 to remote receiver 16 which then transfers the data to local base station repeater cell 10 over hard link 20.

With reference again to FIG. 2, when subscriber unit 12 is unable to receive rf signals directly from local base station repeater cell 10, switching means 13 selects "Path B". Thus, if subscriber unit 12 is unable to receive rf signals from local base station repeater cell 10, communication between subscriber unit 12 and local base station repeater cell 10 occurs along Path B using modem 22. When switching means 13 of subscriber unit 12 selects Path B, local base station repeater cell 10 transmits messages to modem 22 via, for example, telephone line 24 and public switched network 25. Although a telephone line is used in the present embodiment, the present invention is also well suited to having local base station repeater cell 10 and modem 22 connected by, for example cable, or other means. As shown in FIG. 2, modem 22 communicates with subscriber unit 12 via an rf link 26. In the present embodiment, rf link 26 is at a frequency of approximately 218–219 MHz. Although a frequency of approximately 218–219 MHz is used in the present embodiment, the present invention is also well suited to the use of

other frequencies such as, for example, 902 MHz or 45 MHz. Subscriber unit 12 then responds to messages and transmits data messages to local base station repeater cell 10 via modem 22. That is, subscriber unit 12 sends a data message or response over rf link 26 to modem 22. Modem 22 then relays that message or response over link 24 back to local base station repeater cell 10. Thus, two-way communication between local base station repeater cell 10 and subscriber unit 12 is achieved.

With reference still to FIG. 2, in the present embodiment, when communicating over Path B, modem 22 is connected to local base station repeater cell 10 through telephone line 24 using, for example, either an 800 or 900 telephone number. Next, TV listings, for example are downloaded into modem 22 and into subscriber unit 12. The telephone link between subscriber unit 22 and local base station repeater cell 10 via modem 22 is broken after approximately 30 seconds allowing for normal use of the telephone line. Use of the link between subscriber unit 22 and local base station repeater cell 10 via modem 22 is protected by a serial number handshake. Initiation of auto dial-up on a daily or more frequent schedule by subscriber unit 12 insures that the data received by subscriber unit 12 remains current.

Referring still to FIG. 2, the present invention provides for two-way communication between local base station repeater cell 10 and subscriber unit 12 even if subscriber unit 12 is unable to receive rf signals directly from local base station repeater cell 10. Thus, two-way communication between local base station repeater cell 10 and subscriber unit 12 is achieved even when subscriber unit 12 is placed in an area which is not yet equipped with or is not covered by a local base station repeater cell. Additionally, subscriber unit 12 may be located within range of local base station repeater cell 10, but may be positioned, for example, in a basement or other physical location which prevents subscriber unit 12 from receiving transmissions from local base station repeater cell 10 over rf link 14. Furthermore, because subscriber unit 12 only has to transmit messages to nearby modem 22, subscriber unit 12 has a maximum power output in the milliwatt range.

With reference again to FIG. 2, by including remote receiver 16, the present invention is able to function in a standard manner as soon as subscriber unit 12 is able to receive rf signals from local base station repeater cell 10. That is, if subscriber unit 12 is moved, for example, from a basement which prevents the subscriber unit from receiving rf signals from local base station repeater cell 10 to an area in which subscriber unit 12 can receive rf signals from local base station repeater cell 10, conventional two-way communication is resumed. Thus, subscriber unit 12 would receive rf signals directly from local base station repeater cell 10, switching means 13 of subscriber unit 12 would select Path A, and subscriber unit 12 would respond or transmit data messages back to local base station repeater cell 10 via remote receiver 16 thereby eliminating the need for modem 22. Therefore, the present invention is able to compliment a standard two-way interactive data broadcast network and provide two-way communications even in conditions which have previously prevented such communications. Additionally, the present invention does not substantially increase the cost of the standard two-way interactive data broadcast network, and does not require additional local base station repeater cells.

With reference next to FIG. 3, another embodiment of the present invention is shown in which subscriber unit 12 communicates directly with a network hub switching center 30 via modem 22. As shown in the embodiment of FIG. 3,

5,592,491

in instances where no local base station repeater cell is located proximate to subscriber unit 12, two-way interactive communication is still possible. Because there is no local base station repeater cell, subscriber unit 12 is unable to receive rf signals from a local base station repeater cell. Thus, switching means 13 selects Path B, such that communication to and from subscriber unit 12 occurs through modem 22.

Referring again to FIG. 3, in the present embodiment, network hub switching center 30 communicates with modem 22 over hard wire link 32 and public switched network 33. Although a telephone line is used in the present embodiment, the present invention is also well suited to having local network hub switching center 30 and modem 22 connected by, for example cable, or other means. As shown in FIG. 3, modem 22 communicates with subscriber unit 12 via an rf link 26. In the present embodiment, rf link 26 is at a frequency of approximately 218–219 MHz. Although a frequency of approximately 218–219 MHz is used in the present embodiment, the present invention is also well suited to the use of other frequencies such as, for example, 902 MHz or 45 MHz. Subscriber unit 12 then responds to messages and transmits data messages to network hub switching center 30 via modem 22. That is, subscriber unit 12 sends a data message or response over rf link 26 to modem 22. Modem 22 then relays that message or response over link 32 back to network hub switching center 30. Thus, two-way communication between network hub switching center 30 and subscriber unit 12 is achieved.

With reference still to FIG. 3, in the present embodiment, modem 22 is connected to network hub switching center 30 through telephone line 32 using, for example, either an 800 or 900 telephone number. The telephone link between subscriber unit 22 and network hub switching center 30 via modem 22 is broken after approximately 30 seconds allowing for normal use of the telephone line. Use of the link between subscriber unit 22 and network hub switching center 30 via modem 22 is protected by a serial number handshake. Initiation of auto dial-up on a daily schedule by subscriber unit 12 insures that the data received by subscriber unit 12 remains current.

With reference again to FIG. 3, modem 22 is also adapted to communicate with a local base station repeater cell when a local base station repeater cell is located proximate to subscriber unit 12. That is, modem 22 is also able to transmit data through line 34 to a local base station repeater cell when a local base station repeater cell becomes available. Therefore, the present invention is able to compliment a standard two-way interactive data broadcast network and provide two-way communications even in conditions which have previously prevented such communications. Additionally, the present invention provides two-way communications even when a local base station repeater cell is not located proximate to a subscriber unit.

The present invention also provides several substantial benefits over a standard two-way interactive data broadcast network. The present invention can be used to provide wireless facsimile service, or to request pay-per-view services even when the subscriber unit is not able to receive rf signals from the local base station repeater cell. Likewise, the present invention also provides for immediate modem access even when the subscriber unit is located, for example, at poolside etc. Additionally, a single modem of the present communication system can be mounted in such a location as to be able to communicate via an rf link to numerous subscriber units placed within homes located, for example, along a single street or within the same neighborhood. In so

doing, the present communication system is able to collect data from a number of home appliances, etc.

The foregoing descriptions of specific embodiments of the present invention have been presented for purposes of illustration and description. They are not intended to be exhaustive or to limit the invention to the precise forms disclosed, and obviously many modifications and variations are possible in light of the above teaching. The embodiments were chosen and described in order to best explain the principles of the invention and its practical application, to thereby enable others skilled in the art to best utilize the invention and various embodiments with various modifications as are suited to the particular us contemplated. It is intended that the scope of the invention be defined by the claims appended hereto and their equivalents.

I claim:

1. A two-way communication network comprising:

a network hub switching center;

subscriber units dispersed at various locations within a predetermined geographic area, said subscriber units including switching means for selecting a communication path within said network,

local base station repeater cell communicating with identified individual subscriber units within a local base station geographic area associated with said local base station repeater cell, said local base station repeater cell further comprising,

base station data processing and communication unit for transmitting to a set of said subscriber units contained within said local base station geographic area associated with said local base station repeater cell and receiving from a subset of said set of local subscriber units multiplexed synchronously related digital data messages of variable lengths for point-to-point communication between said local base station repeater cell and said subset of said local subscriber units,

reception for receiving and processing data messages from said set of local subscriber units comprising a local remote receiver disposed within one of a plurality of cell subdivision sites partitioned from said local base station geographic area associated with said local base station repeater cell, said plurality of cell subdivision sites dispersed over said local base station geographic area, said local remote receiver being adapted to receive low power digital messages transmitted from said local subscriber units within range of said local remote receiver,

said set of local subscriber units including low power mobile units located within said local base station geographic area, each of said local subscriber units adapted to communicate with said local base station repeater cell by way of digital data signals of variable lengths synchronously related to a base station broadcast signal and timed for multiplexed message transmission, and

a modem communicatively coupled to said local subscriber units and said local base station repeater cell for transferring said multiplexed synchronously related digital data messages of variable lengths between said set of local subscriber units and said local base station repeater cell if said local subscriber units are unable to directly communicate with said local base station repeater cell.

2. The base station configuration of claim 1 wherein said modem and said local subscriber units are communicatively coupled via an rf link.

5,592,491

7

**3.** The base station configuration of claim **2** wherein said rf link between said modem and said local subscriber units is at an rf carrier frequency of approximately 218–219 MHz.

**4.** The base station configuration of claim **1** wherein said modem and said local base station repeater cell are communicatively coupled via a telephone line.

**5.** A method of communicating between subscriber units and a local base station repeater cell comprising the steps of:

determining whether a subscriber unit located with a base station geographic area associated with said local base station repeater cell is receiving a signal from said local base station repeater cell;

if said subscriber unit is receiving a signal from said local base station repeater cell, performing the steps of:

transmitting outgoing data from said local base station repeater cell to said subscriber unit by directly transmitting a first outgoing data signal representative of said outgoing data from said local base station repeater cell to said subscriber unit, and

transmitting incoming data from said subscriber unit to said local base station repeater cell by transmitting a first incoming data signal representative of said incoming data from said subscriber unit to a receive only receiver unit and then transmitting a second incoming data signal also representative of said incoming data from said receiver unit to said local base station; and

if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of:

transmitting said outgoing data from said local base station repeater cell to said subscriber unit by transmitting a second outgoing data signal representative of said outgoing data from said local base station repeater cell to a modem and then transmitting a third outgoing data signal also representative of said outgoing data from said modem to said subscriber unit, and

transmitting said incoming data from said subscriber unit to said local base station repeater cell by transmitting a third incoming data signal representative of said incoming data from said subscriber unit to said modem and then transmitting a fourth incoming data signal also representative of said incoming data from said modem to said local base station.

**6.** The communication method of claim **5** wherein the step of transmitting said second outgoing data signal from said local base station repeater cell to said modem further comprises transmitting said second outgoing data signal from said local base station repeater cell to said modem via a telephone line.

**7.** The communication method of claim **5** wherein the step of transmitting said third outgoing data signal from said modem to said subscriber unit further comprises transmitting said third outgoing data signal from said modem to said subscriber unit via an rf link.

**8.** The communication method of claim **7** wherein the step of transmitting said third outgoing data signal from said modem to said subscriber unit via an rf link further comprises transmitting said third outgoing data signal from said modem to said subscriber unit at an rf carrier frequency of approximately 218–219 MHz.

**9.** The communication method of claim **5** wherein the step of transmitting said third incoming data signal from said subscriber unit to said modem further comprises transmitting said third incoming data signal from said subscriber unit to said modem via an rf link.

**10.** The communication method of claim **9** wherein the step of transmitting said third incoming data signal from said

8

subscriber unit to said modem via an rf link further comprises transmitting said third incoming data signal from said subscriber unit to said modem at an rf carrier frequency of approximately 218–219 MHz.

**11.** The communication method of claim **5** wherein the step of transmitting said fourth incoming data signal from said modem to said local base station repeater cell further comprises transmitting said fourth incoming data signal from said modem to said local base station repeater cell via a telephone line.

**12.** A digital cellular communication system comprising in combination:

a cell site divided into a plurality of subdivided zones,

a plurality of subscriber units with identity numbers based in said cell site,

a cell site communication system including a digital transmitter for communication with individual identified subscriber units geographically located within said cell site,

a set of receive only digital receivers positioned in said subdivided zones, each said digital receiver being coupled by a transmission link with said cell site communication system to relay received digital communications,

a set of said subscriber units comprising portable wireless digital communication units with a limited power digital transmitter having a transmitting power for transmissions within said subdivided zones,

a receiver for reception of digital messages from said cell site digital transmitter,

a modem communicatively coupled to said local subscriber units and said digital transmitter for transferring data between said subscriber units and said digital transmitter if said subscriber units are unable to communicate directly with said digital transmitter.

**13.** A two-way communication system comprising:

at least one subscriber unit disposed within a predetermined base station geographic area, said at least one subscriber unit including switching means for selecting a communication path within said communication system,

a network hub switching center for routing communications from and to said at least one subscriber unit, and

a modem communicatively coupled to said at least one subscriber unit and said network hub switching center for transferring multiplexed synchronously related digital data messages of variable lengths between said at least one subscriber unit and said network hub switching center if said at least one subscriber unit is unable to communicate directly with a local base station repeater cell, said modem also adapted for communicating with said local base station repeater cell if communication therebetween is not otherwise prevented.

**14.** The base station configuration of claim **13** wherein said modem and said at least one subscriber unit are communicatively coupled via an rf link.

**15.** The base station configuration of claim **14** wherein said rf link between said modem and said at least one subscriber unit are at an rf carrier frequency of approximately 218–219 MHz.

**16.** The base station configuration of claim **13** wherein said modem and said network hub switching center are communicatively coupled via a telephone line.

**17.** A method of communicating between a subscriber unit and a network hub switching center in a two-communication system comprising the steps of:

5,592,491

9

determining whether a subscriber unit located with a base station geographic area associated a said local base station repeater cell is receiving a signal from said local base station repeater cell;

if said subscriber unit is receiving a signal from said local base station repeater cell, performing the steps of:

transmitting outgoing data from said network hub switching center to said subscriber unit via said local base station repeater cell, and

transmitting incoming data from said subscriber unit to said network hub switching center via said local base station repeater cell; and

if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of:

transmitting said outgoing data from said network hub switching center to said subscriber unit by transmitting a first outgoing data signal representative of said outgoing data from said network hub switching center to a modem and transmitting a second outgoing data signal also representative of said outgoing data from said modem to said local base station repeater cell, and

transmitting incoming data from said subscriber unit to said network hub switching center by transmitting a first incoming data signal representative of said incoming data from said subscriber unit to said modem and transmitting a second incoming data signal also representative of said incoming data from said modem to said network hub switching center.

**18**. The communication method of claim **17** wherein the step of transmitting said first outgoing data signal from said network hub switching center to said modem further comprises transmitting said first outgoing data signal from said

10

network hub switching center to said modem via a telephone line.

**19**. The communication method of claim **17** wherein the step of transmitting said second outgoing data signal from said modem to said subscriber unit further comprises transmitting said second outgoing data signal from said modem to said subscriber unit via an rf link.

**20**. The communication method of claim **19** wherein the step of transmitting said second outgoing data signal from said modem to said subscriber unit via an rf link further comprises transmitting said data from said modem to said subscriber unit at an rf carrier frequency of approximately 218–219 MHz.

**21**. The communication method of claim **17** wherein the step of transmitting said first incoming data signal from said subscriber unit to said modem further comprises transmitting said first incoming data signal from said subscriber unit to said modem via an rf link.

**22**. The communication method of claim **21** wherein the step of transmitting said first incoming data signal from said subscriber unit to said modem via an rf link further comprises transmitting said first incoming data signal from said subscriber unit to said modem at an rf carrier frequency of approximately 218–219 MHz.

**23**. The communication method of claim **17** wherein the step of transmitting said second incoming data signal from said modem to said network hub switching center further comprises transmitting said second incoming data signal from said modem to said network hub switching center via a telephone line.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.         : 5,592,491                                    Page 1 of  1
APPLICATION NO. : 08/348618
DATED               : January 7, 1997
INVENTOR(S)       : Gilbert M. Dinkins

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

At column 6, line 65 (in claim 2); column 7, line 1 (in claim 3); and column 7, line 4 (in claim 4):
The text "base station configuration" should read --two-way communication network--

At column 7, line 26 and line 43 (in claim 5):
The text "base station" should read --base station repeater cell--

At column 8, line 55 (in claim 14), column 8, line 58 (in claim 15); and column 8, line 62 (in claim 16):
The text "base station configuration" should read --two-way communication system--

At column 9, lines 21-22 (in Claim 17):
The text "local base station repeater cell" should read --subscriber unit--

Signed and Sealed this

Seventeenth Day of November, 2009

David J. Kappos
*Director of the United States Patent and Trademark Office*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EON CORP IP HOLDINGS LLC,

          Plaintiff,

     v.

CISCO SYSTEMS INC, et al.,

          Defendants.

Case No.  12-cv-01011-JST

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT**

Re: ECF No. 924.

## I.  INTRODUCTION

In this patent infringement action involving "Wireless Modem" Patent No. 5,592,491 ("the '491 Patent"), Defendants Cisco Systems, Inc. ("Cisco"), Sprint Spectrum L.P. ("Sprint"), HTC America, Inc. ("HTC"), United States Cellular Corporation ("U.S. Cellular"), Motorola Mobility LLC, and Motorola Solutions, Inc. (collectively, "Motorola") (collectively, "Defendants") have moved for summary judgment of noninfringement.  The matter came for hearing on March 13, 2014.

The '491 Patentee invented a system, and a set of methods, through which subscriber units respond to the unavailability of a cellular connection by transferring instead to a connection through a modem.  But the accused networks do not do that.  In the accused networks, cellular phones transfer to a modem-based Wi-Fi connection *whenever* there is a Wi-Fi connection, *regardless* of whether there is or is not an available cellular connection.  Accordingly, and for other reasons set forth more fully herein, Defendants are entitled to summary judgment of noninfringement of all asserted claims.

## II.  BACKGROUND

### A.  Procedural History

Plaintiff EON Corp. IP Holdings ("EON") filed this case in the Eastern District of Texas

United States District Court
Northern District of California

on October 22, 2010.  Plaintiff EON Corp. IP Holdings, LLC's Original Complaint, Case No. 2:10-cv-00448-DF (E.D. Tex. Oct. 22, 2010), ECF No. 1.  The current defendants are Cisco Systems, Inc. ("Cisco"), Sprint Spectrum L.P. ("Sprint"), HTC America, Inc. ("HTC"), United States Cellular Corporation ("U.S. Cellular"), Motorola Mobility LLC, and Motorola Solutions, Inc. (collectively, "Motorola") (collectively, "Defendants").  In January 2012, the Texas Court granted Defendants' motion to transfer venue to this Court.  Order granting Joint Motion to Transfer Venue to the Northern District of California, Case No. 2:10-cv-00448-DF (E.D. Tex. Jan. 9, 2012), ECF No. 277.

EON asserts that Defendants Sprint and U.S. Cellular directly and indirectly infringe the '491 Patent, and that the remaining defendants indirectly infringe.  Joint Case Management Statement 2:15-23, ECF No. 650.  The '491 Patent is a continuation-in-part of U.S. Patent No. 5,388,101 ("the 101 Patent"), which is incorporated by reference into the '491 Patent.

On May 10, 2013, the Court held a hearing for the purpose of construing disputed terms in the claims of the '491 Patent.  ECF No. 711.  At that hearing, the Court requested further briefing on issues regarding the invalidity of two of the claims of the patent.  The parties provided that supplemental briefing on May 24, May 31, and, at Defendants' request, on July 3, 2013, at which point the Court took the matter under submission. ECF Nos. 722, 724, 728, & 746.

After consideration of the arguments and evidence presented by the parties, and the relevant portions of the record, the Court issued an order construing the terms and determining that claims 1 and 13 were invalid. Order Construing and Determining Validity of Claims of United States Patent No. 5,592,491 ("First Cl. Constr. Order"), ECF No. 748, 2013 WL 3455631, 2013 U.S. Dist. LEXIS 95003 (N.D. Cal. July 8, 2013).  In February 2014, the Court granted EON's motion to reconsider the Court's invalidity determination and clarify its construction of the "modem communicatively coupled" term (neither of which form the basis of the instant motion for summary judgment).  Order Granting Motion for Reconsideration, ECF No. 965, 2014 WL 793323, 2014 U.S. Dist. LEXIS 24781 (N.D. Cal. Feb. 25, 2014). The Court then issued a revised claim construction order in conformance with its order granting the motion for reconsideration. Revised Order Construing and Determining Validity of Claims of United States Patent No.

5,592,491 ("Rev. Cl. Constr. Order"), ECF No. 979, 2014 WL 938511, 2014 U.S. Dist. LEXIS 29746.

After discovery, Defendants now move for summary judgment of noninfringement.

**B.      Patent-in-Suit and Asserted Claims**

The '491 Patent includes system claims 1, 12, and 13, and method claims 5 and 17.  A systems claim includes structural elements; "unlike use of a system as a whole . . . [a] method or process consists of one or more operative steps."  <u>NTP, Inc. v. Research in Motion, Ltd.</u>, 418 F.3d 1282, 1318 (Fed. Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 1174 (2006).

The system claims read on a communication network.  Claim 1 contains, among others, the limitations of a "network hub switching center," '491 Patent 6:17, "subscriber units . . . including switching means," <u>id.</u> 6:19-21, a "local base station repeater cell communicating with . . . subscriber units," <u>id.</u> 6:22-26, and a "modem . . . for transferring [signals] . . . if [] subscriber units are unable to directly communicate with said local base station repeater cell."  <u>Id.</u> 6:57-64.  Claim 12 contains, among others, limitations similar to the above in claim 1, except for the network hub switching center.  <u>Id.</u> 8:11-35.  Claim 13 contains, among others, limitations similar to the above in claim 1, but it does not explicitly recite the local base station repeater cell as a claimed element. <u>Id.</u> 8:36-54.

The claimed network functions as follows.  When the subscriber units are able to directly communicate with the local base station repeater cell, they use that communication path ("Path A").  <u>Id.</u> 3:33-48.  When the subscriber units cannot communicate through Path A, the switching means within the units transfer to communicate instead with the local base station repeater cell through the modem ("Path B").  <u>Id.</u> 3:49-48.

This feature is described in method claims 5 and 17.  Claim 5 claims a method of communicating between a subscriber unit and a local base station repeater cell.  The method includes the first steps of "determining whether a subscriber unit . . . is receiving a signal from said local base station repeater cell," <u>id.</u> 7:9-12.  If it is, it transmits data through Path A, <u>id.</u> 7:13-26, and if not, it transmits data through Path B.  <u>Id.</u> 7:27-43.  Similarly, claim 17 claims a method of communicating between a subscriber unit and a network hub switching center.  If the subscriber

3

**A13**

unit is receiving a signal from the local base station repeater cell, data is transmitted between the subscriber unit and the network hub switching center through Path A.  Id. 9:5-12.  If not, data is transmitted between the subscriber unit and the network hub switching center through Path B.  Id. 9:13-29.

### C.    Accused Products and Services

EON alleges that Defendants Sprint and U.S. Cellular directly infringe the '491 Patent by selling, offering to sell, making, and using the Sprint and U.S. Cellular Networks, respectively.  EON's Patent Local Rule 3-1 and 3-2 Disclosures ("Infringement Contentions") 6:20-7:7, Exh. A to Declaration of Byron R. Chin, ECF No. 928-4.[1]  These networks are the wireless communication networks offered to Sprint and U.S. Cellular subscribers.  Id.  The networks provide access to wireless communication facilities, including cellular, LTE, and Wi-Fi facilities and their related components.  Id.  In addition, EON alleges that Sprint and U.S. Cellular indirectly infringe.  Their subscribers allegedly directly infringe by using the networks, and Sprint and U.S. Cellular contribute to this direct infringement by providing material components.  Id. 9:19-10:17.  Sprint and U.S. Cellular also allegedly induce direct infringement by intentionally encouraging or instructing subscribers to use the infringing networks.  Id.

EON also claims that Defendants HTC and Motorola indirectly infringe by selling, offering to sell, making, using, and importing into the United States subscriber units that are material components of the claimed invention.  Id. 10:18-11:20.  EON further alleges that Defendant Cisco indirectly infringes by providing material components to mobile network operators ("MNOs") who make, use, sell or offer to sell femtocell networks, and to end-users who make and use femtocell networks.  Exh. B to Declaration of John R. Gibson 13:17-14:2, ECF No. 924-8.[2]  EON also alleges that Cisco induces indirect infringement by encouraging or instructing

---

[1] The infringement contentions operative against all Defendants but Cisco are dated July 24, 2012 and are filed with the Court as Exhibit A to the Chin Declaration, ECF No. 928-4.  The document does not contain page numbers.  The Court's pagination begins with page 1 as the title page on which the caption appears, which makes the page numbers one less than the Page Number on the ECF heading.

[2] The infringement contentions filed as Exhibit B to the Gibson Declaration, ECF No. 924-8, were

**A14**

United States District Court
Northern District of California

MNOs and end-users to make, use, sell or offer to sell femtocell networks.  Id.

Generally, EON has two theories of infringement.  One is that Wi-Fi access points and "mobile hotspots" function as the modems of the claimed invention.  These networks, EON argues, allow cell phones (allegedly equivalent to the claimed subscriber units) to establish Wi-Fi connections (allegedly equivalent to Path B) if there is no connection with a cellular tower (allegedly equivalent to Path A).  The other theory is that femtocells, which are transceivers of cellular signals, provide connections to cell phones (allegedly equivalent to Path B) if the cell phones cannot establish connections to cellular towers.

**D.    Jurisdiction**

Since this is a "civil action arising under" an "Act of Congress relating to patents," this Court has jurisdiction pursuant to 28 U.S.C. § 1338(a).

**E.    Legal Standard**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, and "material" only if the fact may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  All reasonable inferences must be drawn in the light most favorable to the non-moving party.  Olsen v. Idaho State Bd. of Med., 363 F.3d 916, 922 (9th Cir. 2004).  These standards apply with full force to summary judgment motions involving patent infringement claims.  See Union Carbide Corp. v. American Can Co., 724 F.2d 1567, 1571 (Fed. Cir. 1984).

"A determination of patent infringement consists of two steps: (1) the court must first interpret the claim, and (2) it must then compare the properly construed claims to the allegedly infringing device."  Playtex Products, Inc. v. Procter & Gamble Co., 400 F.3d 901, 905-06 (Fed. Cir. 2005) (citation omitted).  "To prove infringement, the patentee must show that the accused

made operative against Cisco by January 31, 2013 order of the Court, ECF No. 639.

United States District Court
Northern District of California

device meets each claim limitation, either literally or under the doctrine of equivalents." <u>Playtex Products, Inc. v. Procter & Gamble Co.</u>, 400 F.3d 901, 906 (Fed. Cir. 2005) (citation omitted).

"To support a summary judgment of noninfringement it must be shown that, on the correct claim construction, no reasonable jury could have found infringement on the undisputed facts or when all reasonable factual inferences are drawn in favor of the patentee." <u>Netword, LLC v. Centraal Corp.</u>, 242 F.3d 1347, 1353 (Fed. Cir. 2001). To survive a motion for summary judgment of noninfringement, a patentee must set forth competent evidence that "features of the accused product would support a finding of infringement under the claim construction adopted by the court, with all reasonable inferences drawn in favor of the non-movant." <u>Intellectual Science and Technology, Inc. v. Sony Electronics, Inc.</u>, 589 F.3d 1179, 1183 (Fed. Cir. 2009) (citations omitted). "Summary judgment of noninfringement under the doctrine of equivalents is appropriate if no reasonable jury could determine two elements to be equivalent." <u>Goldenberg v. Cytogen, Inc.</u>, 373 F.3d 1158, 1164 (Fed. Cir. 2004) (citation and internal quotation marks omitted). If expert testimony is provided by the patentee in an attempt to defeat summary judgment, the testimony proffered must be supported by sufficient facts and be reasonable in light of the undisputed factual record. <u>See</u> <u>Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.</u>, 509 U.S. 209 (1993).

## III.     ANALYSIS

Defendants move for summary judgment of non-infringement for three reasons, stemming from the Court's construction of two terms in the patent. First, they argue that, given the Court's construction of the "transferring . . . if" terms in claims 1, 5, 12, 13 and 17, they are entitled to judgment of noninfringement against those claims and their dependents. Second, they argue that a femtocell cannot be the claimed "modem" of the Patent, and therefore they are entitled to summary judgment of noninfringement on all theories related to femtocell networks. Third, they argue that, on the basis of the Court's construction of "network hub switching center," they are entitled to summary judgment of noninfringement as to Claims 1, 13 and 17, as well as their dependents.

The Court addresses each the first and third arguments, and finds it unnecessary to address

United States District Court
Northern District of California

the second. The Court then addresses EON's argument that, regardless of the Court's order on literal infringement, it has viable contentions under the Doctrine of Equivalents.

As a preliminary matter, the Court notes that there is significant admissible evidence demonstrating that the accused products and services do not infringe, while all of the pertinent evidence EON submitted is unsworn and hence inadmissible. For that reason alone, Defendants are entitled to summary judgment. The Court will nonetheless consider EON's arguments assuming *arguendo* that its evidence is admissible.

**A.    The "Transferring . . . If" Terms**

**1.    Systems Claims (1, 12 and 13, and their dependent claims)**

The Court has construed the "transferring . . . if" terms in the systems claims as follows:

| Claim | Term | Construction |
|---|---|---|
| 1 | "transferring . . . if said local subscriber units are unable to directly communicate with said local base station repeater cell" | "transferring . . . if said local subscriber units are unable, for some reason other than the user intentionally disabling said unit, to directly communicate with said local base station repeater cell." The system is binary, meaning the subscriber unit either directly communicates with the base station repeater cell or the modem. The "transferring function" of the modem is conditioned on whether the subscriber unit is unable to directly communicate with the local base station repeater cell. |
| 12 | "transferring . . . if said subscriber units are unable to communicate directly with said digital transmitter" | "transferring . . . if said local subscriber units are unable, for some reason other than the user intentionally disabling said unit, to directly communicate with said digital transmitter." The system is binary, meaning the subscriber unit either communicates directly with the digital transmitter or the modem. The "transferring function" of the modem is conditioned on whether the subscriber unit is unable to directly communicate with the digital transmitter. |

United States District Court
Northern District of California

| 13 | "transferring . . . if said at least one subscriber unit is unable to communicate directly with a local base station repeater cell" | "transferring . . . if said local subscriber units are unable, for some reason other than the user intentionally disabling said unit, to directly communicate with said local base station repeater cell."  The system is binary, meaning the subscriber unit either communicates directly with the local base station repeater cell or the modem. The "transferring function" of the modem is conditioned on whether the subscriber unit is unable to directly communicate with the local base station repeater cell. |

Rev. Cl. Constr. Order 22:7-25:5, 28:11-18, 30:1-7, 30:20-26, 2014 WL 938511, at *12-14, 2014 U.S. Dist. LEXIS 29746, 47-54, 56.  Defendants argue they are entitled to judgment of noninfringement because, on the undisputed facts, the accused handsets' transferring is *not* conditioned on the unavailability of "Path A" communication, and therefore the accused networks do not fall within the scope of the systems claims.  The Court addresses this first with regard to Wi-Fi routers and mobile hotspots, and next with regard to femtocell-based networks.

### a.    Wi-Fi Routers and Mobile Hotspots

As the Court has construed the scope of the systems claims, the "'transferring function' of the modem is conditioned on whether the subscriber unit is unable to directly communicate" with the local base station repeater cell or digital transmitter.  Put another way, the system transfers from "Path A" to "Path B" only if Path A is unavailable.  But it is undisputed that the handsets in the accused networks switch from cellular to Wi-Fi regardless of whether cellular service is available.  In the accused networks, handsets switch to "Path B" even when the handset is able to communicate through Path A, and the accused networks therefore fall outside the scope of the claims.

EON contends otherwise, for two reasons.  First, EON points out that the accused handsets do not *automatically* switch to Wi-Fi in the sense that they only do so after the user has configured the handset to connect to Wi-Fi.  A handset user must first configure the handset to connect to Wi-Fi servers automatically, or the user must specifically approve the connection to a particular Wi-Fi server (and, if necessary, enter a password).  But this is irrelevant.  It remains the case that

1   transferring is not conditioned on the unavailability of cellular service.

2          EON also argues that the "transferring . . . if" terms are satisfied by handset users manually

3   connecting to Wi-Fi. Essentially, EON argues that the handset user's assessment, decision-

4   making, and manual intervention is part of the claimed system, at least when the user is

5   responding to a condition of cellular nonconnectivity.

6          Even assuming that this is a viable infringement theory under the operative infringement

7   contentions, it is foreclosed by the "conditional limitation" the Court has construed the systems

8   claims to contain: "the 'transferring function' of the modem is conditioned on whether the

9   subscriber unit is unable to directly communicate with the local base station repeater cell." The

10  system claimed in the '491 Patent is one that transfers when there is condition of nonconnectivity

11  over Path A, not a system that is dependent upon other factors.

12         Moreover, the Court also concluded in the claim construction order that "[n]othing in the

13  claims, or in the specification, contemplates a role for the user in affirmatively selecting one path

14  over another." 24:16-17. At claim construction, Defendants urged the Court to construe the

15  "transferring . . . if" terms such that "[a] user rendering the subscriber unit unable to communicate

16  with the local base station repeater cell does not fall within the scope of the claim." Defendants'

17  Responsive Claim Construction Brief 6-9 ("Defts' Cl. Constr. Br."), No. 645. EON objected to

18  that construction, but not by providing any reason to believe that a person of ordinary skill in the

19  art would view the claim terms as having a broad enough scope to encompass a user intentionally

20  prompting a transfer to Path B. Instead, EON pointed out a minor ambiguity in Defendants'

21  proposed construction: that a user could be said to "render" a unit unable to communicate if she

22  *unintentionally* took an action that had the *effect* of prompting an inability to communicate (for

23  example, by wandering into an area in which there was no cellular service, or, as EON's counsel

24  argued at claim construction, driving through a tunnel). EON's Opening Claim Construction Brief

25  23:16-24:1, EON's Reply Claim Construction Brief 4:21-24, ECF No. 628; Transcript of

26  Proceeding 52:6-54:18.

27         The Court agreed that an unintentional "rendering" could fall within the scope of the claim,

28  and revised Defendants' proposed construction accordingly. But the Court otherwise adopted

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1  Defendants' view of claim scope: a user deciding to switch to Path B is not part of the system that

2  the Patent claims for transferring.

3       EON relies on a sentence of dicta in the Court's claim construction order: "a user could

4  still respond to an inability to communicate without falling outside of the scope of the claim."

5  Rev. Cl. Constr. Order 25:20-21, 2014 WL 938511, at *14, 2014 U.S. Dist. LEXIS 29746, 54.  In

6  retrospect, this sentence could have been clearer, but it should have been plain enough from the

7  surrounding context and the Court's actual construction that intentional user intervention is not

8  part of the claimed system, even if the user is responding to poor communications over Path A.

9  What the Court had in mind was a situation in which a device performs all of the claimed system

10  steps automatically, but also contains a preliminary step through which a user can activate the

11  system after deciding that cellular connectivity problems might make the system necessary.  At the

12  claim construction phase, without knowing details of the way the accused devices operated, the

13  Court was attempting only to make clear that user involvement would not take an otherwise

14  infringing device outside the scope of the claims.  But the sentence was not intended to

15  accommodate the concept that volitional user intervention forms part of the claimed system, as the

16  Court's actual construction of the terms establishes.

17       The foregoing alone establishes that the accused networks do not satisfy the claimed

18  system limitations in any iterations or operations.  However, it is important to note that EON's

19  noninfringement arguments are in significant tension with the arguments EON just recently made

20  in persuading the Court to reverse its invalidity determination.  The Court initially concluded that

21  Claims 1 and 13 were invalid, since the Patent disclosed insufficient structure to perform the

22  function claimed by the means-plus-function term "switching means."  First Cl. Constr. Order 4:1-

23  9:21, 2013 WL 3455631, at *2-6, 2013 U.S. Dist. LEXIS 95003, 15-27.  The Court concluded that

24  a mere "electronic switch" was insufficient structure to perform the claimed function of "selecting

25  a communications path," since the Court construed "selecting a communications path" to involve a

26  process through which the device itself gathers information about rf signal, determines whether the

27  unit is able to receive sufficient signal, and then decides on an appropriate path.  Id.

28       EON persuaded the Court otherwise, arguing that "the other components of the subscriber

1   unit disclosed in the '101 Patent perform the 'gathering' and 'determining' functions which the

2   Court wrongly ascribes to the switching means."  Motion for Reconsideration 5:2-4, ECF No. 880.

3   EON argued that, given the specific components disclosed in the '101 Patent (a "frequency control

4   component," a "data processor," etc.) the "'101 Patent discloses the *subscriber unit's ability* to

5   detect and gather rf signals and determine whether the signal from a base station is strong or

6   weak."  Id. 5:4-7 (emphasis added).  On this basis, the Court agreed that the Patent already

7   disclosed specific structures capable of performing the gathering and determining functions, and

8   so the Court construed the "selecting" function added in the '491 Patent to be a much narrower

9   task capable of being performed by an "electronic switch."  Order Granting Motion for

10  Reconsideration, 2:4-5:16, 2014 WL 793323, at *1-3, 2014 U.S. Dist. LEXIS 24781, 8-16.

11          Now, however, EON argues that determining the sufficiency of signal strength, and

12  deciding to communicate over Path B, are actions that need *not* be performed by the subscriber

13  unit and the data processor, software, and controller disclosed in the '101 Patent.  Instead, EON

14  now argues that these actions are taken by a *user* – despite the fact that that a user is not disclosed

15  to be part of the claimed system in either patent's specifications.

16          EON cannot have it both ways.  If the structures actually disclosed in the '101

17  specification need not be the entities that "gather information about signal strength and analyze it,"

18  id. 3:6-8, then the Court would construe the "selecting" function added to the '491 Patent to be a

19  much broader, intelligent determination for which the Patents fail to disclose sufficient structure.

20  "[M]eans-plus-function language . . . does not encompass the human being as the 'means' or any

21  part thereof."  Application of Foster, 438 F.2d 1011, 1015 (C.C.P.A. 1971).  At claim

22  construction, EON did not argue that "selecting a communications path" is a function performed

23  by a user; it argued that it is a function performed by "electronic switch 13."  On the other hand, if

24  the "determining" processes are performed entirely by the subscriber unit, and the "electronic

25  switch" merely toggles between the two paths on the basis of those determinations, there is no

26  room left for a human user to be part of the claimed system.

27                         **b.**     **Femtocells**

28          The foregoing analysis applies even more strongly to EON's femtocell-based infringement

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1    theories.  It is undisputed that the accused handsets transfer when there *is* a femtocell-based

2    communications path, rather than when there *isn't* a cell-tower communications path.  The

3    handsets transfer regardless of whether there is a cell-tower connection, and the handsets'

4    transferring is not conditioned on the unavailability of Path A, as the systems claims require.

5         Moreover, unlike Wi-Fi, which a user can manually decide to activate after realizing that

6    there is no cellular reception, a connection to a femtocell cannot be established manually by a

7    handset user.  A femtocell transmits the same type of cellular signal that is transmitted by a cell

8    tower, so when a user realizes that there is no reception from a cell tower, there is no separate

9    antenna to turn on to seek out a femtocell connection.  EON submits an expert report in which the

10   expert turned off his *femtocell* network, went into an area with no cellular service, and then turned

11   the femtocell network back on.  Exh. 4 to Declaration of Mark Halderman ("Halderman Decl.") ¶¶

12   317-28, ECF No. 953-9.  But EON submits no evidence suggesting that the handset itself is

13   manipulated by the user to transfer from cellular to a femtocell connection.  Therefore, even

14   assuming the Court had not already determined that user interactions are not part of the claimed

15   system, EON would have no viable infringement theory.

16        EON argues that femtocells "are deployed to resolve coverage issues related to the cellular

17   networks."  Opp. 3:7-8.  What EON is arguing is that, when a user discovers she is not getting

18   good cellular service in an area, and calls a femtocell provider to install femtocells, the user and

19   the provider have, through those actions, become part of a "system" that the Patentee invented for

20   assessing signal strength and transferring between communications paths.  The brain functions that

21   occur after a cellphone user realizes her calls keep getting dropped, the phone call the user makes

22   to the provider to place an order, the shipping and installation of the femtocells – all this is part of

23   the claimed system.

24        These actions are, as a matter of law, not part of the system the '491 Patentee invented.

25   "[A]pparatus claims cover what a device *is*, not what a device *does*."  Hewlett-Packard Co. v.

26   Bausch & Lomb Inc., 909 F.2d 1464, 1468 (Fed Cir. 2010) (emphasis in the original).  Whether or

27   not the end-user or the femtocell installer *do* the actions described above, they are not what the

28   claimed system *is*.

12

### c. Conclusion

On the undisputed facts, no uses of the accused networks meet the limitations of the systems claims or their dependents. Therefore, Defendants Sprint and U.S. Cellular are entitled to summary judgment against the claim of direct infringement of the systems claims and their dependents. End-users also do not directly infringe since their manual participation is not part of the claimed system. Therefore, since no entity accused of direct infringement actually infringes, all Defendants are also entitled to summary judgment against the claims of indirect infringement.

### 2. Method Claims (5, 17 and their Dependent Claims)

The Court construed the "transferring . . . if" terms in the method claims in a similar manner as it construed the terms in the systems claims:

| Claim | Term | Construction |
|---|---|---|
| 5 | "if said subscriber unit is receiving a signal from said local base station repeater cell, performing the steps of . . ." "if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of . . ." | The method steps listed after 'if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of' are not performed if the subscriber unit is receiving a signal from said local base station repeater cell. Using the modem to communicate regardless of whether there is signal reception does not fall within the scope of the claim. |
| 17 | "if said subscriber unit is receiving a signal from said local base station repeater cell, performing the steps of . . ." "if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of . . ." | The method steps listed after 'if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of' are not performed if the subscriber unit is receiving a signal from said local base station repeater cell. Using the modem to communicate regardless of whether there is signal reception does not fall within the scope of the claim. |

Rev. Cl. Constr. Order 26:6-27:16, 27:18-24, 30:20-26, 2014 WL 938511, at *14, 2014 U.S. Dist. LEXIS 29746, 54-56. As with the systems claims, the Court has construed the method claims such that the transferring steps are only performed when there is a condition of non-connectivity over Path A.

United States District Court
Northern District of California

13

**A23**

The first step in the claimed methods is "determining whether a subsciber unit . . . is receiving a signal." '491 Patent 7:9-12, 9:1-4. The next method steps are "transmitting" steps. If the unit is receiving a signal, the next steps are "transmitting outgoing data" from the base station or network hub switching center, and "transmitting incoming data" from the subscriber unit, through a cellular path. Id. 7:14-26, 9:7-14. If the unit is not receiving a signal, the next steps are "transmitting said outgoing data" from the base station or network hub switching center, and "transmitting said incoming data" from the subscriber unit, through a modem. Id. 7:27-44, 9:15-30.

As articulated in EON's papers and at oral argument, EON's infringement theory is that end-users perform the first method step: "determining whether" the subscriber unit "is receiving a signal." Defendants Sprint and U.S. Cellular therefore are entitled to judgment as a matter of law that they cannot be direct infringers under 35 U.S.C. § 271(a). "Absent an agency relationship between the actors or some equivalent . . . a party that does not commit all the acts necessary to constitute infringement has not been held liable for direct infringement." Akamai Technologies, Inc. v. Limelight Networks, Inc., 692 F.3d 1301, 1307 (Fed. Cir. 2012) (en banc) cert. granted, 134 S. Ct. 895 (U.S. 2014) and cert. dismissed, 133 S. Ct. 1520 (U.S. 2013) and cert. dismissed, 133 S. Ct. 1521 (U.S. 2013). On EON's theory, it is not U.S. Cellular and Sprint who "determine" whether the unit is receiving a signal. Neither is it any device or component these Defendants make or any inherent feature of the networks Defendants operate or produce. It is the user, using her own own mental and sensory capacities, who performs this step. No Defendant performs this step, and therefore no Defendant is a direct infringer of the method claims.

"[A] party who performs some of the steps of a method claim itself and induces another to perform the remaining steps that constitute infringement" can currently be liable in some circumstances for *induced* infringement under 35 U.S.C. § 271(b). Id. at 1309. But as EON acknowledged at oral argument, there is no allegation of divided or joint infringement in this case. Therefore, EON's argument is only viable insofar as it argues that Defendants induce end-users to

United States District Court
Northern District of California

14

**A24**

1    perform *all* of the claimed method steps.

2        But that is not what the operative infringement contentions state.[3]  First of all, in the

3    operative claim charts, EON explicitly accuse the *mobile network operators*, not the end-users, of

4    being the entities who perform the "transmitting" steps.  See, e.g., Exh. A to Declaration of Carl

5    Sanders ("Sanders Decl."), ECF No. 1022-1, at 23-24 ("*Sprint performs* the steps in this portion of

6    Claim 5 by initiating two-way communication with dual-mode subscriber devices in its network . .

7    ..") (emphasis added); id. at 32-33, see also Exh. P to Sanders Decl., at 24-25, 32-33.  This, of

8    course, makes sense.  A cellphone user cannot be the entity who transmits outgoing data from a

9    base station.  Perhaps a cellphone user could be said to be transmitting outgoing data from the

10   cellphone.[4]  But the claims require that the practitioner of the claimed method transmit outgoing

11   data from the base station or network hub switching center.  In any case, whether or not the users

12   *could* perform these steps, the infringement contentions contain no allegations saying that they do.

13   The claim charts say nothing at all about the user directly infringing by performing the claimed

14   "transmitting" steps.  The entirety of this portion of the claim chart discusses the operators of the

15   mobile networks.  In a case without a divided infringement allegation, this is fatal to EON's

16   claims.

17        Second, the claim charts also cannot be fairly interpreted as accusing the end-user of

18   performing the "determining" step.  The claim charts identify only the "subscriber unit" as the

19   _____

20   [3] "The Northern District of California has adopted local rules that require parties to state early in
     the litigation and with specificity their contentions with respect to infringement and invalidity."

21   O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 467 F.3d 1355, 1359 (Fed. Cir. 2006).  The
     infringement contentions must contain, for each opposing party, "[s]eparately for each asserted

22   claim, each accused apparatus, product, device, process, method, act, or other instrumentality
     ("Accused Instrumentality") of each opposing party of which the party is aware. This

23   identification shall be as specific as possible. Each product, device, and apparatus shall be
     identified by name or model number, if known. Each method or process shall be identified by

24   name, if known, or by any product, device, or apparatus which, when used, allegedly results in the
     practice of the claimed method or process."  Patent L.R. 3-1(c).  The contentions must also contain

25   "[a] chart identifying specifically where each limitation of each asserted claim is found within
     each Accused Instrumentality, including for each limitation that such party contends is governed

26   by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused
     Instrumentality that performs the claimed function."  Patent L.R. 3-1(c).

27   [4] To be clear, the Court expresses no view on this point.

28

                                    15

instrumentality that practices the "determining" step, and make no mention of the user whatsoever. See, e.g., Exh. A to Sanders Decl., at 21-22, 32. EON therefore did not identify in its claim charts the "method, act, or other instrumentality" that it now contends infringes the method claim. Patent L.R. 3-1(b). In a plaintiff's 3-1(b) disclosures, a party may identify an infringing method or process "by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process," but this exception does not explicitly apply to the limitation-by-limitation claim charts required by Local Rule 3-1(c). Compare Patent L.R. 3-1(b) with 3-1(c).

In some situations, it may suffice for a patent plaintiff to cite only a device or product in alleging infringement of a method claim – for example, if the user's natural or expected use of that device results in infringement. It might be sufficient if a user used a device like the one suggested in the '101 and '491 Patent specifications, in which specific components within the subscriber unit assessed signal strength and switched communications paths on their own. But on EON's theory, the only sense in which the user uses the subscriber unit to "determine" signal strength is by looking at the cellphone's digital display and counting the number of bars, or by deducing from the unit's failure to download a web page that it must not be receiving a signal. See, e.g., Transcript of Proceeding 47:5-9. Naming a device as the accused instrumentality is insufficient to bring an allegation that the user herself performs the method steps, in a manner that has only a tangential relationship to the named device. See, e.g., CSR Tech. Inc. v. Freescale Semiconductor, No. 12-cv-02619-RS-JSC, 2013 WL 503077, at *1-5 (N.D. Cal. Feb. 8, 2013).

But even if EON's infringement theory were an operative contention in this case, the Court would find that Defendants would be entitled to summary judgment against any such theory as a matter of law. It would not be too much of an exaggeration to say that, under EON's view of claim scope, cellphone users are practicing the patented method whenever they determine that they are having difficulties with cell service, and then seek out any kind of solution to that problem that involves a modem. If a user has cell phone connectivity problems, and decides to steal her neighbor's Wi-Fi, she is practicing a method the '491 Patentee invented. If she borrows a friend's phone, and that phone happens to be connected to Wi-Fi, she is practicing a method the '491 Patentee invented. If she decides to build her own modem and connect to the internet through

16

that, she is infringing the patented method.

Such an expansive view of claim scope is incorrect as a matter of law. From the intrinsic and extrinsic record, from the perspective of a person or ordinary skill in the art, it is plain that this is not "what the inventors actually invented and intended to envelop with the claim." Phillips, 415 F.3d at 1316. Again, as the Court already held, "[n]othing in the claims, or in the specification, contemplates a role for the user in affirmatively selecting one path over another." Rev. Cl. Constr. Order 24:16-17, 2014 WL 938511, at *13, 2014 U.S. Dist. LEXIS 29746, 51. That phrase appeared it in portion of the Court's order discussing the systems claims, but it is equally true of the method claims. While a method claim is normally agnostic as to the user who performs the steps, here it is more than implausible that the user actions accused in this case form part of the method the '491 Patentee invented. EON's view of claim scope is also foreclosed by the Court's construction that the transferring steps "are not performed if the subscriber unit is receiving a signal," and that "[u]sing the modem to communicate regardless of whether there is signal reception" falls outside the scope of the claimed method. On the undisputed facts, the actions allegedly taken by users in using the accused networks fail to meet these claim limitations.

Consider, for example, EON's argument that the user is practicing the claimed method if she determines she is not getting sufficient cellular coverage in her home, decides to order femtocells, and then, once they are installed, uses her phone, which automatically begins transmitting data through the femtocell connection. On EON's theory, it might seem that the user would have performed the "determining" step at the moment she assessed signal strength in her home and found it lacking. But the claims only recite present-tense conditions; the transferring occurs *when* the unit is not receiving a signal, not because of some condition that obtained in the past. At oral argument, EON's counsel suggested that the "determining" would have to occur only at the precise moment she actually connects through an installed femtocell. Transcript of Proceeding 37:8-20, ECF No. 1025. Our user would have to again assess the signal strength and find it lacking one final time at the very moment the device in her hand performs its automatic switch. This incongruity is yet more evidence that the true scope of the patented invention is considerably closer to the specifications and embodiments in the intrinsic record it is to the most

17

stretched possible reading of the claim terms.

For these, among other reasons, the language of the claim terms will not bear the weight of EON's proposed infringement theories. Nor is there sufficient support from the intrinsic and record to support EON's view of claim scope as a matter of law.

### 3. Conclusion

All Defendants are entitled to summary judgment of noninfringement against all asserted claims, and their dependents, on the basis of the foregoing analysis.

### B. Network Hub Switching Center

At claim construction, the Court construed this term as follows:

| Claim | Term | Construction |
|---|---|---|
| 1, 13 & 17 | "network hub switching center" | "a switching center that performs the switching functions needed for operation of the subscriber units in a group of cells that the switching center services." |

Rev. Cl. Const. Order 13:26-17:7, 2014 WL 938511, at *8-10, 2014 U.S. Dist. LEXIS 29746, 32-39. Defendants argue they are entitled to judgment against infringement of Claims 1, 13 & 17, and their dependents, because they argue that the claimed "network hub switching center" cannot be a third-party server that provides for email, social networks, location services, search engines, or other Internet-based services. In its claim construction order, the Court stated:

> In its papers, and at the hearing, EON seems to be maintaining that the scope of this term is broad enough to encompass a switching center that serves any cells anywhere in the world, even those completely unrelated to the network. After carefully reviewing the intrinsic record, the Court concludes that this is not the appropriate "understanding of what the inventors actually invented and intended to envelop with the claim." Phillips, 415 F.3d at 1316.

Rev. Cl. Const. Order 16:25-17:1, 2014 WL 938511, at *10, 2014 U.S. Dist. LEXIS 29746, 38.

EON argues that Defendants fail to rebut EON's infringement expert's contentions that a third-party Internet server may constitute the claimed "network hub switching center." EON's Response Brief 22:12-25, 23:21-24:1, ECF No. 947. EON also argues that a construction that requires the switching center to be a cellular core network component would not make sense, since

18

**A28**

United States District Court
Northern District of California

a preferred embodiment of the '491 Patent includes the public switched network, which is not part of a cellular network. Id. 23:1-4. The modem communicates with the network hub switching center through the public switched network. Id. EON further claims that the ownership of the network hub switching center is irrelevant. Id. 23:10-20. It argues that since a network subscriber uses each and every element of the claimed network, the subscriber directly infringes and Defendants indirectly infringe. Id.

The Court disagrees. First, in rejecting EON's contention in the claim construction order, the Court used the word "network" to mean a cellular core network, not something as expansive as the Internet. The '491 Patent itself provides a basis for this interpretation. Contrary to what EON argues, the public switched network is part of the cellular network. As shown in Fig. 2 of the '491 Patent, the public switched network is coupled between the local base station repeater cell and the modem. '491 Patent Fig. 2.

Second, EON's argument that ownership is irrelevant also misses the mark. Although a claim is infringed when each and every limitation is met, regardless of ownership of the accused elements, the limitations can only be met by elements that fall within the scope of the limitation. Here, since a third-party party server does not fall within the scope of the term "network hub switching center," EON's argument fails.

Defendants are also entitled to judgment of noninfringement on claims 1, 13 & 17 for the additional reason that the accused networks do not contain the "network hub switching center" claimed in the invention.

### C.     Doctrine of Equivalents

In its opposition, EON argues that even if its claims for literal infringement fail to survive summary judgment, it still has viable claims under the doctrine of equivalents ("DOE"). EON's Response Brief 5:7-18, ECF No. 947. EON's infringement expert report states that if the conditional "if" terms are not satisfied literally, they are satisfied under the DOE. Id. 5:19-6:1. Defendants counter that EON's DOE contentions are irrelevant to the present motion because they "merely address a user's 'perceived' strength of the cellular signal or the timing of a user's installation of a Wi-Fi access point, and do not address the fact that the handsets will communicate

19

over Wi-Fi without regard to the absence or deficiency of the cellular path." Defendants' Reply Brief 7:7-12, ECF. No. 968.[5]

Defendants have the better argument. The Court rejects EON's DOE contentions regarding literal infringement through the use of femtocells, as explained *supra*. Although femtocells are often deployed in situations where there is no Path A connection, a handset's transferring function is still not conditioned on the unavailability of cellular service. Installing femtocells as a response to poor cellular coverage does not meet the conditional "if" requirement. As for alleged infringement through the use of Wi-Fi, the Court agrees with Defendants that "[n]one of EON's equivalency theories addresses the fact that the user is unable to condition the handset's use of Wi-Fi on the absence of a cellular path, the deficiency of a cellular path, or any aspect of the cellular path." Defendants' Reply Brief 7:13-16, ECF. No. 968. Moreover, as previously discussed, the user's decision to enable Wi-Fi is not part of the claimed system. These arguments are equally applicable to the DOE contentions EON has very recently offered.

Notwithstanding Defendants' valid objections to the admissibility of EON's expert reports, the Court has carefully reviewed the reports and the DOE arguments contained within. All of them stem from the same assumptions the Court has rejected as a matter of law, and all of them essentially seek to evade the limitations of the claimed method and system. See, e.g., Exh. 3, Lyon Sprint Report at ¶¶ 250-255; Exh. 4, Lyon US Cellular Report at ¶¶ 224-227; Exh. 5, Lyon Cisco Report at ¶¶ 232-23. This is not a situation in which an element is outside the literal reach of a claim, but within the scope of its equivalent function. All of EON's DOE contentions are foreclosed by the Court's view of claim scope.

While determining equivalency is normally a question of fact for the jury, "[w]here the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment." Warner-Jenkinson Co., Inc. v.

---

[5] EON also objects that Defendants did not specifically mention the DOE in their motion. The Court concludes that the arguments Defendants made in their motion apply equally to EON's DOE-based infringement theories, but in any case the Court granted EON leave to file a sur-reply addressing the argument, so it has now been fully briefed.

United States District Court
Northern District of California

20

1   _Hilton Davis Chem. Co._, 520 U.S. 17, 39, n.8 (1997).  EON's "theory of equivalence would

2   entirely vitiate" a limitation contained with the claims, and therefore there is "no further _material_

3   issue for the jury to resolve."  _Id._ (emphasis in the original).  See also _Ethicon Endo-Surgery, Inc._

4   _v. U.S. Surgical Corp._, 149 F.3d 1309, 1318 (Fed. Cir. 1998) (summary judgment of non-

5   infringement under the DOE appropriate when "no reasonable finder of fact could have found

6   infringement by equivalents because the differences between the allegedly infringing devices and

7   the claimed inventions were plainly not insubstantial"); see also _DePuy Spine, Inc. v. Medtronic_

8   _Sofamor Danek, Inc._, 469 F.3d 1005, 1017 (Fed. Cir. 2006) (citing _Tronzo v. Biomet, Inc._, 156

9   F.3d 1154, 1160 (Fed. Cir. 1998) (theory of equivalence "legally insufficient" where, "rather than

10  demonstrate an insubstantial difference between a limitation and an element in the accused device,

11  the theory effectively eliminated a limitation in its entirety").

### IV.    CONCLUSION

12          EON has provided no admissible evidence to preclude summary judgment.  But even the

13  evidence it has submitted fails to create a triable issue of fact, given the legal scope of the claims

14  in the Patent-in-Suit.  Moreover, the theories EON has advanced for infringement of the method

15  claims are inconsistent with the operative infringement contentions in this case.

16          For the foregoing reaons, Defendant's Motion for Summary Judgment of Noninfringement

17  is GRANTED.  All pending deadlines and hearings in this action are VACATED.  Defendants

18  shall submit a proposed form of judgment consistent with this order.

19          **IT IS SO ORDERED.**

20  Dated:  April 1, 2014

21                                                          _____

22                                                                       JON S. TIGAR

23                                                                 United States District Judge

_United States District Court_
_Northern District of California_

21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EON CORP IP HOLDINGS LLC,

        Plaintiff,

    v.

CISCO SYSTEMS INC, et al.,

        Defendants.

Case No.  12-cv-01011-JST

**ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANT MOTOROLA SYSTEMS, INC.**

Re: ECF Nos. 1032 & 1036.

On April 1, 2014, after conducting oral argument and an earlier claim construction hearing, the Court granted a motion by Defendants Cisco Systems, Inc., Sprint Spectrum L.P., HTC America, Inc., United States Cellular Corporation, and Motorola Mobility LLC (the "moving defendants") for summary judgment of non-infringement.  The five moving defendants subsequently submitted a proposed form entering judgment in favor of the five moving defendants as well as a sixth defendant, Motorola Systems, Inc. ("MSI"), who did not join the motion for summary judgment.  MSI argued that, since its alleged liability is predicated exclusively on acts of direct infringement that the Court found as a matter of law not to infringe the Patent-in-Suit, the Court's order entitles MSI to summary judgment for the same reasons as it entitles the five moving defendants to judgment.  ECF No. 1032.

"After giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant."  Fed. R. Civ. P. 56(f).  A district court may *sua sponte* grant summary after ensuing that the party against whom judgment is sought has "had a full and fair opportunity to ventilate the issues involved."  Albino v. Baca, __ F.3d __, No. 10-55702, 2014 WL 1317141, at *12-13 (9th Cir. Apr. 3, 2014) (quoting Cool Fuel, Inc. v. Connett, 685 F.2d 309, 312 (9th Cir. 1982)).

The Court granted Plaintiff EON Corp. IP Holdings LLC ("EON") leave to file any

1 | response to MSI's argument within eight days. ECF No. 1033. EON's response, ECF No. 1036,

2 | did not dispute that the Court's summary judgment order entitles MSI to judgment for the same

3 | reasons as it entitles the other five Defendants to judgment.

4 |      Instead, EON argues that it had negotiated a settlement in principle with MSI. If MSI has

5 | violated an enforceable agreement with EON, that is a matter for another motion or, depending on

6 | the circumstances, another case.

7 |      EON also invokes Rule 54(b)'s prohibition against entering judgment against fewer than

8 | all of the defendants in the action without making specific findings. But that rule only applies

9 | when the Court will, in fact, only be entering judgment against fewer than all the parties in an

10 | action. For the reasons argued by MSI in ECF No. 1032, which EON has failed to rebut, and on

11 | the basis of the Court's earlier orders, the Court will grant summary judgment to MSI pursuant to

12 | Rule 54(f).

13 |      The Court will enter all six defendants' proposed form of judgment.

14 |      **IT IS SO ORDERED.**

15 | Dated: April 24, 2014



16 |  

17 |                          JON S. TIGAR
                       United States District Judge

United States District Court
Northern District of California

2

**A33**

1  KILPATRICK TOWNSEND & STOCKTON LLP
   FREDERICK L. WHITMER (admitted *pro hac vice*)
2  The Grace Building
   1114 Avenue of the Americas
3  New York, NY 10026-7703
   Telephone: (212) 775-8773
4  Facsimile (212) 775-8800
   fwhitmer@kilpatricktownsend.com
5
6  KILPATRICK TOWNSEND & STOCKTON LLP
   CARL E. SANDERS (admitted *pro hac vice*)
   JAMES L. HOWARD (admitted *pro hac vice*)
7  1001 West Fourth Street
   Winston-Salem, NC 27101-2400
8  Telephone:  336 607 7300; Facsimile: 336 607 7500
   E-mail: csanders@kilpatricktownsend.com
9  E-mail: jlhoward@kilpatricktownsend.com
10 KILPATRICK TOWNSEND & STOCKTON LLP
   STEVEN D. MOORE (State Bar No. 290875)
11 BYRON R. CHIN (State Bar No. 259846)
   JESSICA L. HANNAH (State Bar No. 261802)
12 Two Embarcadero Center, 8th Floor
13 San Francisco, CA 94111
   Telephone: 415-576-0200; Facsimile: 415-576-0300
14 E-mail: smoore@kilpatricktownsend.com
   E-mail: bchin@kilpatricktownsend.com
15 E-mail: jhannah@kilpatricktownsend.com
16 Attorneys for Defendants
   MOTOROLA SOLUTIONS, INC. AND MOTOROLA MOBILITY LLC.
17
18          UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
19              SAN FRANCISCO DIVISION

20 EON CORP. IP HOLDINGS, LLC,          Case No. C12-01011 JST (EDL)

21          Plaintiff,                  [~~PROPOSED~~] JUDGMENT

22      v.

23 SENSUS USA INC., et al.,

24          Defendants.

   AND RELATED COUNTERCLAIMS
25
26
27
28



[~~PROPOSED~~] JUDGMENT                                           - 1 -
CASE NO. C12-01011 JST

**FILED**

APR 24 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

For the reasons stated in the Court's April 1, 2014 Order Granting Defendants' Motion for Summary Judgment, D.I. 1029, and pursuant to Federal Rule of Civil Procedure 58, the Court's Judgment is ENTERED as follows:

IT IS ORDERED AND ADJUDGED that final judgment of non-infringement be and is hereby entered in favor of Defendants Cisco Systems, Inc., Sprint Spectrum L.P., HTC America, Inc., United States Cellular Corporation, Motorola Mobility LLC, and Motorola Solutions, Inc. and against EON Corp. IP Holdings LLC, and that any and all counterclaims of Defendants seeking a declaration of invalidity or unenforceability are moot and therefore are DISMISSED without prejudice.

ENTERED this **24** day of April, 2014.

_____
Hon. Jon S. Tigar
U.S. District Court Judge

5522342V.1

[PROPOSED] JUDGMENT
CASE NO. C12-01011 JST

- 1 -



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EON CORP IP HOLDINGS LLC, | Case No.  12-cv-01011-JST |
| Plaintiff, | |
| v. | **REVISED ORDER CONSTRUING AND DETERMINING VALIDITY OF CLAIMS OF UNITED STATES PATENT NO. 5,592,491** |
| ARUBA NETWORKS INC, et al., | |
| Defendants. | |

On May 10, 2013, the Court held a hearing for the purpose of construing disputed terms in the claims of United States Patent No. 5,592,491.  ECF No. 711.  At that hearing, the Court requested further briefing on issues regarding the invalidity of two of the claims of the patent.[1] The parties provided that supplemental briefing on May 24, May 31, and, at Defendants' request, on July 3, 2013, at which point the Court took the matter under submission.  ECF Nos. 722, 724, 728, & 746.

After consideration of the arguments and evidence presented by the parties, and the relevant portions of the record, the Court issued an order construing the terms and determining that claims 1 and 13 were invalid.  Order Construing and Determining Validity of Claims of United States Patent No. 5,592,491 ("Claim Construction Order"), ECF No. 748, 2013 WL

---

[1] The parties' dispute over the validity of the "switching means" term, discussed at Part II, *infra*, is significantly informed by the testimony of EON's expert, Dr. David Lyon.  EON did not timely disclose Dr. Lyon as an expert in this case and failed to disclose his opinions and testimony as required by Patent Local Rule 4-2.  Magistrate Judge Laporte granted Defendants' motion to compel Dr. Lyon's deposition testimony and produce the material on which his opinion is based eight days before the claims construction hearing, and the deposition occurred the day before the claim construction hearing.  ECF Nos. 702 & 722-2. While the Court had the discretion to rule on the validity of the term without considering Dr. Lyon's testimony, the Court concluded that it would be more equitable to rule on the validity of the patent only after permitting both parties to review and respond to the deposition testimony of the patentholder's expert.

3455631, 2013 U.S. Dist. LEXIS 95003 (N.D. Cal. July 8, 2013).   In February 2014, the Court

granted EON's motion to reconsider the Court's invalidity determination and clarify its

construction of the "modem communicatively coupled" term.  Order Granting Motion for

Reconsideration, ECF No. 965, 2014 WL 793323, 2014 U.S. Dist. LEXIS 24781 (N.D. Cal. Feb.

25, 2014).  The Court hereby issues this revised claim construction order in conformance with its

order granting the motion for reconsideration.

## I.     BACKGROUND

Plaintiff EON Corp. IP Holdings ("EON") filed this case in the Eastern District of Texas

("the Texas Court") on October 22, 2010.  Plaintiff EON Corp. IP Holdings, LLC's Original

Complaint, Case No. 2:10-cv-00448-DF (E.D. Tex. Oct. 22, 2010), ECF No. 1.  The current

defendants are Aruba Networks, Inc., BroadSoft, Inc., Cisco Systems, Inc., Meru Networks, Inc.,

SerComm Corporation, Sonus Networks, Inc., Sprint Spectrum L.P., HTC America, Inc., United

States Cellular Corporation, Motorola Mobility LLC, and. Motorola Solutions, Inc. (collectively,

the "Defendants").  In January 2012, the Texas Court granted Defendants' motion to transfer

venue to this Court.  Order granting Joint Motion to Transfer Venue to the Northern District of

California, Case No. 2:10-cv-00448-DF (E.D. Tex. Jan. 9, 2012), ECF No. 277.

EON asserts that defendants Sprint and U.S. Cellular directly infringe on United States

Patent No. 5,592,491 ("the '491 Patent"), entitled "Wireless Modem," and that the remaining

defendants indirectly infringe.  Joint Case Management Statement, ECF No. 650, at 2:15-23.  The

'491 Patent is a continuation-in-part of U.S. Patent No. 5,388,101 ("the '101 Patent"), and the

'101 Patent is expressly incorporated into the '491 Patent.[2]  Both before and after this case was

transferred, the Texas Court issued claim construction opinions and summary judgment orders

regarding the '491 Patent in other litigation brought by EON.

Defendants contend that a means-plus-function term in Claims 1 and 13 of the '491 Patent

is indefinite and that therefore those claims and their dependents are invalid.  See Part II, infra.

---

[2] At various points in this opinion, the Court refers to the claims and specification of the '101 Patent.  Where it does so, it is because there is no intrinsic evidence in the '491 Patent that provides superior evidence on the point at issue.

1   EON and Defendants have also proposed competing constructions of terms in Claims 1, 5, 12, 13,

2   and 17 of the '491 Patent.  <u>See</u> Part III, *infra.*

## II.     INVALIDITY FOR INDEFINITENESS

### A.     Legal Standard

The 1952 Patent Act authorizes functional claiming: "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6.  This provision is "intended to permit use of means expressions without recitation of all the possible means that might be used in a claimed apparatus." <u>O.I. Corp. v. Tekmar Co., Inc.</u>, 115 F.3d 1576, 1583 (Fed. Cir. 1997).  But the other side of this coin is that the "statutory provision was meant to preclude the overbreadth inherent in open-ended functional claims . . . which effectively purport to cover any and all means so long as they perform the recited functions." <u>Halliburton Energy Servs., Inc. v. M-I LLC</u>, 514 F.3d 1244, 1256, n. 7 (Fed. Cir. 2008).  The "duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112, ¶ 6." <u>Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.</u>, 412 F.3d 1291, 1300-02 (Fed. Cir. 2005).

"A challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." <u>Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.</u>, 336 F.3d 1308, 1319 (Fed. Cir. 2003).  If the patent does not disclose adequate structure, the patent is invalid for failing to particularly point out and distinctly claim the invention as required by 35 U.S.C. § 112, ¶ 2.  <u>In re Donaldson Co. Inc.</u>, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (<u>en banc</u>).  "[I]n order for a claim to meet the particularity requirement of ¶ 2, the corresponding structure(s) of a means-plus-function limitation must be disclosed in the written description in such a manner that one skilled in the art will know and understand what structure corresponds to the means limitation." <u>Atmel Corp. v. Info. Storage Devices, Inc.</u>, 198 F.3d 1374,

United States District Court
Northern District of California

United States District Court
Northern District of California

1382 (Fed. Cir. 1999).  "Otherwise, one does not know what the claim means."  Id.  "[A] bare statement that known techniques or methods can be used does not disclose structure."  Biomedino, LLC, v. Waters Techs. Corp., 490 F.3d 946, 952 (Fed. Cir. 2007).

"A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims," and "like claim construction, [it] is a question of law."  Atmel, 198 F.3d at 1378.  Therefore, it is appropriate for the Court to address indefiniteness issues at the claim construction stage.  See Exxon Research and Eng'g Co. v. U.S., 265 F.3d 1371, 1376 (Fed. Cir. 2001).

**B.    Analysis: "Switching means for selecting a communication path within said network" (Claims 1 and 13)**

| Disputed Claim Terms | EON's Proposal | Defendants' Proposal |
|---|---|---|
| "switching means for selecting a communication path within said network" (Claim 1)  "switching means for selecting a communication path within said network" (Claim 13) | The phrase is governed by 35 U.S.C. § 112, ¶ 6.  The claimed function is selecting a communication path within said network/communication system.  Structure: electronic switch 13 and equivalents | Indefinite under 35 U.S.C. § 112, ¶6:  Claimed Function: selecting a communication path within said network/communication system  Corresponding Structure: The patent does not disclose sufficient structure corresponding to the function. |

As both parties agree, these claim terms are each means-plus-function limitations.  Pursuant to 35 U.S.C. § 112, ¶ 6, "such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  To be sufficiently definite and valid, the patent must "set forth in the specification an adequate corresponding disclosure showing what is meant by that language."  Blackboard, Inc. v. Desire2Learn Inc., 574 F.3d 1371, 1382 (Fed. Cir. 2009).

The method in the claims is a "switching means."  '491 Patent, at 6:21, 8:48.  The specification discloses that "[a]s shown in FIG. 2, subscriber unit 12 includes switching means such as, for example, an electronic switch 13 for selecting the path of communication between

4

United States District Court
Northern District of California

1    subscriber unit 12 and local base station repeater cell 10." Id., at 3:36-39. This description -- an

2    "electronic switch" -- is the only disclosure showing what is meant by the language of a

3    "switching means." Defendants argue that this disclosure fails to set forth adequate structure to

4    perform the function perform the function of "selecting a communications path."

5          The Court agrees that the term "selecting," as understood by a layperson outside of the

6    context of the patent, connotes an intelligent determination rather than merely "assuming a

7    position." But the Court must construe the term based primarily on the intrinsic record, as it

8    would be understood by a person of ordinary skill in the art. "The construction of a means-plus-

9    function limitation includes two steps . . . [f]irst, we determine the claimed function," and

10    "[s]econd, we identify the corresponding structure in the written description that performs that

11    function." JVW Enterprises, Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1330 (Fed. Cir.

12    2005); see also Applied Med. Res. Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1332 (Fed. Cir.

13    2006). "Ordinary principles of claim construction govern interpretation of the claim language

14    used to describe the function" of a means-plus-function term. Cardiac Pacemakers, Inc. v. St. Jude

15    Medical, Inc., 296 F.3d 1106, 1113 (Fed. Cir. 2002) (internal citation omitted).

16          The '101 Patent, of which the '491 Patent is a continuation-in-part, discloses elements that

17    perform the functions of gathering information about rf signal, and determining whether the unit is

18    able to receive rf signals. A disclosed "frequency control component" is disclosed to monitor

19    transmission frequency, a disclosed "data processor" enables the subscriber unit to make rf signal

20    strength assessments, and disclosed subscriber unit software assesses whether signal strength goes

21    below a threshold value. '101 Patent at 9:14-19, 10:15-31, 10:39-43. Therefore, EON argues that

22    a person of ordinary skill of the art would understand these functions to be performed by other

23    previously disclosed elements which are incorporated within the "subscriber unit" claimed in the

24    '491 Patent. See '491 Patent at 1:43–52, 2:3-11. On this reading, the subscriber unit's capability

25    to monitor and assess rf signal was already fully disclosed in the parent '101 Patent, and it would

26    redundant to construe the "selecting" function claimed in the '491 Patent to also include those

27    functions. In light of this, a person of ordinary skill of the art could conclude that "selecting a

28    communications path," within the context of these patents, is a fairly narrow function akin to

5

"toggling," or "assuming a position."

At the very least, the patent is amenable to such a construction.  See <u>Exxon Res. & Eng'g</u> <u>Co. v. United States</u>, 265 F.3d 1371, 1380 (Fed. Cir. 2001) ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds"); <u>see also</u> <u>Rhine v. Casio, Inc.</u>, 183 F.3d 1342, 1345 (Fed. Cir. 1999) (claims are to be construed to preserve validity, if possible); <u>see also</u> <u>Biosig Instruments, Inc. v.</u> <u>Nautilus, Inc.</u>, 715 F.3d 891, 898 (Fed. Cir. 2013) <u>cert. granted</u>, ___ U.S. ___, 134 S. Ct. 896 (U.S. 2014) (citing <u>Datamize, LLC v. Plumtree Software, Inc.</u>, 417 F.3d 1342, 1347 (Fed.Cir.2005) ("[a] claim is indefinite only when it is 'not amenable to construction' or 'insolubly ambiguous.').[3] The plausibility of this construction is reinforced by the fact that the Texas Court reached the same conclusion. <u>EON Corp. IP Holdings, LLC v. T-Mobile USA, Inc.</u>, Case No. 6:10-CV-0379 LED-JDL, 2012 WL 3073432, at *3-5 (E.D. Tex. Feb. 8, 2012) <u>report and recommendation adopted sub</u> <u>nom.</u> <u>EON Corp. IP Holdings, LLC v. Skyguard, LLC</u>, Case No. 6:11-CV-15-LED-JDL, 2012 WL 3073907 (E.D. Tex. July 27, 2012) ("[t]he recited function of 'selecting the path of communication' refers to selecting a communication path, not deciding which path to use").

Defendants have not submitted clear and convincing evidence that a person of ordinary skill in the art would find an "electronic switch" insufficient to perform this narrowly understood claim function.  Therefore, Defendants have not demonstrated that Claims 1 and 13 of the '491 Patent are invalid for indefiniteness.

## III.    CLAIM CONSTRUCTION

### A.    Legal Standard

The construction of terms found in patent claims is a question of law to be determined by the Court.  <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), <u>aff'd</u>, 517 U.S. 370 (1996).  "[T]he interpretation to be given a term can only be determined and

---

[3] As of this writing, these standards remaining the governing law of the Federal Circuit regarding indefiniteness, although the Court is aware that the question is currently being reviewed by the Supreme Court.  <u>Nautilus, Inc. v. Biosig Instruments, Inc.</u>, ___ U.S. ___, 134 S. Ct. 896 (2014)

United States District Court
Northern District of California

1　confirmed with a full understanding of what the inventors actually invented and intended to

2　envelop with the claim." Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting

3　Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

4　Consequently, courts construe claims in the manner that "most naturally aligns with the patent's

5　description of the invention." Id.

6　　　　The first step in claim construction is to look to the language of the claims themselves. "It

7　is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the

8　patentee is entitled the right to exclude.'" Phillips, 415 F.3d at 1312 (quoting Innova/Pure Water,

9　Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A disputed claim

10　term should be construed in light of its "ordinary and customary meaning," which is "the meaning

11　that the term would have to a person of ordinary skill in the art in question at the time of the

12　invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1312.

13　In some cases, the ordinary meaning of a disputed term to a person of skill in the art is readily

14　apparent, and claim construction involves "little more than the application of the widely accepted

15　meaning of commonly understood words." Id., at 1314. Claim construction may deviate from the

16　ordinary and customary meaning of a disputed term only if (1) a patentee sets out a definition and

17　acts as his own lexicographer, or (2) the patentee disavows the full scope of a claim term either in

18　the specification or during prosecution. Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d

19　1362, 1365 (Fed. Cir. 2012).

20　　　　Ordinary and customary meaning is not the same as a dictionary definition. "Properly

21　viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading

22　the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks

23　transforming the meaning of the claim term to the artisan into the meaning of the term in the

24　abstract, out of its particular context, which is the specification." Id., at 1321. Typically, the

25　specification "is the single best guide to the meaning of a disputed term." Vitronics Corp. v.

26　Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is therefore "entirely appropriate for a

27　court, when conducting claim construction, to rely heavily on the written description for guidance

28　as to the meaning of claims." Phillips, 415 F.3d at 1315. However, while the specification may

United States District Court
Northern District of California

describe a preferred embodiment, the claims are not necessarily limited only to that embodiment. Id.

Finally, courts may consider extrinsic evidence in construing claims, such as "expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. Expert testimony may be useful to "provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." Phillips, 415 F.3d at 1318. However, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." Id. If intrinsic evidence mandates the definition of a term that is at odds with extrinsic evidence, courts must defer to the definition supplied by the former. Id.

### B.    Analysis

As a preliminary matter, the Court notes that most of the Defendants' proposed 'constructions' cannot be simply inserted into the language of the patent. See infra at III-B-1, III-B-3, III-B-4, and III-B-5. Instead, Defendants propose that the Court read a particular limitation into the claim, or hold that certain specific factual scenarios fall outside of the scope of the claim. See, e.g., infra at III-B-5-a ("[a] user rendering the subscriber unit unable to communicate with the local base station repeater cell does not fall within the scope of the claim"). In response, Plaintiff has proposed only that "no construction is necessary" of most of the disputed terms. See generally infra.

On the one hand, "It is well settled that claims may not be construed by reference to the accused device." NeoMagic Corp. v. Trident Microsystems, Inc., 287 F.3d 1062, 1074 (Fed. Cir. 2002). "[T]he role of a district court in construing claims is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims." American Piledriving Equipment, Inc. v. Geoquip, Inc., 637 F.3d 1324, 1331 (Fed. Cir. 2011). "[A] court must construe claims without considering the implications of covering a particular product or process."

8

United States District Court
Northern District of California

1   SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1340 (Fed. Cir. 2005).

2          On the other hand, "[t]o determine what claim scope is appropriate in the context of the

3   patents-in-suit," it is necessary to construe even "ordinary" terms if applying ordinary meaning

4   does not resolve the parties' dispute over claim scope. O2 Micro Int'l Ltd. v. Beyond Innovation

5   Tech. Co., Ltd., 521 F.3d 1351, 1361 (Fed. Cir. 2008).  Quoting Markman for the proposition that

6   "[t]he purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims

7   asserted to be infringed,'" the O2 Micro court held that a district court committed legal error by

8   finding that it was unnecessary to construe the term "only if," since by doing so the Court failed to

9   resolve the parties' "dispute regarding the proper scope of the claims."  521 F.3d at 1360-61

10  (quoting Markman, 52 F.3d at 976).  The Federal Circuit has also held that "where the

11  specification makes clear at various points that the claimed invention is narrower than the claim

12  language might imply, it is entirely permissible and proper to limit the claims." Alloc, Inc. v. ITC,

13  342 F.3d 1361, 1370 (Fed. Cir. 2003), cert. denied, 541 U.S. 1063 (2004).

14         The rules of NeoMagic Corp. and O2 Micro are in some conflict.  In order to know

15  whether it is resolving the parties' dispute over the scope of the term, the Court must often

16  understand the parties' views about the accused products.  When one party proposes that a term be

17  construed solely to rule out a particular factual situation that relates to its accused product, and the

18  other party asserts that no construction is necessary, the parties place the Court squarely at the

19  heart of that conflict.

20         To strike the right balance, the Court will proceed as follows.  The Court will only

21  understand the accused products as far as is necessary to understand the scope of the parties'

22  dispute.  The rule against construing claims with reference to the accused devices "does not forbid

23  awareness of the accused product or process to supply the parameters and scope of the

24  infringement analysis, including its claim construction component," and "does not forbid any

25  glimpse of the accused product or process during or before claim construction."  Wilson Sporting

26  Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322, 1331 (Fed. Cir. 2006).

27         The Court will not, however, use the accused product or the infringement contentions as

28  any kind of evidence in construing the claims.  The constructions in this order are judgments of

United States District Court
Northern District of California

1    claim scope, not infringement determinations.  If the Court agrees with a party that a term needs

2    no construction, the Court is holding as a matter of law that the limitations proposed by the other

3    party do not inhere in the term, and the parties will not be able to argue for such a limitation to a

4    jury.  The corollary is that, if the Court agrees with a party who has proposed a construction with

5    limitations, the Court is holding as a matter of law that those limitations do in fact inhere in the

6    term, except where clearly stated otherwise.  Hopefully, this should avoid the problem of the

7    Court repeatedly revisiting the same issues of claim scope.

8         Even though some of Defendants' proposals do not fit precisely as "constructions" of the

9    claim term, the Court must fulfill its obligation to establish the legal scope of the claim, using the

10   arguments and record before it.  The Court will go as far as it can to resolve these disputes without

11   going so far as to "obviate factual questions of infringement and validity," since the ultimate

12   question of whether a product actually infringes must be left to the domain of the finder of fact.

13        Finally, as a matter of case management and pretrial procedure, it is well established that

14   district courts have the authority only to construe those terms they deem likely to lead to a

15   dispositive outcome.  See, e.g., Microstrategy Inc. v. Bus. Objects Americas, 410 F. Supp. 2d 348,

16   355 (D. Del. 2006) aff'd, 238 F. App'x 605 (Fed. Cir. 2007) (construing only two claims of the

17   several the parties had submitted for construction).  In other words, district courts have not read

18   O2 Micro to prohibit them from limiting the number of terms they construe at any one pretrial

19   proceeding.  The Federal Circuit permits this practice, provided that the patentee is not

20   permanently deprived of the opportunity to later add claims that present unique issues as to

21   liability or damages.  See In re Katz Interactive Call Processing Patent Litigation, 639 F.3d 1303,

22   1310 (Fed. Cir. 2011); Stamps.com, Inc. v. Endicia, Inc., 437 Fed. Appx. 897, 902-03 (Fed. Cir.

23   2011) (unpublished).

24        In this case, the parties identified six terms whose construction is "likely to be most

25   significant to resolving the parties' dispute," pursuant to Patent Local Rule 4-2(b).  See Joint

26   Claim Construction and Prehearing Statement, ECF No. 579, at 2-5.  The Court proceeds to

27   construe only those terms, since the parties believe construction of such terms is likely to lead to a

28   dispositive outcome.  The Court will revisit the other submitted claim terms only if these

constructions do not lead to a dispositive outcome, the unconstrued terms pose unique issues of liability or damages, and it is necessary to avoid submitting the dispute over their scope to a jury.

### 1. "Modem communicatively coupled" (Claims 1, 12 and 13)

| Disputed Claim Terms | EON's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "a modem communicatively coupled to said local subscriber units and said local base station repeater cell" (claim 1)<br><br>"a modem communicatively coupled to said local subscriber units and said digital transmitter" (claim 12)<br><br>"a modem communicatively coupled to said at least one subscriber unit and said network hub switching center" (claim 13) | No construction is necessary, but if one is adopted: "a modem capable of communication with local subscriber units and said local base station repeater cell" | "a modem is situated between the local subscriber units, on one side, and the local base station repeater cell, on the other, and is connected to both for the purpose of communications between the two. ("The connection requirement.") When the two are communicating, the modem receives digital information from the subscriber units and it then modulates an analog carrier signal to encode that digital information for transmission to the local base station repeater cell. The modem also demodulates such a carrier signal to decode digital information transmitted from the local base station repeater cell and then transmits that digital information to the subscriber units." ("The modem requirement.") |

The first sentence of Defendants' proposed construction reflects the parties' dispute over whether "communicatively coupled" requires a connection or merely the capability of one (the "connection requirement"). In the second and third sentences of the construction, Defendants seek to apply this communicative coupling within the context of a specific modem technology ("the modem requirement"), a limitation that EON denies inheres in the term.

### a. The "connection requirement"

The term "coupled," within the context of the patent, requires a connection, not merely the capability of such a connection. Claim 1 recites that the modem is "communicatively coupled" to subscriber units and the local base station repeater cell "for transferring said multiplexed synchronously related digital data messages of variable lengths between said set of local subscriber units and said local base station repeater cell." '491 Patent, at 6:58-60. The

11

United States District Court
Northern District of California

1    specification discloses an embodiment in which the modem "communicates with subscriber unit

2    12 via an rf link 26," not one in which the modem is merely capable of being so linked.  Id., at

3    3:63.  EON provides no support for its contention that a person skilled in the art would understand

4    the term "communicatively coupled" to require only the capacity to connect.

5            This construction is reinforced by extrinsic evidence -- the everyday understanding of the

6    term "coupled."  In In re Translogic Tech, Inc., 504 F.3d 1249, 1258 (Fed. Cir. 2008), the Federal

7    Circuit noted that "'coupled to' . . . defines a connection," in contrast to the term "coupled to

8    receive," which the intrinsic evidence of that patent required only that the object be "capable of

9    receiving."  See also Digeo, Inc. v. Audible, Inc., Case No. C05-464JLR, 2006 WL 828861, at *4

10   (W.D. Wash. Mar. 27, 2006) ("the ordinary meaning of 'coupled' is 'connected,' and the adverb

11   'communicatively' suggests that the coupling is for the purpose of communication").  We would

12   not call two entities "coupled" simply because they are capable of communicating with each other,

13   and EON does not offer any evidence to suggest that a person skilled in the art would understand

14   the term "coupled" to require only the capability of connection.  Indeed, a great many electronic

15   machines (especially modems) are "capable of connection" to each other, if set up and configured

16   to communicate.  They cannot all fall within the scope of this claim.

17           Finjan, which EON cites, does not hold otherwise, since that case did not involve the term

18   "coupled."  626 F.3d at 1204-05.  And the other case EON cites, In re Translogic, as discussed

19   supra, actually supports Defendants' construction of the term "communicatively coupled."

20           The difficulty with Defendants' proposed construction is that the words "situated between"

21   and "on one side" imply a spatially or geographically specific type of connection that is not

22   reflected in the intrinsic record.  Especially given that the patent is entitled "wireless modem," it

23   would be inappropriate to limit the terms to apply only to any specific physical configuration.  At

24   the hearing, Defendants conceded that their intent was not to impose any such limitation but

25   merely "to make clear that the modem that is communicatively coupled . . . has to be part of the

26   network, and in order for the claim to make sense, there has to be a modem that is communicating

27   with two different things."  Transcript, at 19:1-6.  Therefore, the Court will not construe the term

28   to include Defendants' proposed spatial limitations.  This should also assuage any concerns EON

United States District Court
Northern District of California

1   has that Defendants' construction "suggests a physical connection."  See Opening Br., at 20:3.  It

2   does not.  See Resp. Claim Constr. Br., at 12:20-22 ("a coupling between the modem and local

3   subscriber units/local base station repeater cell . . . is not merely a physical connection, such as a

4   wire or cable").

5                    **b.        the "modem" language**

6           Defendants contend that the second and third sentences are necessary to resolve the

7   parties' dispute over whether the subscriber unit, by itself, can satisfy the requirement of being the

8   claimed modem.

9           Defendant's construction would seem to exclude the preferred embodiment, which does

10  not require a specific type of communication link but rather contemplates a connection through

11  "any means."  '491 Patent, at 3:56-62, 4:9-12.  A construction which excludes "a preferred . . .

12  embodiment in the specification . . . is rarely, if ever, correct."  Vitronics Corp. v. Conceptronic,

13  Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996).

14          Therefore, the Court does not adopt the second and third sentences of Defendants'

15  proposed construction.

16                   **c.        Conclusion**

17          The Court construes the term to require a connection, but does not construe the terms to

18  contain the spatial limitations, or either of the second and third sentences, proposed by

19  Defendants.  Therefore, the Court construes the term (as it appears in Claim 1) as follows: "a

20  modem is connected to the local subscriber units and the local base station repeater cell for the

21  purpose of communications between the two."  Corresponding versions of these terms in Claims

22  12 and 13 are listed in Part V, *infra*.

23          The Court's construction does not imply that the connection must occur in a circuit-

24  switched rather than packet-switched network.  See Order Granting Motion for Reconsideration,

25  2014 WL 793323, at *3-4, 2014 U.S. Dist. LEXIS 24781, 15-17.

26                   **2.        "Network hub switching center" (Claims 1, 13 and 17)**

27

28

| Disputed Claim Terms | EON's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|

| "network hub switching center" (Claims 1, 13, and 17) | No construction necessary | a centralized switching center that performs all of the switching functions needed for operation of the subscriber units in the group of cells that the switching center services |
|---|---|---|

The Texas Court found this term not to require construction. EON Corp. IP Holdings, LLC v. T-Mobile USA, Case No. 6-10-cv-0379-LED-JDL, 2012 WL 405492, at *19 (E.D. Tex. Feb. 8, 2012); EON Corp. IP Holdings, LLC, 741 F.Supp.2d 783, 812-13 (E.D. Tex. 2010). However, Defendants now urge that construction is necessary to resolve the parties' dispute over whether the scope of these claims encompasses a switching center that is not part of the network. It appears that this particular issue was not before the Texas Court when it declined to construe the term, and indeed the Texas Court stated that it declined to construe "without prejudice to [defendants] re-urging" at trial. EON Corp. IP Holdings, LLC v. T-Mobile USA, Inc., Case No. 6:10-cv-379-LED-JDL, ECF No. 1053 (Sep. 19, 2012). Given that a dispute remains between the parties about the scope of the claim, this Court finds that construction is necessary.

EON, relying on a treatise definition, previously submitted to the Texas Court that "[a] network hub switching center is a well understood structural element in hierarchical networks such as described in the inventions," and, in a footnote, cited the following treatise definition: "The Mobile Switching Centre (MSC) is linked to the BS [Base Station] . . . and performs all the switching functions needed for the operation of the [subscriber equipment] in the group of cells it services." EON's Opening Claim Construction Brief, EON Corp. IP Holdings, LLC v. Sensus USA, Inc., Case No. 6:09-cv-116-LED-JDL, ECF No. 157, at 12. Defendants draw their proposed construction from this submission by EON, and suggest, in essence, that EON should be judicially estopped from disputing that "network hub switching center" should be similarly construed in this case. EON's earlier submission was made in the context of whether the phrase connoted sufficient structure pursuant to § 112, ¶ 6. For that among other reasons, the Court is not persuaded that the high bar for judicial estoppel has been cleared in this case.[4] The Court will construe the term

---

[4] See SanDisk Corp. v. Memorex Products, Inc., 415 F.3d 1278, 1290-91 (Fed. Cir. 2005) (quoting New Hampshire v. Maine, 532 U.S. 742, 749 (2001)) (internal citations omitted) ("[i]n New Hampshire, the Supreme Court identified several factors guiding the decision to apply judicial estoppel: (1) the party's later position must be 'clearly inconsistent' with the earlier position; (2)

14

A49

1 based on the intrinsic evidence, rather than confine itself to a particular construction because of

2 briefs filed in previous litigation.

3       Turning to the language of the claim, EON objects to Defendants' proposed construction

4 for proposing two limitations it claims are not reflected in the record: that the switching center is

5 "centralized," and that the switching center "performs all the switching functions" for a particular

6 group of cells.

7       **a.    "centralized"**

8       If the Court were to construe the term to include the concept "centralized," a jury would be

9 likely to look for a specific type of geographic or spatial arrangement.  The intrinsic record does

10 not reflect the geographical specificity that the word "centralized" connotes.  For example,

11 Claim 2 of the '101 Patent recites a hub switching center that is "located remotely" from the base

12 station.  '101 Patent, at 11:56-58.  Defendants point to a portion of the specification of the

13 preferred embodiment disclosing that repeater stations in different geographic locations

14 communicate "under control of a data and switching control center 2."  Id., at 8-9.  But the fact

15 that the switching center *controls* the communication does not mean that the switching center

16 itself is "centralized."  Neither does the fact that EON once, in prosecuting a different patent,

17 distinguished a hub switch from a "distributed" switching system.  See Resp. Br., at 19:27-20:12.

18       Defendants argue that "[t]he term 'hub' suggests, if not requires, that the switching center

19 be 'centralized.'"  Resp. Br., at 19:25-26.  The term suggests that, but does not require it.  While

20 the dictionary definition of "hub" does imply centrality, this extrinsic evidence cannot override the

21 intrinsic evidence.  The switching center need not be "centralized" in the sense that a jury would

22 likely apply that term.

23       **b.    "all of the switching functions . . . for . . . the group of cells that the
24             switching center services"**

25       In its papers, EON's primary objection to this construction is that the switching center does

26 ────────────────────────────────────────────

27 the party must have succeeded in persuading a court to adopt the earlier position in the earlier
proceeding; and (3) the courts consider 'whether the party seeking to assert an inconsistent
position would derive an unfair advantage or impose an unfair detriment on the opposing party if

28 not estopped.' These factors, while not exclusive, must guide the court's application of its
equitable powers.")

United States District Court
Northern District of California

1    not perform *all* of the switching functions.  For example, claims 1 and 13 recite switching means

2    in subscriber units.  '491 Patent, at 6:21-22 & 8:39-40.  This point was conceded by Defendants at

3    the claim construction hearing.  Transcript of Proceedings, ECF No. 717, at 40:24-41:1, 44:25-

4    45:1.

5        But beyond this objection, EON provides little reason to oppose the concept that the

6    switching center relates to a particular group of cells that it services.  In its papers, EON states

7    only that "[t]he intrinsic record provides no support for any express relations between a particular

8    network hub switching center and particular cells.  Only claims 1 and 12 refer to cell sites, and

9    claim 12 does not even recite a network hub switching center."  Open. Br., at 5:3-5.  EON's brief

10   does not address features of the '101 Patent that provide the primary definitions of the switching

11   center.  For example, in the '101 Patent, Claim 1 recites a "hub switching center for routing

12   communications" from subscriber units "served by a base station."  '101 Patent, at 11:19-25.  This

13   very strongly indicates that the switching center serves those units that are part of the network.

14   "[W]here the specification makes clear at various points that the claimed invention is narrower

15   than the claim language might imply, it is entirely permissible and proper to limit the claims."

16   Alloc, Inc., 342 F.3d at 1370.  This is even truer where other claims themselves contradict the

17   scope a patentee seeks to apply to one of the terms in the patent.

18       At the hearing, EON raised the issue that there are embodiments in which the switching

19   center communicates only with a subscriber unit because there is no local base station cell in the

20   area.  See '491 Patent, at Fig. 3; 3:25-27; 5:1-5.  The Court does not agree that Defendants'

21   construction would be inconsistent with these embodiments.  It is still possible to construe the

22   switching center as an object the performs the switching functions for a particular group of units,

23   even if in one particular embodiment the switching center happens temporarily to not be connected

24   to those units.

25       In its papers, and at the hearing, EON seems to be maintaining that the scope of this term is

26   broad enough to encompass a switching center that serves any cells anywhere in the world, even

27   those completely unrelated to the network.  After carefully reviewing the intrinsic record, the

28   Court concludes that this is not the appropriate "understanding of what the inventors actually

United States District Court
Northern District of California

1    invented and intended to envelop with the claim."  Phillips, 415 F.3d at 1316.

2         The Court agrees with EON that it would be inappropriate to construe the term to include

3    the terms "centralized" and "all."  But the remainder of the construction accurately captures the

4    scope of the claim terms as reflected in the intrinsic record.  Therefore, the Court construes

5    "network hub switching center" as follows: "a switching center that performs the switching

6    functions needed for operation of the subscriber units in a group of cells that the switching center

7    services."

8            3.     The "Cell subdivision" Terms (Claims 1 and 12)

| Disputed Claim Terms | EON's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "a local remote receiver disposed within one of a plurality of cell subdivision sites partitioned from said local base station geographic area associated with said local base station repeater cell, said plurality of cell subdivision sites dispersed over said local base station geographic area, said local remote receiver being adapted to receive low power digital messages transmitted from said local subscriber units within range of said local remote receiver" (Claim 1) | "Remote receiver" means "a receiver remote from or collocated with a transmitter, base station, and/or repeater." | the transmission area of each radio transmitter of the local base station repeater cell is covered by a plurality of smaller response areas dispersed throughout, and each response area has a local remote receiver for receiving low power digital messages transmitted from local subscriber units within range of the local remote receiver |
| "a cell site divided into a plurality of subdivided zones, . . . a cell site communication system including a digital transmitter for communication with individual identified subscriber units geographically located within the/said cell site, a set of receive only digital receivers positioned in said subdivided zones, each said digital receiver being coupled by a transmission link with the/said cell site communication system to relay received digital communications" (Claim 12) | No construction necessary | the radio transmission area of the digital transmitter of a cell site communication system is covered by a plurality of smaller response areas, and each response area has a receive only digital receiver coupled by a transmission link to the cell site communication system to relay digital communications received from subscriber units |

28         The parties dispute whether the claims permit a remote receiver to be collocated with the

17

local base station repeater, and whether each subdivision site or zone requires its own remote receiver.

EON's primary objection to Defendants' constructions it that they "effectively require the receivers to be located apart from the transmitter, base station, or repeater."  Opening Br., at 14:1-2.  EON argues that this is inconsistent with the preferred embodiment, since Figure 1 of the '101 Patent discloses a local area repeater station that is collocated with the remote receiver.  But the claims themselves indicate that for each radio transmitter, there is a corresponding coverage area further subdivided by sites or zones that have remote receivers.

EON objects that Defendants' proposed construction limits the claims to "one-way communication," which is inconsistent with the "two-way arrow" disclosed in Fig. 1 of the '101 Patent and in its specification.  '101 Patent, at 10:13-15.  But the construction does not add that concept to the terms.  Defendants' proposed construction of Claim 12 uses the term "receive only," but only because the claim uses that term.  Defendants' proposed construction of Claim 1 does not use the term.

On the other hand, EON's construction of Claim 1 reads the term "remote" out of the term "remote receiver," by suggesting that the receiver can be both "remote from" *or* "collocated with" another device.  This paradoxical construction cannot be correct.

The Court therefore adopts Defendants' constructions of these terms.

### 4. "Receive only" (Claims 5 and 12)

| Disputed Claim Terms | EON's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "receive only" (claims 5 and 12) | No construction is necessary. | "receive only" refers to the communication of messages to and from the base station cells and the subscriber units. That is, the subscriber unit can only receive digital messages directly from the base station cell and not from the receiver units. The receiver unit's role with respect to those messages is simply to receive them from the low powered subscriber units and to pass them along to the base station cell. This does not however, forbid routine handshaking, error checking, and other control signals from being communicated between the receiver units and the subscriber units. |

18

**A53**

| Disputed Claim Terms | EON's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "receive only digital receivers" (claim 12) | "a receiver for receiving and relaying digital communications" | No construction necessary except with respect to the subphrase "receive only," but if the Court determines that this term needs a construction, that construction should be: "a device that receives and relays digital communications from a local subscriber unit to the local base station repeater cell but that does not relay digital communications from the local base station repeater cell to the local subscriber unit." |
| "receive only receiver unit" (claim 5) | "a receiver for receiving transmissions" | No construction necessary except with respect to the subphrase "receive only," but if the Court determines that this term needs a construction, that construction should be: "a device that receives and relays communications from a local subscriber unit to the local base station repeater cell but that does not relay communications from the local base station repeater cell to the local subscriber unit" |

The parties dispute whether a "receive only" digital receiver or receiver unit should be generally construed to include a receiver or unit that also transmits messages.   Construing a "receive only" receiver or unit to both receive and transmit would seem to excise an basic element of the claim term, in violation of the established rule that claims should be interpreted to give effect to all terms in the claim.  Bicon, Inc., 441 F.3d at 950.   The language of the claim terms indicates that, at least as a general rule, the "receive only" receiver and receiver unit only receive.[5] In Figure 2 of the specification, the arrow between the subscriber unit and the remote receiver points in only one direction.  The term "receive only" should be construed generally to exclude the possibility of transmitting messages.[6]

        Rules have exceptions, of course.  The fact that a "receive only" receiver *generally*

---

[5] Defendants also state that "the specification . . . provides that a 'receive only receiver unit' is a device that receives and relays communications from a local subscriber unit to the local base station repeater cell, but that does not relay communications from the local base station repeater cell to the local subscriber unit."  Resp. at 22:4-8.  The cited portion of the specification, '491 Patent at 1:28-41, does not state that "receive only receiver units" do not transmit data; it says that the "subscriber units" do not.

[6] The Court also notes that EON acknowledged a very similar construction in other cases.  Resp. at 21:13.  As discussed *supra*, this alone is not a sufficient reason for the Court to adopt this construction, but it has some persuasive force.

19

United States District Court
Northern District of California

1    receives messages does not mean that it cannot, in some limited way, transmit some types of

2    communications. This fact, too, is not disputed. The only dispute, then, is what kinds of

3    transmissions the "receive only" receivers and units are disclosed to transmit.

4          The only evidence EON submits to contradict Defendants' construction is a double-headed

5    arrow that appears at Figure 1 of a *sister* Patent, U.S. Patent No. 5,481,546. Given the overall

6    function of the receive-only units and receivers within the context of the '491 Patent, and the other

7    aspects of the specification showing only one-way communication, this bi-directional arrow in a

8    different patent cannot override the meaning of "receive only" to allow general two-way

9    communication. The Court agrees with Defendants that, to the extent this figure is relevant, the

10    bidirectional arrow within it reflects a limited exception to the normally "receive only" function of

11    the receivers and units. That exception is the one acknowledged in Defendants' construction: the

12    fact that a unit or receiver is "receive only" does not "forbid routine handshaking, error checking,

13    and other control signals from being communicated between the receiver units and the subscriber

14    units." In its Opening Brief, it was exactly these types of communications that EON pointed to in

15    arguing that "the specification (and knowledge of one skilled in the art) supplies reasons for two-

16    way communication." Opening Br., at 15:20-23. EON does not argue that the Patent claims any

17    exception other than this one, or that a person skilled in the art would understand the term "receive

18    only" to require any more than this.

19          Therefore, to resolve any dispute the parties have over the extent to which "receive only"

20    receivers and units transmit messages, the Court adopts Defendants' proposed construction of

21    "receive only." The Court also agrees that it is unnecessary to further construe the larger terms

22    "receive only digital receivers" and "receive only receiver unit."[7]

23          **5.**        **The Conditional "If" Terms (Claims 1, 5, 12, 13 and 17)**

24          Several claims include conditional language:

25

26

27

28

---

[7] EON also disputes whether it is appropriate to use the term "device" to refer to the receiver units and receivers. Defendants appear to concede that they do not seek to re-define the receivers and units in using this term, and that the term "receiver" (and, presumably, "receiver unit") can be substituted for the term "device" in their proposed constructions. Resp. at 21:21-26. The Court will adopt this amendment in its construction.

- "transferring . . . if said local subscriber units are unable to directly communicate with said local base station repeater cell" (claim 1)

- "if said subscriber unit is receiving a signal from said local base station repeater cell, performing the steps of . . ." (claim 5)

- "transferring . . . if said subscriber units are unable to communicate directly with said digital transmitter" (claim 12)

- "transferring . . . if said at least one subscriber unit is unable to communicate directly with a local base station repeater cell" (claim 13)

- "if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of . . ." (claim 17)

At first glance, it might not be apparent that the term "if" requires construction. But the O2 Micro court found that it was necessary to construe the term "only if" where failing to do so would leave the parties' dispute over claim scope unresolved. Here, the parties dispute whether the scope of the claim extends to the user voluntarily disabling one of the pathways, or to situations in which communication was impaired in the past.

Defendants note that their construction reflects limitations that the Texas Court determined that the claims contain. EON makes a few specific objections to Defendants' constructions on the grounds that they are inconsistent with the intrinsic record, and where the Court agrees that Defendants' constructions are unsupported by the record, it will not adopt those constructions. But EON's primary argument is not about specific deficiencies in Defendants' constructions. EON's primary objection is that the Court should not proceed to construe the claims at this point in this manner. As they put it, "Defendants present an army of Frankenstein constructions brought to life for the purpose of invading the province of the jury." Open. Br., at 1:12-13. EON notes particularly that many of the citations Defendants are citations to summary judgment orders and motions to strike, not claim construction orders.

The issues raised, however, are legal issues of claim scope, not specific factual determinations of infringement. Whether the determination of claim scope occurs at claim construction or (as it did in the Texas Court) in the first part of a summary judgment order, the

21

United States District Court
Northern District of California

1  determination is a legal one rather than a factual issue for a jury.  Therefore, where the Court

2  agrees that a proposed limitation is supported by the intrinsic record, it will construe the term to be

3  so limited.  As discussed more fully *supra*, the Court's determination about claim scope is not

4  based on the accused products.

5      Defendants have proposed one set of constructions for the terms as they appear in Claims

6  1, 12 & 13, and a separate set of constructions that apply to Claims 5 & 17.

7      **a.      The "transferring . . . if" terms in Claims 1, 12 & 13**

| Disputed Claim Terms | EON's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "transferring . . . if said local subscriber units are unable to directly communicate with said local base station repeater cell" (claim 1)<br><br>"transferring . . . if said subscriber units are unable to communicate directly with said digital transmitter" (claim 12)<br><br>"transferring . . . if said at least one subscriber unit is unable to communicate directly with a local base station repeater cell" (claim 13) | No construction necessary. | The system is binary, meaning the subscriber unit either communicates over Path A or Path B.  (*The "binary limitation".*)  The "transferring function" of the modem is conditioned on whether the subscriber unit is unable to directly communicate with the local base station repeater cell. (*The "conditional" limitation.*)  A user rendering the subscriber unit unable to communicate with the local base station repeater cell does not fall within the scope of the claim.  (*The "user intervention" limitation.*) |

21      Defendants' proposed construction contains three sentences, which the parties in their

22  papers call the "binary limitation" the "conditional limitation," and the "user intervention"

23  limitation.  The Court addresses each in turn.

24      **1)      The "binary" limitation**

25      The Texas Court held that "the claim language speaks for itself and the '491 patent

26  discloses a binary system where the subscriber unit either communicates over Path A or Path B."

27  EON Corp. IP Holdings, LLC v. T-Mobile USA, Inc., Case No. 6:10-CV-0379 LED-JDL, 2012

28  WL 405492, at *15 (E.D. Tex. Feb. 8, 2012) ("T-Mobile Claim Construction Order").  The Texas

United States District Court
Northern District of California

1    Court's use of the terms "Path A" and "Path B" language arose in the context of the particular

2    embodiment discussed in that order.  EON objects that it creates confusion to replace the actual

3    language of the claims with "Path A" and "Path B."

4         It should be simple enough to resolve this objection by simply rearticulating the limitation

5    by using the terms that actually appear in the claim.  For example, the Court could construe the

6    terms as follows:

7    - "The system is binary, meaning the subscriber units either communicate with the

8      modem or with the base station repeater cell."  (claim 1)

9    - "The system is binary, meaning the subscriber units either communicate with the

10     modem or with the digital transmitter."  (claim 12)

11   - "The system is binary, meaning the subscriber unit either communicates with the

12     modem or with the local base station repeater cell."  (claim 13)

13   EON also argues that the limitations inappropriately insert functional language into an

14   apparatus claim.  But "it is entirely proper to consider the functions of an invention in seeking to

15   determine the meaning of particular claim language."  ICU Med., Inc. v. Alaris Med. Sys., Inc.,

16   558 F.3d 1368, 1375 (Fed. Cir. 2009) (quoting Medrad Inc. v. MRI Devices Corp., 401 F.3d 1313,

17   1319 (Fed. Cir. 2005)).

18        In all, EON provides little reason to dispute that the claims recite a communication

19   pathway that is an either/or proposition.  This Court finds that the "binary" limitation is a justified

20   construction for the same reasons discussed by the Texas Court.  T-Mobile Claim Construction

21   Order, 2012 WL 405492, at *12-15.  The overall structure of the claims supports this construction,

22   as does the specification, which describes electronic switch 13 as selecting either one path or the

23   other, but not both.  '491 Patent, at Fig. 2.

24                    **2)      The "conditional" limitation**

25        On its face, the "conditional" limitation seems to be a redundant reinterpretation of the

26   word "if."  However, Defendants argue that construction is necessary because the parties dispute

27   whether the claim scope extends only to situations in which the condition of being unable to

28   communicate *exists*, or whether it also extends to situations in which the condition *ever* existed in

                                               23

                                              **A58**

1  the past. Open. Br. at 22 (emphasis added). At the claim construction hearing, EON's counsel did

2  indeed argue that the latter construction properly describes the claim's scope. See Transcript, at

3  58:14-60:7. Construction is necessary to resolve this dispute.

4      The claims only recite present-tense conditions. The claims state that transferring occurs

5  when subscriber units *are* unable to communicate directly; it does not say that transferring also

6  occurs when subscriber units *were* unable to communicate at any point in the past. EON's papers

7  do not dispute this; instead, they accuse Defendants of improper motive in arguing for the

8  limitation. Reply, at 3:19. EON also claims that "the concept of timing makes no sense in the

9  context of these apparatus claims," but does not explain why. In fact, the reverse is true – it makes

10  perfect sense to provide for transfer when a subscriber unit is otherwise unable to communicate

11  now, but it makes no sense to link the capability of transfer to an inability to communicate that

12  happened at an undefined time in the past. Therefore, the Court adopts the conditional limitation

13  proposed by Defendants.

                    **3)       The "user intervention" limitation**

14

15      The Court agrees that the user intervention limitation is connoted by the claim terms, and

16  is a natural deduction from the previous two limitations. Nothing in the claims, or in the

17  specification, contemplates a role for the user in affirmatively selecting one path over another. In

18  Am. Calcar, Inc. v. Am. Honda Motor Co., Inc., 651 F.3d 1318, 1339-40 (Fed. Cir. 2011), the

19  Federal Circuit construed a similar claim containing the terms "in response to" and "when." The

20  court found that the "language of the claim itself suggests that when a vehicle condition is

21  detected, the processing element identifies a provider automatically as opposed to requiring further

22  user interaction," and that "the specification fails to disclose any embodiment that requires any

23  type of user interaction prior to identification of a service provider." Id. For these reasons, the

24  Federal Circuit upheld the district court's decision to construe the term to contain a limitation that

25  there must not be any intervening action by the user between the two events. Id.

26      A similar logic applies here. The claims recite a simple "if, then" automatic switching.

27  They do not suggest an apparatus generally designed to switch at the user's whim. It may be

28  possible to practice the invention that way, but that is not what is claimed as novel. This Court

United States District Court
Northern District of California

1    joins the Texas Court in concluding that "a user solely choosing to turn off the cellular radio,

2    without more, cannot be the reason the subscriber unit is "unable to communicate."" <u>EON Corp.</u>

3    <u>IP Holdings, LLC v. T-Mobile USA, Inc.</u>, Case No. 6:10-cv-379-LED-JDL, ECF No. 1001 (E.D.

4    Tex. Sep. 7, 2012), at 4-5 ("T-Mobile Order on Motion to Strike").

5      The problem with Defendants' proposed construction is it is ambiguous as to what it

6    means for a user to "render[]" the subscriber unit unable to communicate.  If a user wanders into

7    an area where the signal strength is too weak for the unit to communicate, his action has might be

8    said to "render" the unit unable to communicate.  But Defendants do not dispute that this type of

9    situation falls within the scope of the claim; indeed, this situation is disclosed in the specification.

10   '491 Patent, at 3:26-32, 4:32-37.  The Texas Court also implied – although it did not hold, as EON

11   claims – that it would fall within the scope of the claim for a user to disable the unit's

12   communication in response to impaired communication.[8]

13     For these reasons, as well as for the reason that Defendant's proposed limitation as phrased

14   bears an uncomfortable resemblance to a specific noninfringement determination, the Court does

15   not adopt the "user intervention" limitation as it is proposed by Defendants.

16     A different version of the limitation, however, would resolve this dispute over claim scope.

17   Namely, Claim 1 could be construed as "transferring . . . if said local subscriber units are unable,

18   *for some reason other than the user intentionally disabling said unit,* to directly communicate with

19   said local base station repeater cell."  A user wandering into a basement is not intentionally

20   disabling the unit.  And a user could still respond to an inability to communicate without falling

21   outside of the scope of the claim.  But the user's own action cannot itself cause the condition, if

22   that condition does not otherwise obtain.

23   / / /

24

25   _____

     [8] EON claims that the Texas Court "held that 'turning off the cellular data satisfies the 'unable to

26   communicate' condition [if] communication had been and may be expected to still be impaired."
     Open. Br., at 23.  In the quotation EON cites, the Texas Court was characterizing the opinion of

27   Dr. Lyon, not adopting that opinion as its own.  <u>See</u> T-Mobile Order on Motion to Strike, at 4-5.
     The Texas Court held that "to the extent Dr. Lyon asserts that user choice alone satisfies the

28   condition of the system claims, such testimony should be stricken."  <u>Id.</u>, at 5.

**A60**

### 4) Conclusion

The Court agrees with the functional limitation, although the Court will adjust it to avoid specific references to "Path A" and "Path B." The Court also adopts the "conditional" limitation. The Court adopts a modified version of the "user intervention" limitation. Complete descriptions of the Court's constructions appear at Part V, *infra*.

**b.** **The conditional "if" limitations in Claims 5 & 17**

| Disputed Claim Terms | EON's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "if said subscriber unit is receiving a signal from said local base station repeater cell, performing the steps of . . ." (claims 5, 17)<br><br>"if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of . . . " (claims 5, 17) | No construction necessary. | The method steps listed after "if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of" are not performed if the subscriber unit is determined to be receiving a signal from said local base station repeater cell." (*"the binary limitation"*)<br><br>Using the modem to communicate without there first being a determination that there is no signal reception and using the modem to communicate regardless of whether there is signal reception does not fall within the scope of the claim. ("*the conditional limitation*") |

The two sentences of Defendants' proposed construction are referred to as the "binary limitation" and the "conditional limitation."

### 1) The "binary" limitation

Like the "binary" limitation discussed at III-B-5-a-1, *supra*, this proposed "binary" limitation is intended to reflect the Texas Court's determination that only one path may be used at a time. The Court agrees with the thrust of this construction for the same reasons discussed *supra*.

However, EON argues that by including the phrase "is determined to be," the construction could be read to require a system that is constantly re-determining whether or not a signal is being received. See Reply at 6:2-11. Nothing in the intrinsic record supports such a limitation.

Therefore, the Court adopts a modified version of the construction which eliminates the

United States District Court
Northern District of California

offending language: "the method steps listed after 'if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of' are not performed if the subscriber unit is receiving a signal from said local base station repeater cell."  This is essentially a restatement of the claim, but provides confirmation of the binary nature of the system.

### 2)  The "conditional" limitation

While this is phrased as a noninfringement determination, the Court will consider adopting it if it properly describes the scope of the claim.  If excised of its middle clause, the limitation would be unobjectionable:  "using the modem to communicate without there first being a determination that there is no signal reception . . . does not fall within the scope of the claim."  But by also stating that it falls outside the claim to "[use] the modem to communicate regardless of whether there is signal reception," this limitation too may imply that the only products that fall within the scope of the claim are those that constantly re-determine signal reception.  Such a construction is neither required by any previous court order nor compelled by the language of the claim.

The Court will adopt a version of this limitation without the middle statement as an interpretation of claim scope.

## IV.   CONCLUSION

For the foregoing reasons, the Court construes the disputed claim language as follows:

| Claim | Term | Construction |
|---|---|---|
| 1 | "network hub switching center" | "a switching center that performs the switching functions needed for operation of the subscriber units in a group of cells that the switching center services." |

| 1 | "a local remote receiver disposed within one of a plurality of cell subdivision sites partitioned from said local base station geographic area associated with said local base station repeater cell, said plurality of cell subdivision sites dispersed over said local base station geographic area, said local remote receiver being adapted to receive low power digital messages transmitted from said local subscriber units within range of said local remote receiver" | The transmission area of each radio transmitter of the local base station repeater cell is covered by a plurality of smaller response areas dispersed throughout, and each response area has a local remote receiver for receiving low power digital messages transmitted from local subscriber units within range of the local remote receiver |
|---|---|---|
| 1 | "a modem communicatively coupled to said local subscriber units and said local base station repeater cell" | "a modem is connected to the local subscriber units and the local base station repeater cell for the purpose of communications between the two." |
| 1 | "transferring . . . if said local subscriber units are unable to directly communicate with said local base station repeater cell" | "transferring . . . if said local subscriber units are unable, for some reason other than the user intentionally disabling said unit, to directly communicate with said local base station repeater cell." The system is binary, meaning the subscriber unit either directly communicates with the base station repeater cell or the modem. The "transferring function" of the modem is conditioned on whether the subscriber unit is unable to directly communicate with the local base station repeater cell. |
| 5 | "if said subscriber unit is receiving a signal from said local base station repeater cell, performing the steps of . . ."<br><br>"if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of . . . " | The method steps listed after 'if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of' are not performed if the subscriber unit is receiving a signal from said local base station repeater cell. Using the modem to communicate regardless of whether there is signal reception does not fall within the scope of the claim. |

**A63**

| 5 | "receive only" | "receive only" refers to the communication of messages to and from the base station cells and the subscriber units. That is, the subscriber unit can only receive digital messages directly from the base station cell and not from the receiver units. The receiver unit's role with respect to those messages is simply to receive them from the low powered subscriber units and to pass them along to the base station cell. This does not however, forbid routine handshaking, error checking, and other control signals from being communicated between the receiver units and the subscriber units. |
|---|---|---|
| 12 | "a cell site divided into a plurality of subdivided zones, . . . a cell site communication system including a digital transmitter for communication with individual identified subscriber units geographically located within the/said cell site, a set of receive only digital receivers positioned in said subdivided zones, each said digital receiver being coupled by a transmission link with the/said cell site communication system to relay received digital communications" | The radio transmission area of the digital transmitter of a cell site communication system is covered by a plurality of smaller response areas, and each response area has a receive only digital receiver coupled by a transmission link to the cell site communication system to relay digital communications received from subscriber units |
| 12 | "receive only" | "receive only" refers to the communication of messages to and from the base station cells and the subscriber units. That is, the subscriber unit can only receive digital messages directly from the base station cell and not from the receiver units. The receiver unit's role with respect to those messages is simply to receive them from the low powered subscriber units and to pass them along to the base station cell. This does not however, forbid routine handshaking, error checking, and other control signals from being communicated between the receiver units and the subscriber units. |
| 12 | "a modem communicatively coupled to said local subscriber units and said digital transmitter" | "a modem is connected to the local subscriber units and the digital transmitter for the purpose of communications between the two." |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| 12 | "transferring . . . if said subscriber units are unable to communicate directly with said digital transmitter" | "transferring . . . if said local subscriber units are unable, for some reason other than the user intentionally disabling said unit, to directly communicate with said digital transmitter." The system is binary, meaning the subscriber unit either communicates directly with the digital transmitter or the modem. The "transferring function" of the modem is conditioned on whether the subscriber unit is unable to directly communicate with the digital transmitter. |
| 13 | "network hub switching center" | "a switching center that performs the switching functions needed for operation of the subscriber units in a group of cells that the switching center services." |
| 13 | "a modem communicatively coupled to said at least one subscriber unit and said network hub switching center" | "a modem is connected to the local subscriber unit and the network hub switching center for the purpose of communications between the two." |
| 13 | "transferring . . . if said at least one subscriber unit is unable to communicate directly with a local base station repeater cell" | "transferring . . . if said local subscriber units are unable, for some reason other than the user intentionally disabling said unit, to directly communicate with said local base station repeater cell." The system is binary, meaning the subscriber unit either communicates directly with the local base station repeater cell or the modem. The "transferring function" of the modem is conditioned on whether the subscriber unit is unable to directly communicate with the local base station repeater cell. |
| 17 | "if said subscriber unit is receiving a signal from said local base station repeater cell, performing the steps of . . ." "if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of . . ." | The method steps listed after 'if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of' are not performed if the subscriber unit is receiving a signal from said local base station repeater cell. Using the modem to communicate regardless of whether there is signal reception does not fall within the scope of the claim. |

United States District Court
Northern District of California

30

| 17 | "network hub switching center" | "a switching center that performs the switching functions needed for operation of the subscriber units in a group of cells that the switching center services." |
|----|-------------------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------|

**IT IS SO ORDERED**.

Dated: March 5, 2014



JON S. TIGAR
United States District Judge

## CERTIFICATE OF SERVICE

I certify that on August 21, 2014, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system, which will send notification of such filing to all registered participants.

                       */s/  John L. Hendricks*

JOHN L. HENDRICKS
DANIEL SCARDINO
MATTHEW MURRELL
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-615-5792

TERESA M. SUMMERS
SUMMERS LAW GROUP LLC
300 New Jersey Ave., NW
Suite 900
Washington, DC 20001
202-664-0926

*Counsel for Plaintiff–Appellant*

August 21, 2014

## CERTIFICATE OF COMPLIANCE

This brief complies with the requirements of Federal Rule of Appellate Procedure 32 and Federal Circuit Rule 32:

1.  Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), this brief meets the type-volume limitation because it contains no more than 14,000 words. Specifically, it contains 13,878 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.  Pursuant to Federal Rules of Appellate Procedure 32(a)(5)(A) and 32(a)(6), this brief uses a proportionally spaced serif font of 14-point or larger in a plain, roman style. Specifically, it was written in Microsoft Word 2010 using 14-point Times New Roman.

*/s/ John L. Hendricks*

JOHN L. HENDRICKS
DANIEL SCARDINO
MATTHEW MURRELL
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-615-5792

TERESA M. SUMMERS
SUMMERS LAW GROUP LLC
300 New Jersey Ave., NW
Suite 900

Washington, DC 20001
202-664-0926

*Counsel for Plaintiff–Appellant*

August 21, 2014